———————————————

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

———————————————

### No. 09-15136

---

MARTHA RIVERA, et al.,

    Plaintiffs-Appellants,

    v.

NIBCO, INC., an Indiana corporation,

    Defendant-Appellee.

---

On Appeal From a Judgment of the United States District Court
for the Eastern District of California,
Hon. Oliver W. Wanger
D.C. No. CIV F-99-6443 OWW SMS

---

### APPELLANTS' BRIEF

Christopher Ho
Christina N. Chung
Carole Vigne
The LEGAL AID SOCIETY –
  EMPLOYMENT LAW CENTER
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848
Facsimile:  (415) 864-8199

William J. Smith
W.J. SMITH AND ASSOCIATES
2350 West Shaw Avenue, Suite 132
Fresno, CA  93711
Telephone:  (559) 432-0986
Facsimile: (559) 432-4871

**Counsel for Plaintiffs-Appellants**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................... iii

I.    INTRODUCTION ..................................................................1

II.   STATEMENT OF JURISDICTION .......................................2

III.  STATEMENT OF THE ISSUES .........................................2

IV.   STATEMENT OF THE CASE AND FACTS .......................2

     A.    Roxanne Garcia ....................................................7

     B.    Teresa Gomez ......................................................10

     C.    Adrian Lucatero ..................................................18

     D.    Despite The Presence Of Grounds For Identical
          Concerns, Caucasian Prospective Jurors Were Not
          Scrutinized On The Same Issues As The Struck
          Jurors ...................................................................20

          1.    Albert Veldstra .........................................21

          2.    Gary Stanford ...........................................21

          3.    Patricia Stockton ......................................23

          4.    Nancy Marchbanks ...................................24

          5.    Tina Lucas ................................................24

     E.    Nibco Questioned Hispanic Prospective Jurors About
          Their Attitudes On Workplace Languages Despite
          Responses Favorable To Nibco, While It Did Not
          Question Similar Caucasian Jurors ............................25

V.    THE STANDARD OF REVIEW .......................................27

**VI.    SUMMARY OF ARGUMENT** ...............................................................27

**VII.   ARGUMENT** ..........................................................................................28

    **A.    The Applicable Law** .................................................................28

    **B.    Because Nibco's Proffered Reasons For Its
           Peremptory Strikes Of The Three Hispanic Jurors
           Had No Support Whatever In The Record, They
           Provide Compelling Evidence Of Pretext** ...................................33

    **C.    Comparative Juror Analysis Reveals That Nibco
           Treated Hispanic Prospective Jurors Far Differently
           Than Their Caucasian Counterparts** ..........................................38

    **D.    The District Court Applied An Incorrect And
           Insufficiently Searching Legal Standard In Denying
           Appellants' *Batson* Motions** .........................................................42

    **E.    The Statistical Impact Of Nibco's Strikes Provides
           Further Indicia Of Impermissible Motive** .................................47

**VIII.  CONCLUSION** ........................................................................................49

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977) ............................................................ 30

*Avery v. Georgia*, 345 U.S. 559 (1953) ....................................... 28

*Batson v. Kentucky*, 476 U.S. 79 (1986)................................. *passim*

*Boyd v. Newland*, 467 F.3d 1139 (9th Cir. 2006).................................. 30, 31

*Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S 614 (1991). ................ 29

*Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008) ................. 30, 39, 41, 46

*Hernandez v. New York*, 500 U.S. 352 (1991) ................................ 29, 33, 47

*Johnson v. California*, 543 U.S. 162 (2005)........................................... 30, 47

*Kesser v. Cambra*, 465 F.3d 351 (9th Cir. 2006) ................................. *passim*

*Lewis v. Lewis*, 321 F.3d 824 (9th Cir. 2003).................................... 32, 33, 42

*McClain v. Prunty*, 217 F.3d 1209 (9th Cir. 2003) .......................... 31, 32, 37

*Miller-El v. Cockrell,* 537 U.S. 322 (2003)........................................... 29, 33

*Miller-El v. Dretke*, 545 U.S. 231 (2005)............................................. *passim*

*Mitleider v. Hall*, 391 F.3d 1039 (9th Cir. 2004) ......................................... 42

*Powers v. Ohio*, 499 U.S. 400 (1991)........................................................ 29

*Purkett v. Elem*, 514 U.S. 765 (1995)........................................................ 31

*Rodrigues v. Pacific Tel. & Tel. Co.,* 70 F.R.D. 414
    (N.D. Cal. 1976) ................................................................ 27

*Snyder v. Louisiana*, ___ U.S. ___, 128 S.Ct. 1203
    (2008)............................................................................. 29, 39, 42, 43

*Turner v. Marshall*, 121 F.3d 1248 (9th Cir. 1997)................................ 31, 48

*U.S. v. Alanis,* 335 F.3d 965 (9th Cir. 2003) .......................................... 42, 45

*U.S. v. Chinchilla,* 874 F.2d 695 (9th Cir. 1989)......................................... 32

*U.S. v. Cruz-Escoto*, 478 F.3d 1081 (9th Cir. 2007) ............................. 27, 30

*U.S. v. Esparza-Gonzalez,* 422 F.3d 897 (9th Cir. 2005). ........................... 26

*U.S. v. Vasquez-Lopez*, 22 F.3d 900 (9th Cir. 1994) ................................... 29

*Williams v. Runnels*, 432 F.3d 1102 (9th Cir. 2006) ............................. 33, 47

## CONSTITUTIONAL PROVISIONS

Equal Protection Clause............................................................................ 2, 49

## FEDERAL STATUTES AND REGULATIONS

Title VII of the Civil Rights Act of 1964,
    42 U.S.C. §§ 2000e *et seq.* ........................................................ 2, 3, 27

## STATE CASES

*Ex Parte Travis*, 776 So. 2d. 874 (Ala. 2000) ............................................. 40

## STATE STATUTES

California Fair Employment and Housing Act,
    Cal. Gov't Code §§ 12940 *et seq.* .................................................... 2, 3

## OTHER AUTHORITIES

http://en.wikipedia.org/wiki/Dias ................................................................ 27

Thernstrom, S, A. Orlov, and O. Handlin, <u>Harvard Encyclopedia</u>
    <u>of American Ethnic Groups</u> (Cambridge: Harvard University
    Press, 1980) ........................................................................................ 27

## I.     INTRODUCTION

By this appeal, plaintiffs-appellants Martha Rivera, *et al.* ("appellants") seek review of the district court's denial of their *Batson* challenges to the use by defendant-appellee Nibco, Inc. ("Nibco" or "appellee") of its peremptory strikes to remove three Hispanic prospective jurors from the jury panel in a case alleging national origin discrimination in employment against Hispanics and Asians.  Appellants submit that the district court erred, with respect to both fact and law, by upholding Nibco's strikes without engaging in the "sensitive analysis" of all of the relevant circumstances that *Batson* and its progeny have required when evaluating whether such strikes were impermissibly used for reasons of race.

As set forth below, and as is plainly borne out in the trial record, the district court failed to recognize multiple misrepresentations of fact made by Nibco in its attempt to justify its three peremptory strikes of Hispanic venirepersons as race-neutral – misrepresentations that would have been evident had the district court properly applied the law governing *Batson* challenges. The district court also failed to engage in a comparative juror analysis that would have revealed a disparate pattern in Nibco's treatment of jurors that was explicable only by racial considerations.  Taken together, these indicia of improper conduct would have demonstrated that Nibco's stated reasons for its

1

strikes were pretextual, and that those strikes were made for racial purposes in violation of *Batson* and the Equal Protection Clause.

## II.    STATEMENT OF JURISDICTION

Jurisdiction in this Court is proper under 28 U.S.C. § 1291.

## III.    STATEMENT OF THE ISSUES

Whether the district court clearly erred in denying appellants' motions, under *Batson v. Kentucky*, 476 U.S. 79 (1986), challenging appellee's use of three out of four peremptory strikes to remove Hispanic prospective jurors from the jury in a case alleging national origin discrimination against Hispanics and Asians in violation of Title VII of the Civil Rights Act of 1964 and the California Fair Employment and Housing Act.

## IV.    STATEMENT OF THE CASE AND FACTS

On October 1, 1999, appellants filed a complaint in the U.S. District Court for the Eastern District of California, alleging that they had been terminated by Nibco, their former employer, on the basis of their national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and the California Fair Employment and Housing Act, Cal. Gov't Code §§ 12940 *et seq.* ("FEHA").  Appellants, 23 Hispanic and Southeast Asian immigrant workers whose proficiency in English was limited, were laid off before all other employees at Nibco's manufacturing facility in Fresno,

2

California, because of their failure to pass a purportedly work-related examination that Nibco called the "Z-test." The "Z-test," however, was only given in English, and appellants were required to write their answers in English. Employees were given only two tries to pass the "Z-test," and Nibco set the passing score at 100%. The complaint alleged that Nibco's testing and layoff practice violated Title VII and the FEHA because it had an adverse impact on national origin minority groups, and was neither job-related nor consistent with business necessity. Among other things, the appellants alleged that their job duties, which they had successfully performed for years, were simple, routinized, and did not depend upon communication in English for their successful completion. Pages 873-886 to Appellants' Excerpts of Record ("EOR").

The parties filed their trial briefs on October 1, 2008, one week before the start of trial. In its brief, as it had done throughout the litigation, Nibco defended its use of the "Z-test," and its asserted need for English as "a common language," by contending that the speaking of languages other than English at its Fresno manufacturing facility had created inefficiency. At the outset of its brief, Nibco asserted:

> A poor communication network existed at the plant. About six languages were spoken on the plant floor . . . No common language existed in the plant. In fact, no common language often existed even

with departments or shifts.  Miscommunication, ineffective communication or no communication became frequent and significant problems.  Significant inefficiencies resulted from this situation. Managers and supervisors could not communicate readily with the workforce, and vice versa.  *While co-workers were used at times to interpret, this usage was fraught with many problems and created its own inefficiencies as workers were removed from their regular duties to perform those functions.*

Later in its brief, Nibco returned to this theme:

Moreover, the evidence will demonstrate that many limited English proficient workers, including some Plaintiffs, could not perform their duties without assistance from other employees with translation, interpretation, and performance of job duties that required English proficiency.  *NIBCO had a legitimate business interest in improving production efficiency by eliminating the need for other workers to interrupt the performance of their job duties to assist limited English proficient workers with what should be routine job tasks for the positions in question.*

Pages 852-867 EOR (emphasis added).

The trial began on October 8, 2008, and jury selection took place the same day.  A questionnaire, jointly created by the parties and the district court, was given to the venire to fill out, and all parties had the opportunity to review the completed questionnaires prior to voir dire.[1]  Out of a venire of 83 persons,

---

[1]     Among other things, the questionnaire asked the prospective jurors whether they or someone close to them had ever been fired or laid off from a job (Question 24); disciplined, treated unfairly or unlawfully, or otherwise been involved in a workplace dispute (Questions 26 and 34); and whether they believed English should be spoken in the workplace (Question 33), i.e. Jury Questionnaire of April Davis-Brannum, Pages 22-24 of Appendix.

Pages 6-15 of Appellant's Appendix, Judge's List, 21 were called to the jury box.  Pages 3-4 EOR, Voir Dire Transcript ("VDT") 3:13-4:22.

The district court conducted voir dire, excusing a number of the 21 prospective jurors for cause and replacing them from the venire.  Pages 17-187 EOR, VDT 17:21-186:12.  The district court then permitted the parties to conduct voir dire.  At this point, the composition of the jury box was 16 Caucasians and 5 Hispanics.  Page 187 EOR, VDT 186:13-16.  Nibco's counsel asked for a show of hands on several subjects, including whether any of the prospective jurors had been employed in a workplace where different languages were spoken, and elicited further responses from those who raised their hands. Pages 209-216 EOR, VDT 208:1-215:23.  Nibco's counsel then concluded his voir dire by asking three jurors, two of whom were Hispanic, individual questions regarding their attitudes about requiring English in the workplace and about job-related problems experienced by persons close to them.[2]  Pages 216-222 EOR, VDT 215:24-221:16.  After the parties had completed voir dire of those in the jury box, two additional persons were excused for cause and, after voir dire of several more venirepersons, were eventually replaced in the jury

---

[2]    The third of these prospective jurors, April Davis-Brannum, a Caucasian, had not provided any answer at all to Question 33 ("What are your views about whether English should be spoken in the workplace?"), the relevant question on the juror questionnaire.  Page 25 of Appendix.

box.[3]  Pages 222-245 EOR, VDT 221:17-244:8.  The district court permitted the

parties to inquire as of the two replacements, one Hispanic and one Caucasian.

Nibco's counsel only inquired of the Hispanic prospective juror, Teresa Gomez,

asking her about a workers' compensation claim she had filed, her employment

in a multilingual workplace, and job-related problems experienced by her sister.

Pages 247-248 EOR, VDT 246:8-248:18.

The parties then passed the peremptory strike sheet.  Page 249 EOR,

VDT 248:21.  After Nibco had exercised three out of four strikes to remove

Hispanic prospective jurors Roxanne Garcia, Teresa Gomez, and Adrian

---

[3]    At this point, as stated by the district court, the composition of the jury
box was 15 Caucasians and 6 Hispanics.  Page 254 EOR, VDT, 253:17-21.
These prospective jurors were, in order, Robert Paul, April Davis-Brannum,
Denise Langley, Judith Keegan, Sheri Spycher, Teresa Gomez, Albert Veldstra,
Gary Stanford, Tina Lucas, Susan Ginise, Audrey Hyer, Nancy Marchbanks,
Jennifer Tweedy, Adrian Lucatero, Lionel Dias, Steven Mello, Roxanne Garcia,
Jacqueline Geisler, David Nuñez, April Garza, and Patricia Stockton.  The
questionnaires of these 21 prospective jurors are at Pages 18-248 of the
Appendix.  From the record, it appears the district judge determined that aside
from the three prospective jurors challenged by Nibco – Garcia, Gomez, and
Lucatero, Page 252 EOR, VDT 251:20-21 -- prospective jurors Garza, Nuñez,
and Dias were also Hispanic.  *See, e.g.*, Page 260 EOR, VDT 259:4-5 ("Now, I
recognize that there are, besides those three, only three other Hispanic jurors
that are on the panel.").  The remaining 15 jurors were Caucasian.  Page 254
EOR, VDT 253:18-21.

Lucatero,[4] appellants requested a sidebar conference to challenge those three strikes as racially discriminatory under *Batson v. Kentucky*, 476 U.S. 79 (1986). Pages 246-250 EOR, VDT 248:22-249:7.

### A.    Roxanne Garcia

The first struck Hispanic prospective juror discussed at sidebar was Roxanne Garcia, who had been designated as "Prospective Juror Number Seventeen." Page 163 EOR, VDT 162:6-8. Nibco's counsel justified his strike of Ms. Garcia as follows:

> THE COURT: . . . All right. Mr. Hahesy, at this time, you have the opportunity to state the reasons for your challenge to each of the prospective jurors.
>
> MR. HAHESY: I can do that. We've got the notes on them here, Your Honor.
>
> THE COURT: Okay.
>
> MR. HAHESY: On each one of them. On Roxanne Garcia, she was involved with a – with her mother with a discrimination suit recently. She's very close to her mother. She talked to her mother about that case, you know, regularly. She has regular contact with her mother who was involved in a race discrimination. And, you know, the impression I developed from her is that there's still some lingering issues related to that case. She also, when she filled out the

---

[4]    During the sidebar, the district court noted that these three prospective jurors were Hispanic. Page 252 EOR, VDT, 251:20-21. Nibco had also struck Jennifer Tweedy, a Caucasian. Strike Sheet, Page 17 to Appendix

7

questionnaire, she didn't indicate, you know, that matter when she completed it and then when Your Honor asked her did she have any issues about discrimination or whatever, there was no question. And then I had to do the followup to get that issue out. And so, you know, those are the reasons why we decided to strike her.

Pages 250-251 EOR, VDT, 249:11-250:5.

The district court denied appellants' *Batson* challenge to Nibco's

strike of Ms. Garcia. Apart from opining that "she is one of the oddest

prospective jurors I've ever seen.", Page 255 EOR, VDT 254:13-14, the

district court adopted the arguments proffered by Nibco's counsel:

THE COURT: . . . As to Ms. Garcia, the evidence shows that she has a mother who is involved in a racial discrimination claim. . . .

She has indicated that, first when asked by me if there were any issues as to discrimination, whether there were any issues in her background. In effect, she did not disclose that there were any. She did not apparently – I haven't seen her questionnaire, but she did not disclose that in the questionnaire. The fact that somebody who she's very close to, her mother, is going through employment discrimination issues of race right now. . . .

And given the fact that she has issues that, within her closest family, that go to what is in dispute in this case, it is not irrational nor is there any evidence whatsoever of racial animus associated with the challenge.

To the contrary, it would appear that she would likely be a sympathetic juror and someone who would essentially be influenced and affected by what's going on in her life with respect to her mother.

And although the bar seems to have been raised by the Supreme Court requiring a credible justification for the exercise of a peremptory, the Court does find that as to Ms. Garcia, there is a

credible basis on all the grounds stated and therefore the Batson challenge is denied.

Pages 254-255 EOR, VDT 253:22-255:6.

The explanation Nibco proffered for its peremptory strike of Ms. Garcia, however, lacked any support in the record.  Contrary to Nibco's counsel's statement that Ms. Garcia was "involved . . . with her mother with a discrimination suit recently" – a representation adopted by the district court in affirming the strike – her mother *had never brought a lawsuit*, let alone was involved in one "right now."  Page 255 EOR, VDT 254:8-10.  Indeed, under previous voir dire questioning, Ms. Garcia had plainly stated that her mother had <u>not</u> taken any legal action:

> MR. HAHESY:  Did your mother end up filing any kind of claim or lawsuit?
>
> PROSPECTIVE JUROR NUMBER SEVENTEEN:  No, she just moved on.

Page 218 EOR, VDT 217:18-21.

Nibco's counsel further characterized the incidents regarding Ms. Garcia's mother as having taken place "recently," even though he had specifically asked Ms. Garcia when they had occurred, and she had responded, "*It would be three, four years ago*, but it lasted for a while."  Page 218 EOR, VDT, 217:1-4 (emphasis added).  The district court, for its part, appeared to

9

believe that the supposed lawsuit was in fact <u>ongoing</u>. Pages 254-256 EOR, VDT 253:22-23, 254:6-10, 254:23-255:1. In addition, Nibco's counsel also stated to the district court that Ms. Garcia was "very close" to her mother, although Ms. Garcia had never used the word "very." Page 217 EOR, VDT 216:13-25.

Finally, Nibco's counsel claimed that Ms. Garcia had failed to indicate on her questionnaire that anyone close to her had encountered mistreatment on the job, and that he therefore had "had to do the followup to get that issue out." Page 251 EOR, VDT 250:3-4. But in fact, Ms. Garcia had checked three boxes in response to Question 26 on her questionnaire, indicating that she or someone close to her had been "[d]isciplined at work," "[s]ubjected to any form of discrimination or harassment (age, gender, race, disability, etc.)," and "[w]itnessed discrimination, retaliation or harassment at work." Page 45 to Appendix. Nonetheless, and without reviewing Ms. Garcia's questionnaire, the district court accepted Nibco's counsel's statement as true ("She did not apparently – I haven't seen her questionnaire, but she did not disclose that in the questionnaire."). Page 255 EOR, VDT 254:6-8.

## B.    Teresa Gomez

The second struck Hispanic prospective juror discussed at sidebar was

10

Teresa Gomez, who had been designated as "Prospective Juror Number Six."[5]

Nibco's counsel justified his strike of Ms. Gomez as follows:

> MR. HAHESY:  Mr. Gomez.  I got to remember my notes on Mr. Gomez.
>
> MR. HO:  Ms. Gomez.
>
> MR. HAHESY:  Ms. Gomez.  She had the sister – similarly she had the sister who was recently involved in the matter.  She had had two cases, one of which she actually went to the – through the trial.  She was not able to have a verdict in that case.  Her sister was fired.  Her sister had an – you know, problems with discrimination.  Or not – she indicated she filed a workers' comp claim involving the employer.  And she has – if I can remember, my notes on all of Gomez.
>
> She also communicates, she worked in a workplace with many languages, never had a problem.  Loved Frito-Lay, loved working with all of the people of the different languages.  And so I felt there's enough ground there on potential bias right there.

Page 251 EOR, VDT 250:7-23.

Again adopting the arguments made by Nibco's counsel, the district court

denied appellants' *Batson* challenge to Nibco's strike of Ms. Gomez:

> THE COURT:  As to Mrs. Gomez, Mrs. Gomez is a person who has worked currently as a school bus driver, but formerly as a person in the Frito Lay environment where there were multilingual workers and multilingual supervisors.
>
> She stated that she has had her own workers compensation claim and did not go to trial, but it went through the system.  And she

---

[5]   Ms. Gomez was the fourth person to have been been designated as "Prospective Juror Number Six," owing to the excusals for cause of three previous prospective jurors occupying the same seat in the jury box.

had a lawyer.  She did say that she felt that she was fairly treated.  She also has a sister who is apparently involved in a termination case.

Essentially, quite frankly, the Court doesn't see this as having anything to do with race, but quite frankly, it's management versus labor and this is a person who's been making claims against her employer, herself, her sister's involved in a discrimination claim where claims are being made by her against an employer or a co-employee.

And I don't know what – to what extent this would be an influencing factor, but the fact that the supervisors are multilingual and she said that worked very well in the workplace at Frito Lay, there is certainly a rational basis to say that she could impose that experience where she said it was, in effect, a wonderful work environment.  It's a great company, she'd recommend it to anybody on this employment environment where, as I understand the evidence, Nibco didn't have multilingual supervisors and, in fact, imposed this English requirement rather than to speak different languages.  And that's going to be an issue in the case.  But it's a very good reason for somebody who's found that to be a wonderful context.

MR. HO:  If I may just say, Your Honor, there were multilingual supervisors at Nibco, but more to the point, I think there is so many multilingual workplaces in the state; if that were the criteria for exclusions, we would exclude half the possible jurors in the state.

THE COURT:  Well, it isn't the only criteria, it is one of three different criteria that have nothing to do, however, with – we're focused on race here.  And whether that was the motivation for the challenge.  In other words, as long as you have a facially valid reason that has some basis in logic and strategy, because we have eliminated the trial lawyer strategy and the individual experience and trial judgment of the trial lawyer to be able to select jurors and exercising a peremptory challenge, that the lawyer either feels would be favorable to the lawyer's case or unfavorable to the opponent's case.

On the totality of circumstances, I do believe there is a basis for the exercise of the peremptory as to Ms. Gomez and I'm going to deny the Batson challenge.

Pages 256-258 EOR, VDT 255:7-257:3.

The representations of Nibco's counsel regarding his reasons for striking Ms. Gomez – representations that were adopted by the district court -- however, had no basis in the record. First, Nibco's counsel suggested that Ms. Gomez would be unable to be an impartial juror because of a sister of hers who had been terminated from her job, and suggested that "discrimination" may have been involved. But his previous voir dire of Ms. Gomez, in pertinent part, revealed just the opposite:

MR. HAHESY: . . . Mrs. Gomez, on your questionnaire, you mentioned that you'd had – you have a sister that had a problem with an employer. Can you tell me about how long ago this occurred?

PROSPECTIVE JUROR NUMBER SIX: Three or four years ago. And it was her attendance. I think I put that down.

MR. HAHESY: Was – are you – is this a sister you're close to?

PROSPECTIVE JUROR NUMBER SIX: Yes.

MR. HAHESY: She – do you remember what actually happened to her with respect to her employment?

PROSPECTIVE JUROR NUMBER SIX: She called off too many times.

MR. HAHESY: And what happened?

13

PROSPECTIVE JUROR NUMBER SIX:  They let her go.

MR. HAHESY:  Was there anything about that experience that she told you about that she felt was unfair?

PROSPECTIVE JUROR NUMBER SIX:  No.  I don't think she should have called off.  It was her fault.

MR. HAHESY:  So you felt that she was – that it was her fault that she lost --

PROSPECTIVE JUROR NUMBER SIX:  It was her fault that she got fired, yes.

Pages 247-248 EOR, VDT 246:10-247:6.

If anything, therefore, Ms. Gomez's responses indicated that her sister's termination would <u>not</u> adversely affect her impartiality with respect to the issue of job loss.  To the contrary, Ms. Gomez had plainly stated she thought it was her sister's fault that she had lost her job, Page 248 EOR, VDT 247:1-6, indicating that she harbored no resentment toward her sister's employer. Moreover, Ms. Gomez's statement that her sister had lost her job because she had "called off too many times" made plain that <u>no</u> issue of discrimination had been involved.[6]

---

[6]  The district court compounded this misrepresentation by Nibco's counsel when it stated that Ms. Gomez's sister was <u>currently</u> involved in a discrimination <u>lawsuit</u>.  Page 256 EOR, VDT 255:14-15.  Nothing in the voir dire or Ms. Gomez's questionnaire, however, indicated that her sister had brought suit over her termination.

Secondly, the sidebar representations of Nibco's counsel concerning Ms. Gomez's former employment at Frito-Lay – that she had no problems there even though its employees spoke different languages, and that she "loved" working there because it was a multilingual workplace – had no support in the record of the voir dire.[7]  During the district court's voir dire, Ms. Gomez had stated in relevant part:

> THE COURT:  All right.  Any issues in your workplace, the school bus drivers ever go on strike or –
>
> PROSPECTIVE JUROR NUMBER SIX:  Well, I just started that because I worked for Frito Lay.  And Frito Lay is very diverse.  There's all different kinds of races that work together.  And they all speak different languages.
>
> THE COURT:  They speak different languages.
>
> PROSPECTIVE JUROR NUMBER SIX:  Yes.

---

[7]  Appellants take issue with any assumption -- even if it were assumed *arguendo* to be accurate -- that Nibco's characterization of Ms. Gomez's comments about the linguistic diversity of the Frito-Lay workplace indicated any pro-plaintiff bias that disqualified her from serving on the jury. Presumably, no prospective jurors would have been struck on the ground that they were happy in workplaces where their co-workers happened to speak only English; it is unclear why merely enjoying working in a workforce where the employees happened to speak languages other than English would be viewed as possibly giving rise to impermissible bias when the former situation would not. Moreover, the mere fact that Ms. Gomez allegedly "loved" (a term she never used) working in a multilingual workplace indicates neither that she loved Frito Lay <u>because</u> of the different languages spoken there, nor that such an attitude would have rendered her incapable of being impartial regarding a dispute that had arisen in an entirely different workplace.

THE COURT:  And how do they get along in the workplace?

PROSPECTIVE JUROR NUMBER SIX:  I never had any problems with anybody.

THE COURT:  All right.  Do the supervisors speak different languages or do they speak English?

PROSPECTIVE JUROR NUMBER SIX:  They spoke different languages also.

Pages 243-244 EOR, VDT 242:18-243:8.

Nothing in the district court's colloquy with Ms. Gomez supported any suggestion that the Frito-Lay workplace was problem-free -- only that she was able to "get along" with her co-workers there.  Nor did anything suggest that Ms. Gomez "loved working with all of the people of the different languages," as Nibco's counsel claimed, let alone that she "loved" working there <u>because</u> her co-workers spoke different languages.  Likewise, on his voir dire, Nibco's counsel had also elicited nothing from Ms. Gomez to support his later characterization of her as someone who "loved" Frito Lay because of its multilingual workforce:

MR. HAHESY:  Now, you also mentioned that either you or someone close to you had been involved in bringing a formal grievance, or claim or lawsuit against an employer.

PROSPECTIVE JUROR NUMBER SIX:  That was my workman's comp case.

16

MR. HAHESY:  That was your workers' comp claim.

PROSPECTIVE JUROR NUMBER SIX:  Yes.

MR. HAHESY:  And about how long ago was that?

PROSPECTIVE JUROR NUMBER SIX:  2005.

MR. HAHESY:  And did you continue to be employed by Frito Lay after that case?

PROSPECTIVE JUROR NUMBER SIX:  No.

MR. HAHESY:  Did you – why did your employment with Frito Lay end?

PROSPECTIVE JUROR NUMBER SIX:  The job was physically demanding and I – I couldn't perform that job any longer, so I decided to not to continue working with them.

MR. HAHESY:  So other than the workers' comp claim against Frito Lay, did you bring any other type of claim or grievance against –

PROSPECTIVE JUROR NUMBER SIX:  No.  And I felt that I was, you know, dealt with fair.  I mean, I don't have any grievance against Frito Lay.  And if I had to recommend them for somebody to go work with them, I'd say they're a great company to work for.  I have no grievances with them.  I thought I was dealt with fairly.

Pages 248-249 EOR, VDT 247:7-248:7.

In her colloquy with Nibco's counsel, therefore, Ms. Gomez had stated

only that Frito-Lay was "a great company to work for," that "I don't have any

grievance against Frito Lay," and that she "thought I was dealt with fairly."

Nothing suggests that her positive attitudes about Frito Lay were linked to its

17

workers' use of languages other than English; if anything, those attitudes appeared to relate in substantial part to Frito-Lay's handling of her workers' compensation claim.[8]

### C.    Adrian Lucatero

The third struck Hispanic prospective juror discussed at sidebar was Adrian Lucatero, who had been designated as "Prospective Juror Number Fourteen." Page 154 EOR, VDT 153:20-22. Nibco's counsel justified his strike of Mr. Lucatero as follows:

> MR. HAHESY:  And then Lucatero was – his father was very recently laid off.  You know, he indicated that he was not, you know, frankly, I thought comfortable sitting as the juror.  You know, he had indicated that, you know, the experience of his father getting laid off was something that bothered him and he was concerned about that.  And then in his questionnaire, he indicated that it was a relatively recent layoff.  And so given the fact that this case involved a layoff.

---

[8]    This is echoed in Ms. Gomez's colloquy with the district court. *See, e.g.*, Pages 242-243 EOR, VDT at 241:7-242:8 ("THE COURT:  . . . How about other experience with the court system?  PROSPECTIVE JUROR NUMBER SIX:  I've gone through workman's comp case.  [. . .]  THE COURT:  And how did that resolve?  PROSPECTIVE JUROR NUMBER SIX:  It went well.  I got my medical benefits paid and everything.  [. . .]  THE COURT:  All right.  And did you actually go to a hearing or was it resolved by agreement?  PROSPECTIVE JUROR NUMBER SIX:  It was resolved.  I didn't --  THE COURT:  You didn't have to go to a hearing?  PROSPECTIVE JUROR NUMBER SIX:  No.  [. . .]  THE COURT:  All right.  So would your evaluation of the process be that it was fair?  PROSPECTIVE JUROR NUMBER SIX:  Yes.  THE COURT:  And you're satisfied?  PROSPECTIVE JUROR NUMBER SIX:  Yes.").

Page 252 EOR, VDT 251:2-9. Later in the sidebar, Nibco's counsel twice repeated his earlier representation that Mr. Lucatero's father had been "recently" laid off. Pages 258-259 EOR, VDT 257:22, 258:14-17. He moreover stated, three separate times, that Mr. Lucatero currently lived with his father. Page 258 EOR, VDT 257:10, 257:15-16, 257:21-22.

Initially, the district court appeared inclined to grant appellants' *Batson* motion, observing, "As to Mr. Lucatero, the only thing we have on him that I can see is that his father was recently laid off. . . . I will tell you that I don't really have enough of a basis. Mr. Lucatero seems to be a fairly straightforward fellow. If that's the only reason, I don't think that his father's laid off is enough." Page 258 EOR, VDT 257:4-14. Moreover, the district court pointed out to Nibco's counsel that "[t]he problem is you didn't ask whether his father was suffering or whether he's been upset by it, whether there are any hard feelings or difficulties. Whether he thought it was fair or unfair." Pages 258-259 EOR, VDT 257:23-258:1.

Ultimately, however, the district court reversed course and upheld Nibco's strike of Mr. Lucatero:

> THE COURT: All right. I'm going to find that the facts are sufficiently analogous. In other words, a layoff because of a reduction in work and persons being out of work where the juror lives with his father. And that exact circumstance is being experienced.

There's certainly nothing racially charged or racially motivated against that and that's what Batson seeks to prevent. It doesn't seek to prevent the legitimate exercise of peremptory challenge for strategic reasons by a trial lawyer. Therefore I'm going to deny the Batson challenge on that.

Pages 259-260 EOR, VDT 258:18-259:3.

Importantly, in his juror questionnaire, Mr. Lucatero had written only, "My father got laid off because of no hours." Page 143 of Appendix. And despite his asserted concerns about Mr. Lucatero, Nibco's counsel had not asked him <u>any</u> questions on voir dire.[9] Nor had the district court's brief questioning of Mr. Lucatero elicited anything about those subjects. Indeed, Mr. Lucatero had responded affirmatively when the district court asked him, "[C]ould you hear this kind of a case with an open mind?" Pages 154-155 EOR, VDT 153:21-154:25. Indeed, there was no basis at all in the voir dire of Mr. Lucatero, or in his questionnaire, to establish either when his father was laid off -- let alone whether that layoff was "recent" -- or if he actually did live with his parents. Nor did Mr. Lucatero give any indication that he would have been less than comfortable sitting as a juror, or that his father's layoff had

---

[9]    As with Ms. Garcia and Ms. Gomez, appellants' counsel asked Mr. Lucatero no questions on voir dire.

bothered him or would have biased him against Nibco. Instead, he stated just the opposite.[10]

By the end of the sidebar, therefore the district court had denied appellants' *Batson* motions as to each of the three Hispanic jurors struck by Nibco.

### D.      Despite The Presence Of Grounds For Identical Concerns, Caucasian Prospective Jurors Were Not Scrutinized On The Same Issues As The Struck Jurors

As seen above, Nibco struck Hispanic prospective jurors Garcia, Gomez, and Lucatero on the proffered bases that their closeness to persons who had suffered adverse employment actions, or their attitudes about the speaking of languages other than English in the workplace, raised questions about their ability to be impartial jurors in the case. Nibco, however, neither questioned nor challenged Caucasian jurors whose questionnaires or voir dire statements raised similar concerns.

### 1.      Albert Veldstra

Prospective juror Albert Veldstra, who was Caucasian, indicated on his questionnaire that he had been laid off from a job 40 years ago (Question 24),

---

[10]  "THE COURT:  Any reason you'd be unable to serve on our jury? "PROSPECTIVE JUROR NUMBER FOURTEEN:  No.  THE COURT:  Thank you very much, Mr. Lucatero."  Page 155 EOR, VDT 154:22-25.

and that he or someone close to him had been disciplined at work (Questions 26 and 34). Pages 242-244 of Appendix. Nibco's counsel, however, did not follow up on either of those answers. Moreover, when Nibco's counsel asked the prospective jury members for a show of hands concerning their attitudes on languages in the workplace, Mr. Veldstra volunteered that as a police officer, "we dealt with people from all over the world. And a lot of times they didn't speak English and you improvised." When asked by Nibco's counsel to describe his "experiences with the improvising," Mr. Veldstra responded, "Well, a lot of the times less than satisfactory. But you do what you need to do to adapt and overcome." Page 212 EOR, VDT 211:1-10. Nibco did not challenge Mr. Veldstra, and he was seated on the jury.

### 2. Gary Stanford

In his answer to Question 24 on the juror questionnaire, Caucasian prospective juror Gary Stanford wrote, "My wife was called a 'poor performer' after 19-1/2 years of dedicated service." Page 209 of Appendix. He also indicated, in response to Question 26, that that he or someone close to him had been disciplined, discriminated against or harassed, and treated unfairly at work, and had been forced to leave a job for those reasons. Page 210 of Appendix. And in response to Question 34, Mr. Stanford wrote that he himself had been disciplined at work. Page 211 of Appendix. On voir dire by the

22

district court, Mr. Stanford spoke of his wife's "bitterness" over her termination -- and, in fact, indicated that she was currently considering bringing suit: "There's a possibility it may turn into a claim.  There's a possibility it may turn into more than just one single claim."[11]  Page 118 EOR, VDT 117:11-13. Nibco's counsel, however, did not follow up with Mr. Stanford on those issues. Nor did Nibco challenge him.[12]

### 3.    Patricia Stockton

In response to Question 24 on the questionnaire, Caucasian prospective juror Patricia Stockton answered that she had a brother who was fired from his job, and that she or someone close to her had been "wrongfully terminated." Pages 220-221 of Appendix.  Nibco's counsel, however, did not follow up with Ms. Stockton on those issues, even though neither the district court nor appellants' counsel had done so.  Nor did Nibco challenge her.[13]

---

[11]  Mr. Stanford also stated that he had filed a personal injury lawsuit in the past, that "[i]t went all the way to a court date to appear," and that it settled "[p]retty much" "[o]n the courthouse steps."  Page 120 EOR, VDT 119:8-13. Nibco's counsel, however, did not follow up on this subject, despite the potential for pro-plaintiff bias.

[12]  Appellants exercised one of their peremptory challenges to excuse Mr. Stanford.

[13]  Ms. Stockton was ultimately not seated on the jury because ten jurors had been agreed upon and seated before her name was reached.

### 4.  Nancy Marchbanks

On her questionnaire, Caucasian prospective juror Nancy Marchbanks stated that she or someone close to her had been disciplined and had witnessed "discrimination, retaliation or harassment" at work.  Page 155 of Appendix. However, neither the parties nor the district court inquired of her about that subject.  And in response to Question 34, Ms. Marchbanks also indicated that she herself had been disciplined at work.  Page 156 of Appendix.  On voir dire by the district court, she elaborated that "[i]n the 70s I had a letter put in my file."  But despite those two potential causes for concern, Nibco neither questioned nor challenged Ms. Marchbanks, and she was seated on the jury.

### 5.  Tina Lucas

In response to Question 33 on her questionnaire, Caucasian prospective juror Tina Lucas wrote, "I think English should be spoken at a workplace, but if you can help someone translate thats [sic] great."  Page 134 of Appendix. When Nibco's counsel asked the prospective jury members for a show of hands concerning their attitudes on languages in the workplace, Ms. Lucas volunteered that as a United Airlines flight attendant, her co-workers had served as interpreters:  "[O]ur main focus was English.  But we had others who spoke other languages who translated on the aircraft.  But we had to read and write English."  Page 211 EOR, VDT 210:22-25.  But just as with prospective juror

24

Albert Veldstra, Nibco's counsel did not follow up with Ms. Lucas concerning her attitudes about workplace interpretation, even though neither the district court nor appellants' counsel had questioned her on that topic.  Nor did Nibco challenge Ms. Lucas, and she was seated on the jury.

### E.   Nibco Questioned Hispanic Prospective Jurors About Their Attitudes On Workplace Languages Despite Responses Favorable to Nibco, While It Did Not Question Similar Caucasian Jurors

Finally, Nibco's counsel singled out Hispanic prospective jurors Garcia and Gomez to ask them about their opinions concerning the speaking of languages other than English in the workplace.  This, however, was despite the fact that their responses to Question 33 on the juror questionnaire ("What are your views about whether English should be spoken in the workplace?") were favorable to the defense.  Ms. Garcia had written, "Sure."  Page 46 of Appendix.  In spite of this unequivocal response, however, Nibco's counsel nevertheless asked her for her views on the matter.  Pages 219-220 EOR, VDT 218:22-219:7.  The same is true of Hispanic prospective juror Gomez, who had written "You should." to the same question, Page 90 of Appendix, but who was still challenged by Nibco at the sidebar on the stated basis of that issue.

Numerous Caucasian prospective jurors who had similar answers, however, were not similarly followed up with.[14]  Strikingly, Caucasian prospective juror Geisler even indicated in response to Question 46 that she thought that a requirement that she be proficient in English at her job was "unfair."  Pages 82-83 of Appendix.  Nibco's counsel, however, did not follow up with her on that matter.

After the sidebar and the denial of appellants' *Batson* motions, Nibco chose not to exercise its fifth peremptory strike.[15]  A ten-person jury, comprised

---

[14]  *See, e.g.,* responses to Question 33 on questionnaires completed by prospective jurors Geisler, Page 79 of Appendix; Ginise, Page 68 of Appendix; Hyer, Page 101 of Appendix; Langley, Page 123 of Appendix; Marchbanks, Page 156 of Appendix; Mello, Page 167 of Appendix; Paul, Page 189 of Appendix; Spycher, Page 200 of Appendix; Stanford, Page 211 of Appendix; Stockton, Page 222 of Appendix; and Tweedy, Page 232 of Appendix.  As noted earlier, Caucasian prospective juror Davis-Brannum had written no answer at all to Question 33, thus explaining Nibco's inquiry of her on the subject.  Page 24 of Appendix.

[15]  Had Nibco used its fifth peremptory strike, another Hispanic juror, April Garza, would have been the next to be seated, as she was "Prospective Juror Number Twenty," Page 173 EOR, VDT 172:22-24, and nine strikes had already been used to remove lower-numbered prospective jurors 3 (Langley), 4 (Keegan), 6 (Gomez), 8 (Stanford), 11 (Hyer), 13 (Tweedy), 14 (Lucatero), 17 (Garcia), and 18 (Geisler).  Pages 264-26 EOR, ECRO 1:19-2:2; Strike Sheet; Page 17 of Appendix; Pages 1-5 of Appendix, Koonan Declaration, ¶9.  This Circuit has held that a prosecutor's <u>waiver</u> of a peremptory strike may form the basis of a *Batson* violation.  *U.S. v. Esparza-Gonzalez*, 422 F.3d 897, 904 (9th Cir. 2005).  As such, this Court may consider Nibco's waiver of its fifth strike as evidence of racial purpose.

of eight Caucasian jurors[16] and two Hispanic jurors,[17] was sworn and seated.

Page 265 EOR, ECRO Transcript ("ECRO") 2:4-11.  On November 26, 2008,

the jury returned a verdict against all 23 appellants.  Special Verdicts of Trial

Jury, Pages 838-849 EOR.  This appeal ensued.

## V.    THE STANDARD OF REVIEW

Although a district court's findings regarding purposeful discrimination

in jury selection are entitled to "great deference," they will be set aside upon a

showing of clear error.  *U.S. v. Cruz-Escoto*, 478 F.3d 1081, 1085 (9th Cir.

2007).

## VI.    SUMMARY OF ARGUMENT

The district clearly erred in denying appellants' *Batson* objections to

---

[16]  Jurors Paul, Davis-Brannum, Spycher, Veldstra, Lucas, Ginise, Marchbanks, and Mello were found by the district court to be Caucasian.  See n.3 *supra*.

[17]  Jurors Dias and Nuñez were evidently found by the district court to be Hispanic.  See n.3.  However, the spelling of Mr. Dias's surname indicates that he was of Portuguese, not Hispanic, national origin.  *See, e.g.,* S. Thernstrom, A. Orlov, and O. Handlin, Harvard Encyclopedia of American Ethnic Groups (Cambridge: Harvard University Press, 1980), at 815 (discussing Portuguese-American immigrants who retained their traditional surnames, including "Dias"); http://en.wikipedia.org/wiki/Dias ("Dias" a common surname in the Portuguese language).  The term "Hispanic" does not include persons of Portuguese ancestry.  *See, e.g., Rodrigues v. Pacific Tel. & Tel. Co.,* 70 F.R.D. 414, 417 (N.D. Cal. 1976) ("Portuguese Americans are not to be considered to be 'Spanish-surnamed' or 'Hispanic' for the purposes of filing statistical reports required by Title VII").

Nibco's peremptory strikes of the three Hispanic prospective jurors.  First, at sidebar, Nibco's counsel made numerous misrepresentations of fact concerning the three Hispanic jurors that had no support in either the record of the voir dire or in the juror questionnaires, but served to support his strikes.  Second, the disparate pattern of questioning engaged in by Nibco's counsel, and his subsequent strikes, are best explained not by reference to Nibco's stated race-neutral concerns about the subject matter of the questions, but instead by an impermissible focus on the race of the prospective jurors.  These factors compel a finding of pretext.

## VII.  ARGUMENT

### A.    The Applicable Law

It has long been recognized that "peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'"  *Batson v. Kentucky*, 476 U.S. 79, 96 (1986), citing *Avery v. Georgia*, 345 U.S. 559, 562 (1953).  Under *Batson*, the courts use a three-step process to determine whether a peremptory challenge was impermissibly based on race:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race [; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the

parties' submissions, the trial court must determine whether the
defendant has shown purposeful discrimination.

*Miller-El v. Dretke*, 545 U.S. 231, 277 (2005) ("*Miller-El*") (Thomas, J.,

dissenting), quoting *Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003).  *Batson*

has been extended from the criminal context to apply to civil jury selection,[18] to

cover jury selection discrimination on the basis of ethnicity as well as race,[19]

and to apply to the exclusion of jurors of a race other than that of the opponent

of the strike.[20]  *Batson* and its progeny establish that the harm of discrimination

in jury selection is so serious that "the Constitution forbids striking even a

single prospective juror for a discriminatory purpose."  *U.S. v. Vasquez-Lopez*,

22 F.3d 900, 902 (9th Cir. 1994), cited in *Snyder v. Louisiana*, ___ U.S. ___,

128 S.Ct. 1203, 1208 (2008).

Once a prima facie case of a *Batson* violation has been made out,[21] "the

burden shifts to [the proponent of the strike] to come forward with a neutral

---

[18]  *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S 614 (1991).

[19]  *Hernandez v. New York*, 500 U.S. 352 (1991) (use of peremptory
challenges to strike Hispanic jurors).

[20]  *Powers v. Ohio*, 499 U.S. 400 (1991).

[21]  "Once a prosecutor has offered a race-neutral explanation for the
peremptory challenges and the trial court has ruled on the ultimate question of
intentional discrimination, the preliminary issue of whether the defendant has
made a prima facie showing becomes moot."  *Hernandez*, 500 U.S. at 359.  *See
also Kesser v. Cambra*, 465 F.3d 351, 381 (9th Cir. 2006) (quoting *Hernandez*);

explanation" for the strike. *Batson*, 476 U.S. at 97. This explanation must be "clear and reasonably specific." *Id*. at 98 n.20. In assessing the sufficiency of that explanation, the district court must do more than engage in "a mere exercise in thinking up any rational basis." *Miller-El*, 545 U.S. at 252. Instead, it "must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Batson*, 476 U.S. at 93, quoting *Arlington Heights v. Metropolitan Housing Development Corp*., 429 U.S. 252, 266 (1977). This includes "'the totality of the relevant facts' about a prosecutor's conduct.", *Miller-El*, 545 U.S. at 239 (citing *Batson*), and "any other relevant circumstances." *Johnson v. California*, 543 U.S. 162, 169 (2005).

Notably, this "sensitive inquiry" includes "a comparative analysis of similarly situated jurors". *Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008). Such a comparative analysis is required even when it was not requested or attempted in the trial court. *Kesser v. Cambra*, 465 F.3d 351, 361 (9th Cir. 2006) (citing *Miller-El*); *see also Boyd v. Newland*, 467 F.3d 1139, 1148-49 (9th Cir. 2006) (comparative juror analysis should be used on appeal even

---

*Cruz-Escoto*, 476 F.3d at 1089. Because the district court asked Nibco's counsel to explain his challenges and subsequently ruled on appellants' *Batson* objections to those challenges, this brief need not analyze *Batson*'s application to the prima facie stage in this case.

where the trial court did not do so.)  "Comparative juror analysis refers . . . to an examination of a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group."  *Boyd*, 467 F.3d at 1145 (citing *Miller-El*).  In this regard, the Supreme Court has held that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination."  *Miller-El*, 545 U.S. at 241; *see also McClain v. Prunty*, 217 F.3d 1209, 1221 (9th Cir. 2003) ("Peremptory challenges cannot lawfully be exercised against potential jurors of one race unless potential jurors of another race with comparable characteristics are also challenged.").  Consistent with that, this Circuit has found the failure by the proponent of a peremptory strike to challenge white jurors who were similarly situated to challenged minority jurors to be "fatal" to a proffered race-neutral reason for a strike.  *Turner v. Marshall*, 121 F.3d 1248, 1253-54 (9th Cir. 1997).

In addition, "implausible and fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."  *Purkett v. Elem*, 514 U.S. 765, 768 (1995).  Among other things, "where the facts in the record are objectively contrary to the prosecutor's statements, serious questions about

31

the legitimacy of a prosecutor's reasons for exercising peremptory challenges are raised." *McClain*, 217 F.3d at 1221. Moreover, "[w]here there is reason to believe that there is a racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it." *Kesser*, 465 F.3d at 359. *See also Miller-El*, 545 U.S. at 265 ("The prosecutors' chosen race neutral reasons for the strikes are so far at odds with the evidence that pretext is the fair conclusion, indicating the very discrimination the explanations were meant to deny.").

Importantly, "[a] court need not find all nonracial reasons pretextual in order to find racial discrimination." *Kesser*, 465 F.3d at 360; *see also U.S. v. Chinchilla,* 874 F.2d 695, 699 (9th Cir. 1989) ("Although these criteria would normally be adequately "neutral" explanations taken at face value, the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against their sufficiency."); *Lewis v. Lewis*, 321 F.3d 824, 831 (9th Cir. 2003) ("The proffer of various faulty reasons and only one or two otherwise adequate reasons, may undermine the prosecutor's credibility to such an extent that a court should sustain a *Batson* challenge.").

Finally, "[w]hile the disproportionate impact on Latinos resulting from the prosecutor's criterion for excluding the jurors does not answer the race-neutrality inquiry, it does have relevance to the trial court's decision on this

question." *Hernandez*, 500 U.S. at 363; *see also Miller-El v. Cockrell*, 537 U.S. at 342 ("The prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members . . . Happenstance is unlikely to produce this disparity."); *Williams v. Runnels*, 432 F.3d 1102, 1103 (9th Cir. 2006) (district court reversed where it "failed to appreciate the import of Williams' showing of statistical disparity" where prosecutor used three out of four peremptory strikes to excuse African-Americans).

**B.      Because Nibco's Proffered Reasons For Its Peremptory Strikes Of The Three Hispanic Jurors Had No Support Whatever In The Record, They Provide Compelling Evidence Of Pretext**

In his effort to justify his strikes of Garcia, Gomez, and Lucatero, Nibco's counsel repeatedly misrepresented, exaggerated and even contrived from thin air purported "facts" about them.  These "facts" ultimately persuaded the district court to deny the *Batson* motions.

Addressing his strike of Roxanne Garcia, Nibco's counsel stated that she had been involved "with her mother in a discrimination suit."  This was simply untrue.  In fact, when he himself had asked Ms. Garcia if her mother had filed a lawsuit, she responded plainly, "No, she just moved on."  His subsequent misrepresentation to the district court -- after Ms. Garcia had just told him the opposite -- powerfully bespeaks pretext.  *See Lewis*, 321 F.3d at 830 ("I]f a

review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination.").

Nibco's counsel also displayed little reluctance to embellish other "facts" about Ms. Garcia to make them appear more supportive of its strike. For example, he represented that she was "very close" to her mother, although she had never used those words. He also stated that her mother's imaginary lawsuit had taken place "recently," even though Ms. Garcia had said that her mother's problems at work had taken place "three, four years ago." And though Ms. Garcia had clearly indicated on her questionnaire that she or someone close to her had suffered adverse actions in the workplace, Nibco's counsel disingenuously claimed to the district court that "I had to do the followup to get that issue out" in an apparent attempt to cast doubt upon her candor.

Nibco's counsel engaged in similar misrepresentations of the facts when called upon to justify his strike of Ms. Gomez. He indicated to the district court that her sister had "had problems with discrimination," even though – in response to his own questioning – Ms. Gomez had plainly said that her sister had been terminated simply because "[s]he called off too many times." Ms. Gomez, in fact, had nowhere mentioned "discrimination." This factual distortion of her statements by Nibco's counsel, the content of which was

34

adopted by the district court,[22] could hardly have been more patent. Moreover, Nibco's counsel persisted in arguing that her sister's termination rendered her unsuitable as a juror, even though Ms. Gomez had clearly stated that her sister's termination "was her fault," not her employer's, thus negating any argument based upon alleged anti-employer bias.

Furthermore, despite the absence of any basis in Ms. Gomez's voir dire, Nibco's counsel portrayed her as having expressed a specific "love" for "working with all of the people of the different languages" in an effort to convince the district court that she might therefore be biased against Nibco. This was despite the fact that she had stated only her attitudes that: 1) Frito-Lay was "a great company to work for"; 2) "I don't have any grievance against Frito Lay"; and 3) she had "never had any problems" with her co-workers there, some of whom evidently happened to speak languages other than English. Nibco's willingness disingenuously to conflate those separate attitudes into a very different one that could better serve its cause, yet again, plainly points to pretext.[23] *See Kesser*, 465 F.3d at 369 ("The prosecutor's willingness to make

---

[22] "THE COURT: . . . [H]er sister's involved in a discrimination claim, where claims are being made by her against her employer or a co-employee." Page 256 EOR, VDT 255:19-21.

[23] At the very least, even assuming *arguendo* that Ms. Gomez's views legitimately lent themselves to Nibco's questionable interpretation, Nibco's

up nonracial reasons for striking Lawton, Smithfield, and Nakata makes it even

harder to believe that his reasons for striking Rindels were race-neutral.").[24]

Finally, Mr. Lucatero had indicated only that "My father got laid off

because of no hours."  But in the hands of Nibco's counsel, this simple

---

counsel would have been expected to conduct additional voir dire to ensure that any asserted assessment of her as an adverse juror was in fact well-founded. *Miller-El*, 545 U.S. at 244 ("[W]e expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike.").  That Nibco's counsel did not do even that much -- again assuming, purely *arguendo*, any need for clarification in the first place -- is itself indicative of pretext.  *Id.*

[24]    The demeanor of Nibco's counsel as he attempted to justify his strike of Ms. Gomez is noteworthy.  Not only did he appear initially to believe that Ms. Gomez was a man (first referring to her as "Mr. Gomez", Page 251 EOR, VDT 250:7-8), but his subsequent comments, even with the assistance of his notes, were markedly disjointed and characterized by fits and starts:

> MR. HAHESY:  Ms. Gomez.  She had the sister – similarly she had the sister who was recently involved in the matter.  She had had two cases, one of which she actually went to the – through the trial.  She was not able to have a verdict in that case.  Her sister was fired.  Her sister had an – you know, problems with discrimination.  Or not – she indicated she filed a workers' comp claim involving the employer.  And she has – if I can remember, my notes on all of Gomez.

Page 251 EOR, VDT 250:10-18.  Nibco's counsel's verbal demeanor fairly calls into question whether he in fact had any properly reasoned basis for striking Ms. Gomez prior to being required to justify the strike.  Appellate courts have looked to the transcripts of jury selections to assess a prosecutor's demeanor, and credibility, when justifying a peremptory strike, *see, e.g., Miller-El*, 545 U.S. at 245-46.  Moreover, it is far from obvious that this justification satisfies the requirement that a proffered neutral explanation be at least "clear and reasonably specific."  *Batson*, 476 U.S. at 98 n.20.

statement was stretched beyond recognition into his very different and various representations to the district court that:  1) Mr. Lucatero's father had been laid off <u>recently</u>; 2) Mr. Lucatero had "indicated that he was not, you know, frankly, I thought comfortable sitting as the juror."; 3) Mr. Lucatero had "indicated that, you know, the experience of his father getting laid off was something that bothered him and he was concerned about that."; and 4) Mr. Lucatero lived with his father.  None of those contrived assertions had any basis in the record.

The factual misrepresentations, and more, by Nibco's counsel are sufficient by themselves to establish pretext. *Miller-El*, 545 U.S. at 265; *McClain*, 217 F.3d at 1221; *Kesser*, 465 F.3d at 359.  But even if that were not enough, it should be noted -- as the district court correctly pointed out with respect to Mr. Lucatero[25] -- that Nibco's counsel did not bother to inquire of any of the struck Hispanic prospective jurors as to whether the job losses in question would have any present effect on their impartiality.  His failure to do so renders suspicious any remaining contention that those terminations were the genuine reason for the strikes.  *See, e.g., Miller-El*, 545 U.S. at 246 ("Fields's testimony indicated he was not close to his brother . . . and the prosecution

---

[25]   "THE COURT:  The problem is you didn't ask whether his father was suffering or whether he's been upset by it, whether there are any hard feelings or difficulties.  Whether he thought it was fair or unfair."  Pages 258-259 EOR, VDT 257:23-258:1.

asked nothing further about the influence his brother's history might have had on Fields, as it probably would have done if the family history had actually mattered.").

### C. Comparative Juror Analysis Reveals That Nibco Treated Hispanic Prospective Jurors Far Differently Than Their Caucasian Counterparts

The facts of this case moreover demonstrate that during the jury selection process, Nibco engaged Hispanic prospective jurors in ways strikingly different than Caucasian prospective jurors in a manner that inarguably violated *Batson*.

To begin with, Nibco's counsel argued that the closeness of Hispanic prospective jurors Garcia, Gomez, and Lucatero to persons who had lost their jobs or encountered adverse treatment at work justified his striking them, given that the lawfulness of the appellants' loss of their jobs at Nibco would be an issue at trial.[26]  However, this argument is scarcely consistent with the fact that Nibco's counsel chose not to challenge Caucasian prospective jurors Veldstra, Stanford, Stockton, and Marchbanks, each of whom had likewise indicated that they or someone close to them had lost their jobs or suffered other adverse workplace actions.

---

[26]  As noted in the preceding subsection, Nibco's objections to prospective jurors Garcia, Gomez, and Lucatero on this basis were shot through with factual misrepresentations and unsupported assumptions, rendering them highly suspect with respect to pretext even when viewed standing alone.

Nibco's failure to challenge Mr. Stanford in particular stands out as nothing less than remarkable in view of his evident strong feelings, expressed vividly in his questionnaire ("My wife was called a 'poor performer' after 19-1/2 years of dedicated service.") and at length in his colloquy with the district court, Pages 116-119 EOR, VDT 115:18-118:3, on behalf of his wife – who, like the appellants, had lost her job after years of good performance. *See, e,g., Snyder v. Louisiana*, 128 S.Ct. at 1211 ("The implausibility of this explanation is reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious as Mr. Brooks'."); *Green*, 532 F.3d at 1030 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove discrimination to be considered at *Batson*'s third step.") (citing *Miller-El*).

Similarly, Nibco's counsel did not even bother to ask Caucasian prospective jurors Veldstra and Tweedy about their experiences with job loss in order to probe for possible bias.[27]  His choice not to do so is redolent of pretext. *Miller-El*, 545 U.S. at 246 ("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is

---

[27]   Nor did Nibco's counsel have the benefit of any voir dire by either the appellants or the district court on this subject.

39

evidence suggesting that the explanation is a sham and a pretext for discrimination") (citing *Ex Parte Travis*, 776 So. 2d. 874, 881 (Ala. 2000).

The same is true as to Nibco's professed concerns about prospective juror Gomez's attitudes about multilingual workplaces. Nibco's counsel argued vigorously that it was reasonable for him to strike her in that she had supposedly "[l]oved working at Frito Lay, loved working with all of the people of the different languages.", Page 251 EOR, VDT 250:20-21 – ostensibly, to support the notion that she might be prone to be biased in favor of workers at other multilingual workplaces.[28] Yet at the same time, he voiced no concern whatsoever about Caucasian prospective jurors Veldstra and Lucas, who had not only worked in multilingual settings but who also appeared receptive to and comfortable with the role of linguistic accommodations in getting a job done.[29]

---

[28] This asserted reason for the strike of Ms. Gomez is also independently suspect, *see* n.7 *supra*.

[29] As noted earlier, Mr. Veldstra noted on voir dire that as a police officer, "we dealt with people from all over the world. And a lot of times they didn't speak English and you improvised." When asked by Nibco's counsel to describe his "experiences with the improvising," Mr. Veldstra responded, "Well, a lot of the times less than satisfactory. But you do what you need to do to adapt and overcome." Page 212 EOR, VDT 211:1-10. Similarly, Ms. Lucas said during voir dire that as a flight attendant, her co-workers had served as interpreters: "[O]ur main focus was English. But we had others who spoke other languages who translated on the aircraft." Page 211 EOR, VDT 210:22-25. And in her questionnaire, she had written, "I think English should be spoken at a workplace, but if you can help someone translate thats [sic] great."

Particularly given the marked emphasis that Nibco, in defending the case, placed upon the alleged inefficiency of using interpreters in its Fresno facility,[30] the failure of Nibco's counsel to exercise his strikes against any of those two Caucasian jurors,[31] or even simply to conduct further voir dire into their attitudes in that regard, is telling. *See, e.g., Miller-El*, 545 U.S. at 246, 248 (plausibility of justification proffered for strike was "severely undercut by the prosecution's failure to object to other panel members who expressed views much like Warren's."); *Green*, 532 F.3d at 1033 ("That the prosecutor did not question these similarly situated venirepersons . . . undermines the prosecutor's first asserted rationale for striking Deborah P.").[32]

The inconsistency of Nibco's professed concerns over the attitudes of prospective jurors Garcia, Gomez, and Lucatero makes implausible the argument that such concerns were the true basis for striking them. Instead, the simplest explanation is that Nibco was motivated to strike them on account of

---

Page 142 of Appendix. Nibco's counsel did not follow up on the subject with either juror.

[30] Defendant's Trial Brief, 3:14-22, 18:20-26, Pages 852, 867 EOR.

[31] Nibco used only four out of its five peremptory strikes, *see* n.15 *supra*.

[32] Moreover, as already mentioned, although Nibco's counsel did question Caucasian prospective juror April Davis-Brannum on her views about languages in the workplace, he did so because she had failed to provide any answer at all to the corresponding question on her questionnaire. Page 217 EOR, VDT 216:2-12.

41

their race and ethnicity, in violation of *Batson*.  *Snyder*, 128 S.Ct. at 1212 ("The prosecution's proffer of this pretextual justification naturally gives rise to an inference of discriminatory intent.").

> **D.** **The District Court Applied An Incorrect And Insufficiently Searching Legal Standard In Denying Appellants' *Batson* Motions**

In assessing a *Batson* challenge to a peremptory strike, "the trial court must not simply accept the proffered reasons at face value; it has a duty to 'evaluate meaningfully the persuasiveness of the prosecutor's [race]-neutral explanation[ ]" to discern whether it is a mere pretext for discrimination." *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004) (citing *U.S. v. Alanis*, 335 F.3d 965, 969 (9th Cir. 2003)).  In this regard, the district court must do more than engage in "a mere exercise in thinking up any rational basis." *Miller-El*, 545 U.S. at 252.  Nor should it accept "any nonracial excuse that comes along.", *Kesser*, 465 F.3d at 359, or credit asserted reasons for the strike that are merely "facially plausible." *Alanis,* 335 F.3d at 969.  Indeed, at *Batson*'s third step, "the court has *an affirmative duty* to determine if purposeful discrimination occurred."  *Lewis*, 321 F.3d at 832 (emphasis added).

The record of the sidebar conference indicates that the district court misapplied the law applicable to *Batson* motions.  In ruling upon the appellants' challenge to the strike of Ms. Garcia, for example, the district court found that

"it is *not irrational* nor is there any evidence whatsoever of racial animus associated with the challenge.", and that "although the bar seems to have been raised by the Supreme Court requiring a credible justification for the exercise of a peremptory, the Court does find that as to Ms. Garcia, there is a credible basis on all the grounds stated . . ."[33]  Pages 255-256 EOR, VDT 254:21-255:6 (emphasis added).

The district court's apparent view that no more than a "credible justification" need be presented by the proponent of a strike, coupled with its statement that Nibco's proffered reasons were "not irrational," makes it unlikely that it looked beyond the face of Nibco's counsel's arguments.  In any event, the record certainly does not reflect that the district court engaged in the "sensitive inquiry" or the comparative juror analysis that *Batson* requires, *see id*, 476 U.S. at 93; *Kesser*, 465 F.3d at 361 (citing to *Miller-El*).  Had the district court engaged in a comparative analysis, it would have revealed that Nibco's inquiries of Ms. Garcia concerning her mother's termination were not equally made to similarly situated Caucasian prospective jurors.  Likewise, a

---

[33]  Although the district court did not state which Supreme Court decision or decisions it was referring to, its comments at least appear inconsistent with the endorsement and use, in both *Miller-El* and *Snyder*, of a searching review of the factual record as well as comparative juror analysis.  Certainly, neither case stands for the proposition that "a credible basis" is all that is required from the proponent of a peremptory strike to insulate it from a *Batson* objection.

"sensitive inquiry" into "the totality of relevant facts" would have informed the district court that Nibco's counsel's representations as to Ms. Garcia's situation were not grounded in fact.[34]

The same can be said of the district court's disposition of Nibco's strike of Ms. Gomez.  It found that "there is certainly *a rational basis* to say that she

---

[34]  Further with respect to Ms. Garcia, the district court went beyond its deferential acceptance of Nibco's stated reasons to offer its own, unsolicited observations in ruling in favor of the strike:

> I found her manner to be very strange in responding to my questions.  She didn't – she was very, very quiet.  I could barely hear her when she was responding.  She was, quite frankly, very odd in her presentation and her affect. . . .
>
> And the Court is well satisfied that there are good reasons.  I'm just going to say that in 17 and a half years as a trial judge, she is one of the oddest prospective jurors I've ever seen.  I don't know whether it's a speech issue or whether it's a communication issue or whether she's just very shy.  I'm not in any way being critical of her, but I did find her presentation of herself to be very, very different from anybody on this panel or any panel that I've ever had.

Pages 254-255 EOR, VDT 253:22-254:18.  The district court's insertion of its own views of Ms. Garcia in the course of ruling in Nibco's favor, however, is squarely counter to the Supreme Court's admonitions in *Miller-El*:

> [W]hen illegitimate grounds like race are at issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. . . . If the stated reason does not hold up, its pretextual significance does not fade because a trial court, or an appeals court, can imagine a reason that might not have been shown up to be false.

*Miller-El*, 545 U.S. at 252.

could impose that experience [at Frito-Lay] where she said it was, in effect, a wonderful work environment." It also stated that a peremptory strike would be sustained "as long as you have *a facially valid reason* that has some basis in logic and strategy . . ." Pages 256-257 EOR, VDT 255:25-256:20 (emphasis added). As with the strike of Ms. Garcia, the district court applied an unduly deferential standard to its evaluation of Nibco's strike, despite *Batson*'s mandate that a truly neutral justification must be more than merely "facially plausible." *Alanis,* 335 F.3d at 969. Moreover, it did not conduct either a searching analysis of the relevant facts concerning Ms. Gomez or a comparative juror analysis that would have cast doubt on the veracity of Nibco's stated reasons for her strike.

The district court was brief in explaining its ruling on the strike of Mr. Lucatero:

> THE COURT: All right. I'm going to find that the facts are sufficiently analogous. In other words, a layoff because of a reduction in work and persons being out of work where the juror lives with his father. And that exact circumstance is being experienced.
>
> There's certainly nothing racially charged or racially motivated against that and that's what Batson seeks to prevent. It doesn't seek to prevent the legitimate exercise of peremptory challenge for strategic reasons by a trial lawyer.

Pages 259-260 EOR, VDT 258:18-259:2. The district court's comments nonetheless indicate that, contrary to *Miller-El* and numerous other *Batson*

45

cases, it only evaluated the facial plausibility of the reasons proffered by Nibco's counsel.  And, as with Ms. Garcia and Ms. Gomez, it did not conduct any analyses that would have revealed Nibco's disparate questioning of similar Caucasian jurors or its misrepresentations of fact concerning Mr. Lucatero and his father.

Had the district court understood its obligation under *Batson* to conduct a "sensitive inquiry" taking into account "the totality of the relevant facts," it would -- at a bare minimum -- have reviewed the relevant juror questionnaires and the transcript of the voir dire proceedings to verify the accuracy and race-neutrality of Nibco's conduct and arguments.  Doing so would have revealed the substantial liberties taken by Nibco's counsel in mischaracterizing key information about the jurors that he challenged.  It would also have exposed the striking differences in Nibco's questioning and treatment of Hispanic prospective jurors as opposed to their similarly situated Caucasian counterparts. Instead, the district court's inquiry never proceeded beyond its ready conclusion that the reasons asserted by Nibco's counsel for his strikes were merely "facially valid" or "not irrational."  *Batson* requires more. *See, e.g.*, *Green*, 532 F.3d at 1030 (reversing and remanding where the trial court failed to undertake "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," as required by Supreme Court).

### E.     The Statistical Impact Of Nibco's Strikes Provides Further Indicia Of Impermissible Motive

Lastly, in addition to assessing the conduct of Nibco's counsel, it is also proper for this Court to examine the totality of the circumstances relating to the challenged strikes.  *See, e.g., Johnson v. California*, 545 U.S. 162, 169 (2005) (opponent of peremptory strike may look to "any other relevant circumstances" to raise inference of impermissible racial motivation); *Kesser*, 465 F.3d at 359 ("invidious discriminatory purpose may often be inferred from the totality of the relevant facts.") (citing *Hernandez*).  One of the "relevant circumstances" commonly examined by the courts is the presence of any statistical indicia of discrimination.  *See, e.g., Hernandez*, 500 U.S. at 363; *Williams v. Runnels*, 432 F.3d at 1103.

In this case, the numbers are indicative.  Nibco used three out of its four peremptory strikes to challenge Hispanic jurors; only one of its strikes was used to remove a Caucasian prospective juror, Jennifer Tweedy.  *See Williams*, 432 F.3d at 1103 (district court reversed where it failed to take into account prosecutor's use of three out of four peremptory strikes to excuse African-Americans).  Moreover, Nibco passed on its fifth strike when it was probable that using that strike would have resulted in adding a Hispanic, April Garza, to the jury.  Page 3 of Appendix, ¶ 9.  At the end of the day, a jury box of 15

47

Caucasians and 6 Hispanics had been reduced to a panel of 8 Caucasians and just 2 Hispanics. While the number of Caucasians had been reduced by less than 50%, fully two-thirds of the Hispanics had been removed -- due almost entirely to Nibco's strikes.[35]

Of course, the fact that two Hispanics remained on the jury does not negate the statistical import of Nibco's strikes. Aside from the fact that "just one racial strike calls for a retrial," *Kesser*, 465 F.3d at 369, it is of no moment that the proponent of the strikes in question may have allowed some prospective jurors of the same race or ethnicity to stay on the jury. *See, e.g., Turner*, 121 F.3d at 1254 ("Where the prosecutor's explanation for striking a minority juror is unsupported by the record, empaneling other minority jury members will not salvage her discredited justification.). Indeed, it is perhaps unsurprising that after appellants had made their *Batson* motions and Nibco's counsel had been forced to justify his strikes, he chose not to make a fourth strike of either of the two Hispanic prospective jurors left in the jury box, David Nuñez and Lionel Dias. The Supreme Court addressed an identical situation in *Miller-El*:

---

[35]   As previously noted, juror Lionel Dias, whom the district court assumed to be Hispanic, was in all likelihood of Portuguese, and thus Caucasian, descent. *See* n.17 *supra*. If so, the racial impact of Nibco's strikes would have been even more pronounced: while 50% of the Caucasian prospective jurors would have remained on the jury, only 16%, or one, of the Hispanic prospective jurors would have been left on a jury of 9 Caucasians and one Hispanic.

> With at least three remaining panel members highly undesirable to the State, the prosecutors had to exercise prudent restraint in using strikes. The late-stage decision to accept a black panel member willing to impose a death sentence does not, therefore, neutralize the early-stage decision to challenge a comparable venireman, Warren. In fact, if the prosecutors were going to accept any black juror to obscure the otherwise consistent pattern of opposition to seating one, the time to do so was getting late.

*Miller-El*, 545 U.S. at 249-50.

## VIII. CONCLUSION

The evidence that Nibco's three peremptory strikes of Hispanic prospective jurors were exercised for racial purposes is plain and inarguable. Nibco's counsel engaged in multiple and overt misrepresentations of fact in his attempt to persuade the district court that his strikes were race-neutral. Moreover, Nibco's counsel treated Hispanic and Caucasian prospective jurors in markedly different ways, scrutinizing facially favorable Hispanic jurors while failing to inquire as of Caucasian jurors whose prior life experiences or views on key trial issues were problematic from a defense perspective. Because the district court did not conduct a meaningful inquiry into pretext, as required by *Batson* and its progeny, it clearly erred in denying appellants' challenges to the strikes.

Particularly in a trial involving claims of national origin discrimination, Nibco's discriminatory exercise of its peremptory strikes to remove Hispanics

from the jury is precisely the kind of practice that *Batson* seeks to prevent.  As the Supreme Court stated in its opinion in that case, "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."  476 U.S. at 89.  Nibco's willingness to do just that, in a case where discrimination against Hispanics and Asians was at issue, indicates a cynicism of the very sort that "undermine[s] public confidence in the fairness of our system of justice."  *Id*. at 87.

The indicia of racial purpose on Nibco's part are so extensive as to make a finding of pretext virtually inescapable.  But even assuming *arguendo* that "[t]he evidence in the record here 'is open to judgment calls . . . when this evidence on the issues raised is viewed cumulatively its direction is too powerful to conclude anything but discrimination.'"  *Kesser*, 465 F.3d at 367-68 (citing *Miller-El*).  Because "just one racial strike calls for a retrial," *Kesser*, 465 F.3d at 369, appellants respectfully request that this Court vacate the judgment below and remand this matter for a new trial.

Dated:  May 15, 2009          Respectfully submitted,


Christopher Ho
Christina N. Chung
Carole Vigne
The LEGAL AID SOCIETY –
    EMPLOYMENT LAW CENTER

William J. Smith
Shelley G. Bryant
W.J. SMITH & ASSOCIATES



By:     /S/Christopher Ho_____
              CHRISTOPHER HO

Attorneys for Appellants
MARTHA RIVERA, et al.

## STATEMENT OF RELATED CASES

This case was previously before this Court. *Rivera v. Nibco, Inc.*, No. 02-16532.  Appellants are aware of no other related cases.

## CERTIFICATE OF COMPLIANCE

I certify that the number of words in this brief, exclusive of the table of contents, the table of authorities, and this certificate, is 12,416, as calculated by the word processing system used to prepare this brief.

/S/Christopher Ho_____
CHRISTOPHER HO