No. 09-15136

United States Court of Appeals
For the Ninth Circuit

MARTHA RIVERA, et al.,

Plaintiffs and Appellants,

v.

NIBCO, INC., an Indiana corporation,

Defendant and Appellee.

Appeal From the United States District Court
for the Eastern District of California, Fresno
Case Number 1:99-cv-06443-OWW-SMS

Honorable Oliver W. Wanger, United States District Court Judge

**APPELLEE'S BRIEF**

CHARLES J. STEVENS (106981)
BRADLEY A. BENBROOK (177786)
DANIEL J. CROXALL (258390)
STEVENS, O'CONNELL & JACOBS LLP
400 Capitol Mall, Suite 1400
Sacramento, CA  95814-4428
Telephone:  (916) 329-9111

HOWARD A. SAGASER (072492)
MICHAEL S. HELSLEY (199103)
SAGASER, JONES & HELSLEY
2445 Capitol Street, 2nd Floor
Fresno, CA 93717-1632
Telephone:  (559) 233-4800

WILLIAM C. HAHESY (105743)
LAW OFFICES OF WILLIAM C. HAHESY
225 W. Shaw Avenue, Suite 105
Fresno, CA 93704
Telephone:  (559) 579-1230

Attorneys for Defendant and Appellee
NIBCO, INC.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Defendant/Appellee Nibco, Inc. hereby states that Nibco, Inc. has no parent company and no publicly held corporation owns 10% or more of its stock.

Dated:  June 29, 2009                           /s/ Charles J. Stevens
                                        Charles J. Stevens

# **TABLE OF CONTENTS**

**Page(s)**

JURISDICTION...............................................................................1

STATEMENT OF THE ISSUES.....................................................1

STATEMENT OF THE CASE AND FACTS ................................1

I.    The Underlying Issues At Trial Involved Layoffs, Alleged Race
Discrimination, and Questions About Accommodations For A
Multilingual Workforce. ..............................................................1

II.    The Parties' Peremptory Strikes Followed Patterns Based Upon
Prospective Jurors' Personal Experiences And Views Relating
To The Issues That Were About To Be Tried...............................3

      A.    Stricken Juror Roxanne Garcia Distinguished Herself By
Identifying Substantial Personal Experience With
Discrimination And Harassment In The Workplace. .........................4

      B.    Stricken Juror Teresa Gomez Stood Out On Several Grounds. ..........7

      C.    Adrian Lucatero Stood Out As The Only Member Of The
Venire Whose Close Family Members Were Currently
Unemployed. ...................................................................10

STANDARD OF REVIEW ...................................................11

SUMMARY OF ARGUMENT ..............................................11

ARGUMENT ....................................................................13

I.    The District Court's Findings That Nibco's Strikes Resulted
From Basic Trial Strategy, Rather Than Discrimination, Were
Supported By The Record And Not Clearly Erroneous. ...........13

      A.    The Court Correctly Concluded That Roxanne Garcia's Strike
Was Not Motivated By Purposeful Discrimination. .........................18

i

1.  The Evidence Strongly Supports The Conclusion That
    Garcia's Strike Was Not Motivated By Discrimination. .................18

2.  Mistaken References To A "Discrimination Suit" Are
    Immaterial To The District Court's No-Discrimination
    Finding................................................................................21

3.  Appellants' "Comparative Analysis" Reveals No Pretext –
    Garcia Had No Peers In The Venire When It Came To
    Nibco's Stated Grounds For Her Strike. ...........................................25

B.  The Court Correctly Concluded That Teresa Gomez's Strike
    Was Not Motivated By Purposeful Discrimination. .........................29

1.  The Record Strongly Supports The Conclusion That Nibco's
    Strike Of Gomez Was Not Motivated By Discrimination. ...............30

    a.  Gomez's Multilingual Work Experience – And Her
        Characterization Of That Experience – Is Strong
        Evidence That The Strike Was Based On Strategy
        Rather Than Discrimination. ................................................30

    b.  Gomez's Own Claim Against Her Former Employer
        And Her Sister's Termination Supported The District
        Court's Conclusion That The Strike Was Based On
        "Labor Versus Management" Strategy Concerns, Not
        Discrimination.....................................................................32

2.  Appellants' "Comparative Analysis" Reveals No Pretext –
    No Other Members Of The Venire Were Similarly Situated
    To Gomez. .........................................................................36

C.  The Court Correctly Concluded That Adrian Lucatero's
    Strike Was Not Motivated By Purposeful Discrimination.................40

II.   That Hispanic Jurors Were Seated On The Jury Strongly
      Supports The Finding Of No Discrimination.............................................47

III.  The District Court Applied The Correct Legal Standard And
      Made The Necessary Findings.................................................................50

ii

IV.     Appellants' Statistical Disparity Claim Is Misplaced. ...............................54

CONCLUSION ..........................................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Batson v. Kentucky*, 476 U.S. 79 (1986) ............................................................ passim

*Boyde v. Brown*, 404 F.3d 1159 (9th Cir. 2005) ..................................................... 15

*Burks v. Borg*, 27 F.3d 1424 (9th Cir. 1994) ...................................................... passim

*Garcia v. Excel*, 102 F.3d 758 (5th Cir. 1997) .................................................. passim

*Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008) ................................................. 25

*Hernandez v. New York,* 500 U.S. 352 (1991) ..................................................... passim

*Husain v. Olympic Airways*, 316 F.3d 829 (9th Cir. 2002) ...................................... 11

*Johnson v. California*, 545 U.S. 162 (2005) ............................................................ 54

*Kesser v. Cambra*, 465 F.3d 351 (9th Cir. 2006) ............................................... passim

*Lewis v. Lewis*, 321 F.3d 824 (9th Cir. 2003) ......................................................... 21

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ............................................................ 20

*Miller-El v. Dretke,* 545 U.S. 231 (2005) ........................................................... passim

*Mitleider v. Hall*, 391 F.3d 1039 (9th Cir. 2004) ................................. 22, 39, 46, 53

*Purkett v. Elem*, 514 U.S. 765 (1995) ............................................................... passim

*Rice v. Collins*, 546 U.S. 333 (2006) ...................................................................... 11

*Stubbs v. Gomez*, 189 F.3d 1099 (9th Cir. 1999) .................................. 31, 32, 36, 45

*Tinner v. United Ins. Co. of America*, 308 F.3d 697 (7th Cir. 2002) ................ 33, 34

*Turner v. Marshall*, 121 F.3d 1248 (9th Cir. 1997).......................................... 39, 48

*United States v. Alanis*, 335 F.3d 965 (9th Cir. 2003)...................................... 52, 53

*United States v. Arce*, 997 F.2d 1123 (5th Cir. 1993) ..................................... 17, 35

*United States v. Bauer*, 84 F.3d 1549 (9th Cir. 1996) .............................................15

*United States v. Chinchilla*, 874 F.2d 695 (9th Cir. 1989) .................. 23, 35, 48, 55

*United States v. Collins*, 90 F.3d 1420 (9th Cir. 1996) ................................... 11, 52

*United States v. Contreras-Contreras*, 83 F.3d 1103 (9th Cir. 1996) ............. 17, 36

*United States v. Cruz-Escoto*, 476 F.3d 1081 (9th Cir. 2007)................... 11, 14, 41

*United States v. Esparza Gonzalez*, 422 F.3d 897 (9th Cir. 2005).........................50

*United States v. Gillam*, 167 F.3d 1273 (9th Cir. 1999)............................. 41, 48, 50

*United States v. Hernandez-Herrera*, 273 F.3d 1213 (9th Cir. 2001)....................49

*United States v. Lewis*, 837 F.2d 415 (9th Cir. 1988)..............................................39

*United States v. Lorenzo*, 995 F.2d 1448 (9th Cir. 1993).......................................43

*United States v. Rodrequez*, 859 F.2d 1321 (8th Cir. 1988)...................................41

*United States v. Rudas*, 905 F.2d 38 (2nd Cir. 1990) .............................................36

*United States v. Thompson*, 827 F.2d 1254 (9th Cir. 1987) ................ 16, 36, 43, 47

*United States v. You*, 382 F.3d 958 (9th Cir. 2004)......................................... 14, 20

*Williams v. Runnels*, 432 F.3d 1102 (9th Cir. 2006) ...............................................54

## Other Authorities

http://en.wikipedia.org/wiki/Susa ...........................................................................49

## JURISDICTION

Appellee NIBCO, Inc. ("Nibco") agrees with appellants' jurisdictional statement.

## STATEMENT OF THE ISSUES

Whether the district court clearly erred when it made factual determinations that Nibco's three peremptory strikes in this employment discrimination case were not motivated by discrimination and therefore did not violate *Batson v. Kentucky*, 476 U.S. 79 (1986).

## STATEMENT OF THE CASE AND FACTS

Appellants filed their complaint in the United States District Court for the Eastern District of California in October 1999.  Nine years later, in October 2008, the case went to trial.  At trial, 23 plaintiffs from several different Hispanic and Southeast Asian nationalities accused Nibco of wrongfully terminating them on the basis of national origin in violation of state and federal law.

**I.     The Underlying Issues At Trial Involved Layoffs, Alleged Race Discrimination, and Questions About Accommodations For A Multilingual Workforce.**

In its trial brief, Nibco summarized the circumstances giving rise to the layoffs at issue here:

> NIBCO acquired and merged two financially struggling irrigation businesses in Fresno, California in 1995. The overwhelming majority of the employees in the NIBCO workforce both before and after the events that give rise to this lawsuit are Asian and Hispanic.  Soon after the acquisition, NIBCO found numerous problems with the manufacturing operations at the

1

Fresno plant, including . . . dysfunctional internal controls, inadequate skills, serious quality control issues, [and] inadequate safety policies, practices and procedures . . . .

A poor communication network existed at the plant. About six languages were spoken on the plant floor, including English, Spanish, Hmong (two dialects), Cambodian and Vietnamese. No common language existed in the plant. In fact, no common language often existed even within departments or shifts. . . . Significant inefficiencies resulted from this situation. Managers and supervisors could not communicate readily with the workforce, and vice versa. While co-workers were used at times to interpret, this usage was fraught with many problems and created its own inefficiencies as workers were removed from their regular duties to perform those functions.

By the end of 1996, the Fresno plant had lost nearly $3 million since opening. The status quo could not continue. After an intensive review, NIBCO decided that many changes had to occur in order to make the operation safe, efficient and viable. . . . New internal controls, many of which required basic English skills, were implemented. Efforts were undertaken to modernize the manufacturing equipment and processes. . . . A new "pay-for-skill" system was implemented. . . . Training became a significant component of these many changes. The training ultimately came to include the tests at issue in this case.

NIBCO developed 11 job-knowledge tests that contain information that all production associates needed to know to safely, efficiently and competently perform the expanded jobs. . . . A small subset [of employees] – the plaintiffs here and a few others – did not [pass the tests]. As a result of not passing the tests, the plaintiffs were placed into a production level position without any reduction in pay or benefits and with a change in their job duties. This position was the lowest-skilled position in the plant. As the financial losses continued to mount to over $7 million by the end of 1997 and into 1998, layoffs had to occur. The plaintiffs and others were laid off in the late summer and fall of 1998. . . .

The losses ultimately became too great and in August of 1999, NIBCO sold the plant and ceased its operations in Fresno.

EOR 852:2-53:16.

2

Appellants claimed below that Nibco's classification of plaintiffs into the low-skilled categories based on their failure to pass the rudimentary Z-Tests was merely a "guise" for discrimination.  EOR 303:22-23.  Appellants alleged in their complaint that their "primary languages" were Spanish, Hmong, Laotian, and Cambodian.  *See* EOR 875 (Complaint, ¶¶ 7, 8, 10, and 12).  They claimed that Nibco should have hired translators and bought "computer-based translation software" to accommodate their various languages, notwithstanding that the plant was already bleeding millions of dollars in losses.  *See* EOR 302:13-17.

## II. The Parties' Peremptory Strikes Followed Patterns Based Upon Prospective Jurors' Personal Experiences And Views Relating To The Issues That Were About To Be Tried.

Appellants' summary of jury selection fails to mention that, after the district court had excused several members of the venire for cause, they moved to strike two additional Caucasian members of the venire for cause.  EOR 222-29.  Appellants also fail to mention that all five of their strikes were against Caucasians and that the district court commented (and they conceded) that their challenges were based, in part, on the strategy of striking business owners and managers.

3

EOR 260-61; App. 106, 118 (stricken juror Keegan a "business owner" and stricken juror Langley a manager who had experience with layoffs).[1]

Appellants argue as if the three individuals at issue in their *Batson* motion were nearly indistinguishable from other jurors on the venire, aside from their Hispanic ethnicity. That is simply not true. Each had unique characteristics that cried out for peremptory strikes in this employment discrimination case.

### A. Stricken Juror Roxanne Garcia Distinguished Herself By Identifying Substantial Personal Experience With Discrimination And Harassment In The Workplace.

Garcia's jury questionnaire revealed that she had by far the most direct and indirect experience of all prospective jurors with discrimination and harassment in the workplace.[2] Question 45 in the jury questionnaires asked prospective jurors to

---

[1]    Other jurors stricken by appellants gave pointed answers when asked to describe their "views about whether English should be spoken in the workplace." Stricken juror Geisler said "Yes English is the Language of the USA!" App. 79. Stricken juror Hyer said "Yes English should be spoken in the work place – there is no other country that would bend for us." App. 101; *see also* App. 211 (stricken juror Stanford stating that "I believe that Enlish [sic] should be spoken in every workplace in the United States of America").

[2]    Nibco has moved to strike appellants' Appendix and references to the Appendix in the opening brief. Because this brief will be filed before a ruling on the motion to strike, it includes multiple citations to the Appendix and responds to appellants' reliance on the materials in the Appendix. To be sure, the motion to strike is not outcome-determinative here in light of the overwhelming support the Appendix provides for an affirmance of the district court's no-discrimination findings.

identify their experience – whether directly or through family members or close friends – with workplace discrimination or termination.  Out of 30 boxes in Question 45's grid, Garcia checked *11 boxes*.  App. 49.  The next closest number of boxes checked was *four* (Jennifer Tweedy, whom Nibco also struck).  Appellants' Opening Brief ("AOB") 7 n.4; App. 236.  Garcia's responses revealed that she and a family member had significant experience with discrimination.  Yet, when asked in the questionnaire, for any question in which Garcia checked yes, to "please explain the situation and how it was resolved," Garcia did not do so.  She said:  "Many different situations.  Many incidences @ work and environment."  *Id*. at 49.[3]

Having refused to elaborate on the "many different situations," Ms. Garcia was asked by Nibco's counsel to address these experiences during voir dire.  Garcia revealed that her mother had experienced discrimination and that she spoke frequently with her mother about this ordeal:

---

[3]    She also checked the box marked "Agree Strongly" to this statement:  "I do not trust corporations."  App. at 48.  The only other juror who checked that box, David Nunez, reported no comparable personal or family experience with workplace discrimination – he checked *zero boxes* in response to question 45.  App. at 181.  Indeed, Nunez was a far more attractive juror to defendant than Garcia on several additional grounds, including, but certainly not limited to:  (1) he spent 18 years in the military, EOR 167; (2) he spent 12 years as a security guard, *id*.; and (3) he "agree[d] strongly" that the "government has gone too far in regulating employer/employee relations." App. 180.

MR. HAHESY: . . . You mentioned on your questionnaire that I believe you had experience with either you or someone close to you had been subjected to discrimination or harassment.

GARCIA: Yes.

MR. HAHESY: Is that you or somebody close to you?

GARCIA: My mother.

MR. HAHESY: And can you tell me about how long ago that was?

GARCIA: It would be three, four years ago, **but it lasted for a while**.

. . . .

MR. HAHESY: And just in general, what was – what was she experiencing?

GARCIA: Discrimination by her boss. Racial.

MR. HAHESY: And were you -- did your mother share this information with you as she was kind of going through this?

GARCIA: Yes.

MR. HAHESY: Did your mother end up filing any kind of claim or lawsuit?

GARCIA: No, she just moved on.

EOR 217:19-218:21 (emphasis added).

Upon further questioning, Garcia confirmed she was close to her mother and suggested that she was *still talking* to her mother about her mother's experience with workplace discrimination:

MR. HAHESY: Ms. Garcia, just a couple more. Are you -- are you close to your mother?

6

GARCIA: Yes.

MR. HAHESY: I mean, do you see her quite often?

GARCIA: Uh-huh. Yes.

MR. HAHESY: You know, have you -- have you talked to her a lot about the experience she had at the work?

GARCIA: Yeah. During the time when it was happening ***more so than now***.

EOR 221:16-24 (emphasis added).

When asked whether, in light of her mother's experience, Garcia could "put aside [her] mother's experiences in deciding a case that involved 23 women," she was non-committal: "I would have to hear what they would have to say. What's being presented, you know. There's true, false." EOR 222:1-6.

The district court expressly found that Garcia's strike was not motivated by discrimination. EOR 254-56.

### B.    Stricken Juror Teresa Gomez Stood Out On Several Grounds.

Teresa Gomez entered the jury box very late in the voir dire session, after appellants moved to strike two Caucasians for cause, and after the court and counsel had already asked the panel – collectively and individually – several questions. EOR 240-45. During the district court's voir dire of Ms. Gomez, she volunteered that she had worked in a multilingual environment in response to a question that had nothing to do with language:

THE COURT: All right. Any issues in your workplace, the school bus drivers ever go on strike or --

GOMEZ: Well, I just started that because I worked for Frito Lay. And Frito Lay is very diverse. There's all different kinds of races that work together. And they all speak different languages.

THE COURT: They speak different languages.

GOMEZ: Yes.

THE COURT: And how do they get along in the workplace?

GOMEZ: I never had any problems with anybody.

THE COURT: All right. Do the supervisors speak different languages or do they speak English?

GOMEZ: They spoke different languages also.

EOR 243:18-244:8.

Gomez also indicated on her juror questionnaire that she had filed both disability and worker's compensation claims.  App. 94.  When asked whether on the questionnaire she "or anyone close to [her had] ever been fired, laid off or forced to resign from a job," she replied with gusto:  "Sister has been fired!"  App. 88.  When Nibco's counsel conducted voir dire on these subjects, Garcia volunteered yet more information about Frito Lay – this time, she expressed positive feelings about her former employer:

MR. HAHESY: Mrs. Gomez, on your questionnaire, you mentioned that you'd had -- you have a sister that had a problem with an employer. Can you tell me about how long ago this occurred?

GOMEZ: Three or four years ago. And it was her attendance. I think I put that down.

MR. HAHESY: Was -- are you -- is this a sister that you're close to?

GOMEZ:  Yes.
…
MR. HAHESY: Now, you also mentioned that either you or someone close to you had been involved in bringing a formal grievance, claim or lawsuit against an employer.

GOMEZ: That was my workman's comp case.
. . .
MR. HAHESY: And about how long ago was that?

GOMEZ: 2005.

MR. HAHESY: And did you continue to be employed by Frito Lay after that case?

GOMEZ: No.

MR. HAHESY: Did you -- why did your employment with Frito Lay end?

GOMEZ: The job was physically demanding and I -- I couldn't perform that job any longer, so I decided to not to continue working with them.

MR. HAHESY: So other than the workers' comp claim against Frito Lay, did you bring any other type of claim or grievance against –

GOMEZ: No. And I felt that I was, you know, dealt with fair. **I mean, I don't have any grievance against Frito Lay. And if I had to recommend them for somebody to go to work with them, I'd say they're a great company to work for**. I have no grievances with them. I thought I was dealt with fairly.

EOR 247:10-248:7 (emphasis added).  Suffice it to say, no other juror expressed

such positive feelings toward a multilingual employer.

The district court found that the strike of Gomez was not motivated by discrimination.  EOR 256-58.

### C.    Adrian Lucatero Stood Out As The Only Member Of The Venire Whose Close Family Members Were Currently Unemployed.

Prospective juror Adrian Lucatero was the only individual out of the 21 prospective jurors who indicated on his questionnaire that two family members – both his mother and father – were *currently unemployed*.  App. 142.  In response to the question "[h]ave you **or anyone close to you** ever been fired, laid off or forced to resign from a job?" Lucatero checked the "yes" box and explained:  "My father got laid off because of no hours."  App. 143 (emphasis added). Lucatero indicated on his questionnaire that he was 19 years old – the youngest prospective juror by far.  App. 139.  (The next oldest member of the venire was Garcia, at 25.  App. 40.)

The district court found that Nibco's strike of Lucatero was not motivated by discrimination.  EOR 259-60.

\* \* \*

After a lengthy trial, the jury returned a unanimous verdict for Nibco.  By this appeal, appellants seek only a review of the district court's determination that Nibco's challenged strikes were not motivated by "purposeful discrimination" and therefore did not violate *Batson v. Kentucky*.

## STANDARD OF REVIEW

The district court's findings regarding purposeful discrimination at the third step of the *Batson* test are findings of fact reviewed for clear error. *Rice v. Collins*, 546 U.S. 333, 338 (2006); *United States v. Cruz-Escoto*, 476 F.3d 1081, 1085 (9th Cir. 2007). Under the clearly erroneous standard of review, the Court accepts the district court's factual findings unless it has a "definite and firm conviction that a mistake has been made." *Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002) (citation omitted). "Thus, if the district court's findings are plausible in light of the record viewed in its entirety, the appellate court cannot reverse even if it is convinced it would have found differently." *Id.* (citation omitted); *see also Hernandez v. New York,* 500 U.S. 352, 369 (1991) ("where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous").

## SUMMARY OF ARGUMENT

The single issue on this appeal is whether the district court clearly erred when it found that Nibco's strikes were not motivated by discrimination. Ample evidence supports the district court's factual conclusion, which is afforded "great deference" on appeal. The district court's bottom-line determination that Nibco's counsel did not engage in discriminatory strikes was plainly not erroneous at all, much less clearly so.

This was an employment discrimination case involving layoffs. The district court properly concluded that the strikes were not based on racial discrimination but rather were based on the particular employment status and experiences of the stricken jurors or their close family, or both. Indeed, all four of the jurors Nibco struck exhibited characteristics that cried out for peremptory challenges.

Importantly, appellants offered virtually no argument or evidence below to refute Nibco's evidence or otherwise support their motion, on which they bore the burden of proof. Their belated effort to make the record they failed to make below invites this Court to substitute its own assessment of the facts for the district court's – an invitation wholly at odds with accepted principles of appellate review and Supreme Court instruction in the *Batson* context.

Appellants' new arguments and new evidence, however, do nothing to undermine the district court's no-discrimination finding. For example, a "comparative analysis" of the jury venire, while not required below or here, strongly confirms that Nibco's strikes were not based on discrimination. Rather, using the stated criteria for the strikes and the evidence in the testimony and jury questionnaires, the stricken jurors stood out from those who were seated as jurors. Under any objective "comparative analysis" among the members of the venire, the evidence in the record and the new "evidence" in the Appendix strongly demonstrate objective, race-neutral reasons for Nibco's strikes.

Appellants mistakenly assign no weight whatsoever to the district court's finding that two members of the venire with Hispanic surnames were seated on the jury. They also take an unseemly detour into racial genotyping by arguing whether one of the seated jurors really was Portuguese, and whether that should "count" as Hispanic. Multiple decisions demonstrate that the seating of minority jurors supports a district court's no-discrimination finding.

The district court made the necessary and appropriate findings of no discrimination under *Batson*. Its denial of the *Batson* motion should be affirmed.

## <u>ARGUMENT</u>

**I.    The District Court's Findings That Nibco's Strikes Resulted From Basic Trial Strategy, Rather Than Discrimination, Were Supported By The Record And Not Clearly Erroneous.**

This appeal involves the third step of the three-step process under *Batson v. Kentucky*, where "the court must determine whether the defendant [opposing the strikes] has shown '*purposeful discrimination*.'" *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006) (citing *Batson*, 476 U.S. at 98, and *Purkett v. Elem*, 514 U.S. 765, 767 (1995)) (emphasis added).

The district court's conclusion at this third step is a *factual finding* and thus subject to "great deference": "In *Batson*, we explained that the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." *Hernandez*, 500 U.S. at 364

(citing *Batson*, 476 U.S. at 98 n.21, and referring to "*Batson*'s treatment of intent to discriminate as a pure issue of fact, subject to review under a deferential standard"); *Cruz-Escoto*, 476 F.3d at 1085 ("findings regarding purposeful discrimination in jury selection are findings of fact entitled to great deference").

As the *Hernandez* court reiterated, "[d]eference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as [the Court] noted in *Batson*, the finding 'largely will turn on evaluation of credibility.'" *Hernandez*, 500 U.S. at 365 (citing *Batson*, 476 U.S. at 98 n.21). "Courts measure credibility 'by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; *and by whether the proffered rationale has some basis in accepted trial strategy*.'" *United States v. You*, 382 F.3d 958, 968 (9th Cir. 2004) (emphasis added) (citations omitted). "As with the state of mind of a juror, evaluation of the [striking attorney's] state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Hernandez*, 500 U.S. at 365. Appellants ignore these fundamental concepts and invite this Court to retroactively micro-manage the district court's supervision of jury selection here.

The opening brief also pays little heed to the core *Batson* tenet that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768. A *Batson*

14

movant "cannot satisfy his 'ultimate burden' if he does not offer any evidence to rebut the prosecutor's race-neutral explanation. Accordingly [the reviewing court] must consider '[t]he correctness of the court's ruling . . . in terms of the information that was before [it] at the time that the *Batson* objection was raised.'" *Boyde v. Brown*, 404 F.3d 1159, 1171-72 (9th Cir. 2005) (citing *United States v. Bauer*, 84 F.3d 1549, 1554-55 (9th Cir. 1996)). In *Boyde*, "[b]ecause [the *Batson* movant] did not rebut the prosecutor's race-neutral explanations, [he] failed to carry his burden of persuasion," and the Ninth Circuit refused to engage in "second-guessing the trial court's determination." *Boyde*, 404 F.3d at 1172. Likewise, when the defendant in *Bauer* sought to rely on a new fact that it claimed undermined the prosecutor's race-neutral explanation for the strike, the court refused to consider it because it "was not before the [district] court at the time of its ruling." *Bauer*, 84 F.3d at 1555-56 ("We refuse to speculate on what the court may or may not have done, had that fact been brought to its attention.").

Appellants nod to the "clearly erroneous" standard of review here but then spend their entire argument urging this Court to second-guess the district court's no-discrimination findings based largely on evidence not presented below. Indeed, appellants offered *almost no evidence or argument* to support their motion below, and this failure is fatal under *Boyde* and the deferential standard of review dictated by *Batson* and *Hernandez*. For example, appellants' counsel cited none of the

information in the jury questionnaires, despite the fact they had a chance to review the completed questionnaires and had the questionnaires sitting right in front of them when they made the *Batson* motion.

The case law does not allow this type of sand-bagging. In *United States v. Thompson*, 827 F.2d 1254 (9th Cir. 1987), the Ninth Circuit reversed the district court's denial of a *Batson* motion when the trial court conducted the hearing without the participation of the moving party's counsel. In language bearing heavily on the circumstances here (where appellants objected and then essentially sat back to allow the court and Nibco's counsel to resolve the motion), the *Thompson* court stressed that a *Batson* movant's counsel "can perform two crucial functions in an adversary proceeding. The first is to point out to the district judge where the [striking counsel's] stated reason may indicate bad faith." *Id*. at 1260. Among other things, such active participation allows the striking lawyer the opportunity "to explain further her reasoning and perhaps dispel the inference that she acted from improper motives." *Id*. "The second function defense counsel can perform is to preserve for the record, and possible appeal, crucial facts bearing on the judge's decision." *Id*. at 1261. The appellate court "can only serve [its] function when the record is clear as to the relevant facts, or when defense counsel *fails to point out any such facts* after learning of the prosecutor's reasons." *Id* . (emphasis added).

16

Indeed, the Fifth Circuit has found that a *Batson* movant's failure to contest a stated justification for a strike constitutes a waiver that precludes disputing the justification for the first time on appeal. In *United States v. Arce*, 997 F.2d 1123 (5th Cir. 1993), the prosecutor offered two justifications for striking a Hispanic juror, one of which (his short duration of employment) the defendants did not contest. The Fifth Circuit found that defendant had waived his right to object to this justification on appeal. *Id*. at 1126-27. Since that justification stood "as an uncontested basis for excusing" the juror, the court did not even address the legitimacy of the other disputed justification. *Id*. at 1127; *see also United States v. Contreras-Contreras*, 83 F.3d 1103, 1105 (9th Cir. 1996) (citing *Arce* where defendant both failed to make *Batson* objection and failed to object to the prosecutor's volunteered explanation). In short, this Court should decline appellants' invitation to treat this appeal as a "do-over" to raise new issues it had every opportunity to raise below, a practice inconsistent with existing cases and highly problematic from a policy perspective.

Even if every new argument and new piece of "evidence" is considered, however, they do not show that the district court's factual findings – that Nibco's counsel engaged in no purposeful discrimination as to each challenged strike – were clearly erroneous.

**A.     The Court Correctly Concluded That Roxanne Garcia's Strike
        Was Not Motivated By Purposeful Discrimination.**

The district court concluded that there was no "evidence whatsoever of racial animus associated with the challenge" of Roxanne Garcia. EOR 255:21-22. That finding was accurate and supported by the record.

**1.     The Evidence Strongly Supports The Conclusion That
        Garcia's Strike Was Not Motivated By Discrimination.**

When asked to justify Nibco's strike of Ms. Garcia, Nibco's counsel stated that Garcia is "very close to her mother. She talked to her mother about that case, you know, regularly. She has regular contact with her mother who was involved in a race discrimination. . . . [T]he impression that I developed from her is that there's still some lingering issues related to that case." EOR 250:17-24.

Given the opportunity to rebut these reasons, appellants' counsel first got Ms. Garcia confused with Ms. Gomez and then attributed a reason to the strike that Nibco's counsel had *not* offered as a basis for Garcia's strike. EOR 252:22-253:9 (mistakenly claiming that strike was based on grounds that Ms. Garcia "work[s] in a workplace where there's more than one language spoken"). In other words, counsel offered *nothing* in response.

The district court found no purposeful discrimination:

[G]iven the fact that she has issues that, within her closest family, that go to what is in dispute in this case, it is not irrational ***nor is there any evidence whatsoever of racial animus associated with the challenge***. [¶] To the contrary, it would appear that she would likely be a

18

> sympathetic juror and someone who would essentially be influenced
> and affected by what's going on in her life with respect to her mother.

EOR 255:19-256:1 (emphasis added).

The district court's no-discrimination finding was accurate and supported by the record. Indeed, Roxanne Garcia's voir dire testimony, as well as her jury questionnaire, cried out for a strike in this case involving alleged employment discrimination. Garcia testified that:

- Her mother had been subjected to employment discrimination based on her Mexican ethnicity, EOR 218:22-219:6;

- The discrimination against her mother apparently started three or four years earlier, "but it lasted for a while," EOR 218:1-4;

- She acknowledged that she "talked to her [mother] a lot about the experience," and even indicated that she was *continuing* to talk to her mother about the experience *through the time of jury selection*, EOR 221;

- She was close to her mother and sees her "quite often," EOR 221; and

- When asked whether she could "put aside [her] mother's experience" in this discrimination case, *she did not say "yes."* EOR 221-22.

In her jury questionnaire Garcia evidenced far more personal experience with workplace discrimination and harassment than any of the other jurors. In response to Question 45 on the questionnaire, she indicated that she had *personally*

suffered racial and sexual discrimination and sexual harassment, and she stated that a family member had been subjected to multiple forms of discrimination, retaliation, harassment, and unfair treatment.  In all, she checked *11 boxes* on Question 45's grid – far more than any other juror.  App. 49.

Counsel's justification for the strike was based on objective facts that related directly to counsel's trial strategy, all of which strongly bolsters the court's credibility determination – a determination entitled to "great deference" in any event.  *See*, *e.g.*, *You*, 382 F.3d at 968 (credibility finding relating to "whether the proffered rationale has some basis in accepted trial strategy"); *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (same).  In a case involving allegations of discriminatory employment practices, defense counsel is plainly entitled to strike jurors based on their close family member's recent experience with discrimination, and appellants do not suggest otherwise.  They simply contest the district court's credibility determination that Garcia's life experience was the real reason for the strike, despite the Supreme Court's admonition that "evaluation of the [striking attorney's] state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'"  *Hernandez*, 500 U.S. at 365.

The district court's finding was not erroneous.

**2.    Mistaken References To A "Discrimination Suit" Are Immaterial To The District Court's No-Discrimination Finding.**

Appellants argue around the margins that Nibco's counsel made misstatements concerning Garcia, and that these purported misstatements "powerfully bespeak[] pretext."  AOB at 33 (citing *Lewis v. Lewis*, 321 F.3d 824, 830 (9th Cir. 2003)).  The cases, however, show that mistakes do not support a pretext finding where, as here, the remaining bases for a strike are plainly supported by the record and objectively relate to the underlying case.

Before discussing appellants' arguments here, however, it is worth reviewing *Lewis*, as that case arose under radically different facts.  In *Lewis*, a habeas case, the prosecutor offered six reasons for striking one of the African-American jurors.  *Id*. at 827-28.  The trial court expressly rejected "at least two or three" of the proffered reasons as unconvincing.  *Id*. at 828, 833.  "The trial court did not find the prosecutor credible."  *Id*. at 834.  Nevertheless, the trial court ruled that *one* of the proffered reasons was "probably reasonable" and then "offered a conflicting analysis of the record support" for that reason in denying the *Batson* motion.  *Id*. at 828, 834.  For good measure, the judge also failed to allow defense counsel to point out why the record did not support the justification.  *Id*. at 828.

On that record, this Court had no problem concluding that the trial court "never fulfilled its affirmative duty to determine if the defendant had established

purposeful discrimination." *Id*. at 832. Indeed, there was substantial reason to conclude that the only justification considered by the trial court was wrong. *Id*. at 832-33. It was in this setting that the Court stated that "if a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination." *Id*. at 830.

In this case, by contrast, where there is very strong support in the record for the district court's conclusion that Garcia's strike was non-discriminatory, appellants claim that the district court should have dismissed the evidence as "pretext" because Nibco's counsel mistakenly referred to Garcia's mother bringing a "discrimination suit." AOB at 33. This was an obvious mistake, as Garcia had, just a few minutes earlier, testified that no such suit had been brought. EOR 218:18-21. Appellants had two lawyers sitting in the courtroom during Garcia's testimony and standing next to Nibco's lawyer during the sidebar on the *Batson* motion, yet neither of appellants' lawyers said anything about this mistake. As shown above, the adversarial process applies to *Batson* motions, a concept that seems foreign to appellants. Given the powerful, objective evidence supporting Garcia's strike, this mistake cannot possibly be enough to upset the no-discrimination finding as clear error. *Cf. Mitleider v. Hall*, 391 F.3d 1039, 1049 (9th Cir. 2004) (mistaken reason for strike need not be treated as pretext).

This Court's opinions in *United States v. Chinchilla*, 874 F.2d 695 (9th Cir. 1989), and *Burks v. Borg*, 27 F.3d 1424 (9th Cir. 1994), illustrate why appellants cannot leverage a misstatement into a reversal of the district court's no-discrimination finding. In *Chinchilla*, where the government struck the only Hispanic person in the jury panel and the only Hispanic person in the alternate pool, two of the government's explanations did not hold up under scrutiny. The remaining reasons for the strikes were flimsy and subjective: the alternate's "poor appearance" and the prospective juror's "choice of employment." *Chinchilla*, 874 F.2d at 698-99.

In *Burks*, the defendant relied on *Chinchilla* in arguing that the prosecutor's justifications were pretextual and should not be believed. This Court refused to second-guess the district court's credibility determination and distinguished *Chinchilla* as follows: Where multiple "explanations offered by the prosecutor were objectively and demonstrably false" and the *Batson* movant "shows the remaining race-neutral reason is not sufficiently 'clear and reasonably specific,' he may be deemed to have carried his burden of proving intentional discrimination." *Burks*, 27 F.3d at 1429.

Here, even granting the mistaken reference to a "discrimination suit," the remaining race-neutral reasons for Garcia's strike are entirely clear and specific: Garcia's mother, with whom she was close, experienced employment

discrimination and spoke often to Garcia about it over the three or four years since it began.  Appellants cannot dispute these facts.  This is textbook material for a peremptory strike that strongly supports the district court's finding.

Appellants' additional claims of mistaken statements are themselves mistaken.  They accuse Nibco's counsel of "disingenuously claim[ing] to the district court that [he] had to do followup to get" Garcia to describe her mother's experience.  AOB 34.  But *this statement was true*.  Garcia was asked in Question 45 of her questionnaire to "please explain the situation" underlying any check marks she provided in response to Question 45, and Garcia pointedly refused to do so.  She only stated, "Many different situations.  Many incidences @ work and environment."  App. 49.  (Perhaps she concluded there was not enough room to explain all of her perceived experiences with discrimination and harassment.)  Counsel's additional justification is plainly supported by the record.

Finally, appellants actually accuse Nibco's counsel of taking improper liberties by arguing that Garcia was "very close" to her mother when she only testified that she and her mother were "close."  AOB 34.  While not a substantial contention, this does reveal the type of micromanagement of the jury selection process that appellants advocate.

The district court's no-discrimination finding was not erroneous.

24

### 3. Appellants' "Comparative Analysis" Reveals No Pretext – Garcia Had No Peers In The Venire When It Came To Nibco's Stated Grounds For Her Strike.

Appellants claim that "a comparative analysis of similarly situated jurors" would reveal discrimination lurking behind Garcia's strike. AOB at 30 (quoting *Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008)). The opening brief repeatedly cites *Kesser* and *Miller-El v. Dretke,* 545 U.S. 231 (2005) for their observations that, "[i]f a prosecutor's proffered reason for striking a [minority] panelist applies *just as well to an otherwise-similar* [nonminority] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Kesser*, 465 F.3d at 360 (citing *Miller-El*, 545 U.S at 241) (emphasis added). Contrary to appellants' claim that a comparative analysis is "required," AOB at 30-31, *Green v. LaMarque* itself, decided years after *Miller-El*, confirms that "comparative analysis" is *not* required. *See Green*, 532 F.3d at 1030.

In any event, appellants fail to grasp that, under the "comparative analysis" contemplated by the *Miller-El* and *Kesser* line of cases, *there were no jurors who were "otherwise-similar" to Garcia* when it came to their personal and family experience with employment discrimination. Under any honest "comparative analysis," Roxanne Garcia stood out as a leading candidate for a strike based on her 11 check marks in response to Question 45. Her voir dire testimony only cemented that conclusion.

Appellants attempt to cover up this glaring weakness by lumping all of the stricken jurors together and arguing that the proper level of generality for making comparisons among jurors here is whether "they or someone close to them had lost their jobs or suffered other adverse workplace actions."  AOB 38.  Under a *Miller-El* "comparative analysis," however, it is the "side-by-side" comparison between jurors who were stricken to those who were empaneled that matters.  *Miller-El*, 545 U.S. at 241; *Kesser*, 465 F.3d at 362 (counseling "'side-by-side comparison' with the background and responses of the jurors who were seated").

No side-by-side comparison of Garcia with the jurors who were seated could possibly lead to the conclusion that the district court clearly erred here.  A cursory review of the allegedly "comparable" Caucasian jurors cited in the opening brief reveals that none of them are "otherwise-similar" to Garcia:

<u>Stricken Juror Tweedy</u>.  Appellants claim that Nibco's failure to question prospective juror Tweedy about her "experiences with job loss" is "redolent of pretext."  AOB 39.  Tweedy was the next closest to Garcia in responses to Question 45, albeit a distant second with only four check marks, *and Nibco struck her as well*.  Nibco did not *need* to question Tweedy to properly conclude that she should be stricken.  The fact that Nibco struck prospective Caucasian juror Tweedy

on grounds consistent with its other strikes runs directly contrary to the extreme

circumstances presented in *Miller-El* and *Kesser*.[4]

    <u>Stricken Juror Stanford</u>.  Appellants argue that "Nibco's failure to challenge

[prospective juror] Stanford in particular stands out as nothing less than

remarkable" in light of Stanford's voir dire testimony about his wife's termination

and her potential employment claims.  AOB 39; EOR 116:18-118:13.  What is

--------------------------------------------------------

[4]    Each case is entirely distinguishable here in any event.  In *Miller-El*, "10 of the 11 qualified black venire panel members were peremptorily struck," and "[a]t least two of them . . . were ostensibly acceptable to prosecutors seeking a death verdict, and [one] was ideal."  545 U.S. at 265. Moreover, prosecutors in the case "marked the race of each prospective juror on their juror cards."  *Id*. at 264.  The government claimed at oral argument "that prosecutors could have been tracking jurors' races to be sure of avoiding a *Batson* violation," but *Batson* had not even been decided at the time the trial took place.  *Id*. n.38.  In short, the facts were strongly stacked against a no-discrimination finding.

    *Kesser* likewise presented extreme facts.  In *Kesser*, a habeas case, the court determined that the California courts "erred in finding any sincere, permissible motives" for the peremptory challenges, which the court called "blatant race-based strikes."  465 F.3d at 358.  Indeed, "[t]he racial animus behind the prosecutor's strikes [wa]s clear.  When he was asked to explain why he used a peremptory challenge to eliminate [Native-American] Rindels, he answered using blatant racial and cultural stereotypes."  *Id*. at 357.  And his "obvious fixation with Native Americans was not limited to Rindels," as "he used two more challenges to strike the remaining Native Americans."  *Id*.  Indeed, during the *Batson* hearing itself, when listing his reasons for his strikes, the prosecutor said "these were 'the darkest-skinned women that I saw on the panel.'"  *Id*. at 368-69.  These facts bear no resemblance to this case.

*really* remarkable is that appellants would even make this argument when appellants admit that *they struck Stanford before Nibco ran out of strikes*. AOB 23 n.12, 26. Nibco's failure to strike him before appellants, while it still had a strike left, shows nothing.

Juror Veldstra. Appellants likewise complain that Nibco did not question prospective juror Veldstra, who was seated, about his employment adversities. AOB 38-39. Veldstra, who had retired a sergeant after 30 years of service in the Stanislaus County sheriff's department, indicated that he had been laid off "40 years ago" due to a "seasonal layoff." EOR 109-10; App. 242. He is hardly "comparable" to Garcia (or either of the other stricken jurors, for that matter).

Unseated Juror Stockton. Appellants cannot argue that prospective juror Stockton is comparable to Garcia when Stockton only stated in her questionnaire that her "brother was fired from his job" and "*just* moved on and got another job." AOB 38; App. at 225 (emphasis added). Having checked only two boxes in Question 45 and indicated that her brother's job loss was essentially no big deal, Stockton's questionnaire, unlike Garcia's, did not cry out for further questioning,[5]

---

[5]     Appellants repeatedly argue here that Nibco's "failure" to "probe" prospective jurors about an array of subjects is evidence of counsel's alleged discrimination. *See*, *e.g.* AOB at 39-42, citing *Miller-El*, 545 U.S. at 246 ("the State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham"). Appellants fail to note, however, that *Miller-El* was a capital case where

(continued . . . )

let alone a strike.  In any event, appellants also admit that Stockton was *not* seated on the jury.  AOB 23 n.13.

Juror Marchbanks.  Appellants' claim that juror Nancy Marchbanks was comparable to Garcia (or the other stricken jurors) is preposterous.  They cite "discipline" Marchbanks suffered in her employment which consisted of the placement of a letter in her file *in the 1970s*.  AOB 24.  Marchbanks also advised in her questionnaire that she had witnessed discrimination or harassment, App. at 155 and 157 (describing employer who "kissed an assistant"), which simply cannot be compared to Garcia's statements about her mother's ordeal.

The district court's finding of no purposeful discrimination – entitled to great deference – was plainly correct.

### B.    The Court Correctly Concluded That Teresa Gomez's Strike Was Not Motivated By Purposeful Discrimination.

In a separate finding, the district court likewise concluded that appellants failed to show that Nibco's strike of prospective juror Teresa Gomez was motivated by purposeful discrimination.  This finding was plainly accurate.

---

( . . . continued)
jury selection "took place over *five weeks*" and offered comparatively *unlimited* time for voir dire questioning.  *Id*. at 275 (Thomas, J. dissenting) (emphasis added).  By contrast, when appellants' counsel engaged in voir dire questioning here, he noted *twice* "that *I have a limited amount of time*."  EOR 188:13-15, 196:25-197:2 (emphasis added).

    **1.**    **The Record Strongly Supports The Conclusion That Nibco's Strike Of Gomez Was Not Motivated By Discrimination.**

Nibco's counsel provided multiple race-neutral reasons for the strike of Ms. Gomez, all of which were amply supported by the record.

    **a.**    **Gomez's Multilingual Work Experience – And Her Characterization Of That Experience – Is Strong Evidence That The Strike Was Based On Strategy Rather Than Discrimination.**

Nibco's counsel offered Gomez's experience at (and views about) Frito Lay as one of his many justifications for Gomez's strike: "She worked in a workplace with many languages, never had a problem.  Loved Frito Lay, loved working with all of the people of the different languages.  And so I felt there's enough ground there on potential bias right there."  EOR 251:19-23.[6]

The district court found Gomez's work history to be a genuine (and "very good") reason for Nibco to strike her that was not "motivat[ed]" by race:

> [T]he fact that the supervisors are multilingual and she said that worked very well in the workplace at Frito Lay, there is certainly a rational basis to say that she could impose that experience where she said it was, in effect, a wonderful work environment. It's a great company, she'd recommend it to anybody on this employment environment where, as I understand the evidence, Nibco didn't have

---

[6]    In response, appellants argued that "the mere fact that someone such as Ms. Gomez . . . indicate[s] that [she] work[s] in a workplace where there's more than one language being spoken indicates to me that there is some bias.  Just by counsel's own words."  EOR 253.  They seem to have abandoned this argument on appeal and instead simply dispute the genuineness of this reason.  AOB 40-41.

> multilingual supervisors and, in fact, imposed this English requirement rather than to speak different languages. And that's going to be an issue in the case. But it's a very good reason for somebody who's found that to be a wonderful context.

EOR 256:22-275:9.

Appellants attack this finding by arguing that Nibco wrongly "conflated" Gomez's positive feelings about Frito-Lay and its multi-lingual work environment by arguing that they were related. AOB at 35. This argument first ignores that Gomez herself *volunteered* that "Frito Lay is very diverse. There's all different kinds of races that work together. And they all speak different languages." EOR 243:20-23. Likewise, when asked whether, following the disposition of her worker's compensation claim against Frito Lay she held any other grievance against them, instead of just saying "no," she *volunteered again* that "if I had to recommend them for somebody to go to work with them, I'd say they're a great company to work for." EOR 249:2-7. Nibco's counsel was certainly entitled to assume that there was at least some connection between Frito Lay's multilingual work environment and Ms. Gomez's view that it was a "great company to work for." *See Stubbs v. Gomez*, 189 F.3d 1099, 1103-06 (9th Cir. 1999), and discussion *infra* in Section C.

There can be no doubt – and appellants do not dispute[7] – that making such a connection is a legitimate basis for a strike. They just dispute that counsel genuinely made such a connection. Having witnessed Gomez's statements first-hand, the district court certainly found that connection to be credible, and that factual finding is entitled to great deference.

> **b.    Gomez's Own Claim Against Her Former Employer And Her Sister's Termination Supported The District Court's Conclusion That The Strike Was Based On "Labor Versus Management" Strategy Concerns, Not Discrimination.**

Nibco's counsel further justified the Gomez strike by noting that Gomez had filed a worker's compensation claim against Frito Lay and that her sister had been terminated from her job. EOR 251:10-17, 254:1-11. Indeed, during voir dire, Gomez confirmed that the worker's compensation claim had been brought just a few years earlier, and that the claim "went well" because she "got [her] medical benefits paid and everything." EOR 242:9-17, 248:10-15.

---

[7]    Indeed, appellants argue in a footnote that, "assuming" the connection were legitimate, Nibco "would have been expected to conduct additional voir dire" to test whether her Frito Lay experience would have produced bias. AOB at 35-36 n.23. Appellants again cite *Miller-El* for this proposition, where the voir dire lasted *five weeks*. Appellants overlook that, even if Gomez had denied that this experience would result in bias, Nibco's counsel had ample justification for disbelieving her. *See Burks*, 27 F.3d at 1429; *Stubbs*, 189 F.3d at 1105.

Appellants' argument completely omits any discussion of Gomez's claim against her employer, let alone an explanation as to why the recent claim was not, in and of itself, a strategic, non-discriminatory basis for striking her. Appellants were likewise mute on this point in the district court. In a case involving allegations of discriminatory employment practices, it goes without saying that defense counsel is entitled to strike jurors based on their propensity to assert employment-based claims *themselves*. *Cf. Tinner v. United Ins. Co. of America*, 308 F.3d 697, 703-706 (7th Cir. 2002) (affirming no discrimination finding in Title VII case where stricken juror's sister had filed a discrimination suit).

Accordingly, the district court was unquestionably justified to conclude that: "[Q]uite frankly, the Court doesn't see this as anything having to do with race, but quite frankly, it's management versus labor and *this is a person who's been making claims against her employer*, *herself*." EOR 256:16-19 (emphasis added). Indeed, the court noted that appellants themselves had based their strikes on the same "labor versus management" theme: "[J]ust like I allowed you your strategic reasons. It's labor versus management. And you want to get rid of managers, quite frankly, if you're the claimant." EOR 260:18-21. Appellants' counsel admitted that he had struck Caucasians based at least in part on that very distinction: "It was strategic, Your Honor, and that is in part some of the reasons . . . ." *Id*. at 260:25-261:1.

33

The district court's analysis echoes the analysis in *Tinner*, where the court found it instructive that plaintiff had struck a Caucasian manager:

> Presumably, [plaintiff] excluded Mr. Kuester *because he fell on the side of "management,"* and Tinner's counsel wanted to ensure a more plaintiff-friendly jury panel. United did not object to the strike of Mr. Kuester, who was white. *This type of challenge in jury selection is crucial to the functioning of our adversarial legal system.* Just as Tinner's challenge of Mr. Kuester is not indicative of a purposeful effort to exclude whites, United's challenge of Mrs. Clardy is not indicative of its efforts to systematically exclude African-Americans.

*Tinner*, 308 F.3d at 706 n.6 (emphasis added).

Appellants attempt to attack the genuineness of the "labor versus management" justification by focusing solely on the termination of Gomez's sister and repeatedly arguing that Nibco's counsel "misrepresented" to the district court that Gomez's sister had filed a discrimination claim. While counsel did state that Gomez's sister "had problems with discrimination," the next words out of his mouth were: "**Or not**." EOR 251:15-16. In other words, counsel misspoke *and corrected himself*.

The best evidence that this misstatement was corrected on the spot is the apparent decision by appellants' counsel at the time that they did not need to clarify the record further. When given an opportunity to respond, appellants' counsel obviously did not see the need to mention anything about the "discrimination" statement. Instead, counsel referred to Gomez as "Garcia" and disputed that Gomez had any lingering bias resulting from her sister's

termination.[8]  EOR 252-53.  Yet, months later, appellants decry the corrected

misstatement as a "distortion" that "could hardly have been more patent."  AOB

34-35.  This argument should be rejected on waiver grounds.  *See Arce*, 997 F.2d at

1122-23 and discussion *supra*.  In any event, considering the unquestionable

legitimacy of the strike based on all of the remaining, objective justifications, the

district court's reference to Gomez's sister being "involved in a discrimination

claim" cannot possibly suffice to render the bottom-line no-discrimination finding

clearly erroneous.  *See* discussion of *Burks* and *Chinchilla, supra*.

Appellants likewise miss the mark by continuing to stress Gomez's

acknowledgement that her sister's termination "was her fault" because "she called

off too many times."  AOB at 34-35; EOR 247:18-248:2.  Professed bias is in no

way required to justify a strike.  *See Batson*, 476 U.S. at 97 ("we emphasize that

the prosecutor's explanation need not rise to the level justifying exercise of a

---

[8]     Counsel's own verbal gaffe – confusing Gomez and Garcia – surely
undercuts appellants' already-improper invitation in a footnote for this court to
substitute its own evaluation of the "demeanor" of Nibco's counsel in the place of
the district court's, based on a mistaken reference to Ms. Gomez as "Mr. Gomez"
and allegedly "disjointed" comments, "even with the assistance of his notes."
AOB 36 n.24.  This argument expressly ignores the Supreme Court's instruction in
*Hernandez* that "evaluation of the [striking attorney's] state of mind based on
demeanor and credibility lies 'peculiarly within a trial judge's province.'"
*Hernandez*, 500 U.S. at 365.  The district court witnessed first-hand the various
parties' demeanor and decided that Ms. Gomez's own eloquence about her
experiences and her views supported the strike.

challenge for cause"). And, in any event, counsel was entitled to disbelieve any statements denying anti-employer bias. *See*, *e.g.*, *Burks*, 27 F.3d at 1429 (prosecutor entitled to disbelieve juror's statements that they could impose death penalty); *Stubbs*, 189 F.3d at 1105 (prosecutor's belief that juror was lying was a race-neutral justification for strike). Finally, appellants ignore Ms. Gomez's own hand-written statement in her jury questionnaire. When asked to explain whether she or anyone close to her had ever been terminated from a job, she wrote: "Sister has been fired!" App. 88. Gomez's own exclamation point undercuts appellants' suggestion that her sister's termination was a non-event.[9]

### 2. Appellants' "Comparative Analysis" Reveals No Pretext – No Other Members Of The Venire Were Similarly Situated To Gomez.

Appellants' "comparative analysis" of the Gomez strike focuses on Nibco's justification that Gomez had worked in a multilingual environment where, as

---

[9]     Nibco also justified its strike of Gomez by pointing out that she had served on two juries, and in the case where she served through the end of trial, the jury had been unable to reach a verdict. EOR 241, 251. Although appellants ignore this on appeal, strikes based on prior jury service are "wholly within [a lawyer's] prerogative." *Thompson*, 827 F.2d at 1260; *Contreras-Contreras*, 83 F.3d at 1104-1106 (no *Batson* violation when prosecutor struck juror "who had been on a jury very recently in this district"); *United States v. Rudas*, 905 F.2d 38, 41 (2nd Cir. 1990) ("service on a hung jury was a legitimate reason for striking" Hispanic juror).

Gomez herself stated, the workers and supervisors spoke multiple languages. AOB 25-26, 40-41; EOR 243-44. But appellants certainly cannot claim that Nibco's justification in this regard "applies *just as well to an otherwise-similar* [nonminority] who [wa]s permitted to serve." *Kesser*, 465 F.3d at 360.

Instead, just as with the faulty comparative analysis discussed above, they claim that other members of the venire were "comparable" only after changing the level of generality for the basis of comparison. Thus, appellants find it nefarious that Nibco "voiced no concern whatsoever about Caucasian prospective jurors Veldstra and Lucas, who had not only worked in *multilingual settings* but who also appeared receptive to and comfortable with the role of linguistic accommodations in getting a job done." AOB 40 (emphasis added).

Gomez did not merely state that she worked in a "multilingual setting." She volunteered that the "very diverse" Frito Lay included "all different kinds of races" that "all speak different languages." EOR 243:21-23. She further advised that the supervisors spoke multiple languages as well as the workers, and she volunteered that Frito Lay was a "great company to work for." EOR 244, 248. As the district court correctly noted, whether Nibco should have made such accommodations was a key issue in the trial. EOR 256:16-257:9.

Veldstra and Lucas were in no way comparable to Gomez in this regard. Veldstra was a *police officer*, so of course he "dealt with people from all over the

world" where "a lot of times they didn't speak English and you improvised."  EOR 212:2-5.  Likewise, Lucas had worked as a flight attendant, so she naturally encountered passengers who spoke different languages; she noted that "we had others who spoke other languages who translated on the aircraft."  EOR 211:22-25 (noting also: "But we had to read and write English").  Veldstra and Lucas *did not*, by contrast, state that they had multilingual co-workers and supervisors, nor did they state that multilingual skills were needed for their fellow employees to communicate *with each other*.  They were not "otherwise-similar" to Gomez.  *Kesser*, 465 F.3d at 360.[10]

Appellants also appear to argue that a discriminatory purpose is revealed by virtue of their allegation that "Nibco's counsel singled out Hispanic prospective jurors Garcia and Gomez to ask them about their opinions concerning the speaking of languages other than English in the workplace."  AOB 25.  This is factually wrong.  Nibco's counsel did not ask Gomez about any such "opinions," nor did he

---

[10]    Whereas appellants find it sinister that Nibco's counsel allegedly refrained from "conduct[ing] further voir dire into [Veldstra's and Lucas'] attitudes" about multilingual workplaces, any such economizing of time would have made sense under the circumstances.  AOB 41.  Nibco's counsel did, however, ask Veldstra: "How were your experiences with the improvising?" while dealing with a multilingual public as a police officer.  EOR 212:6-7.

need to, given her spontaneous statements that the multilingual Frito Lay was a "great" place to work.[11]

Finally, it must also be noted that Nibco offered multiple, independent reasons for striking Gomez, which makes it all the more difficult for appellants to show other jurors were "comparable." *United States v. Lewis*, 837 F.2d 415, 417 n.5 (9th Cir. 1988) (rejecting claim that discrimination shown where prosecutor "failed to strike other veniremen possessing some of the same characteristics that she cited as justifications for striking the black" juror and recognizing "that the decision whether to strike . . . hinges upon the interplay of various factors and that no unchallenged juror possessed all the cited characteristics"); *Mitleider*, 391 F.2d at 1049 n.9 (comparing multiple factors to distinguish jurors); *Turner v. Marshall*, 121 F.3d 1248, 1253 (9th Cir. 1997) (reversing denial of *Batson* motion but emphasizing that "we do not confront a case in which the prosecutor offered several explanations for a peremptory strike, and a seated juror shares *some* of the

_____

[11]    This argument further ignores that Nibco did not strike Garcia based on her "attitudes" about language in the workplace.  In any event, their theory that Garcia was "singled out" is refuted by the record.  *Appellants' counsel* had already asked the entire group of jurors then in the jury box to volunteer "what [their] particular feelings" were about the issues of language in the workplace.  EOR at 188-196 (eliciting responses from eight members of the venire, including Veldstra, but not including Garcia).  Nibco's counsel did ask questions about jurors' experiences in environments with several different languages, which elicited responses from an additional three jurors who had not previously responded to language-based questions from appellants' counsel.  EOR at 210-12.

same characteristics") (emphasis in original).  In Gomez's case, there were no comparable jurors.

In sum, the district court's no-discrimination finding as to Gomez is strongly supported by the record.

### C.    The Court Correctly Concluded That Adrian Lucatero's Strike Was Not Motivated By Purposeful Discrimination.

The record strongly supports the district court's no-discrimination finding as to the strike of prospective juror Adrian Lucatero.  There is no dispute that Lucatero indicated on his questionnaire that both of his parents were unemployed. EOR 259:7; App. 142.  Indeed, when Nibco's counsel referred to the layoff of Lucatero's father, appellants' counsel agreed that "Mr. Lucatero did say something about his father."  EOR 253:10-11.  There is likewise no dispute that Lucatero indicated that his father was laid off "because of no hours."  EOR 259:6; App. 143. There is no dispute that Lucatero indicated he was "close" to his father on his questionnaire.  App. 143.  Finally, there can be no dispute that Nibco's position at trial was that plaintiffs' layoffs resulted from adverse business conditions.  EOR 259:12-14 (relating Lucatero's father's layoff to "the situation here where there was a slowdown in business").  These circumstances unquestionably justified the strike and provide powerful evidence of no discrimination.

Courts have consistently recognized the propriety of peremptory strikes of prospective jurors who are unemployed *or whose family members are unemployed*

in cases having *nothing to do with layoffs*. This Court recognizes this common trial strategy as an acceptable, race-neutral justification for striking jurors in the *Batson* context. In *United States v. Cruz-Escoto*, 476 F.3d 1081, *supra*, for example, defendant challenged the government's strikes of two Hispanic prospective jurors. "The government rationalized excluding the two Hispanic jurors because they – *or their sons*, depending on which version of transcript is accurate – were unemployed." *Id*. at 1089-90 (emphasis added). The court rejected defendant's claim that this was an unacceptable race-neutral justification for the strike. *See also United States v. Gillam*, 167 F.3d 1273, 1278 (9th Cir. 1999) (no *Batson* violation where the stricken "juror had been unemployed for a year and [the prosecutor] was concerned about his ability to serve as a conscientious juror"); *United States v. Rodrequez*, 859 F.2d 1321, 1324 (8th Cir. 1988) (no *Batson* violation where one of the stricken jurors "was the relative of a police officer who had been laid off").

*When the underlying case involves employment-based claims and layoffs*, a court certainly does not commit "clear error" when it concludes that a strike based on a juror's family members' unemployment is not racially motivated. In *Garcia v. Excel*, 102 F.3d 758 (5th Cir. 1997), for instance, a Hispanic plaintiff brought an action for a workplace injury. Plaintiff made a *Batson* motion when defendant corporation struck an African-American and two Hispanic members from the

venire.  The corporate defendant "advised that the three members of the venire were excused because of their work histories *or that of their spouses*."  *Id*. at 759 (emphasis added).  Since plaintiff's "action involved an alleged workplace injury and [defendant] expressed the view that it preferred not to have unemployed jurors or those with unemployed spouses," the justification was plainly valid and no *Batson* error occurred.  *Id*. at 760.

Where there is no dispute here that Lucatero's father, with whom Lucatero had a "close" relationship, had been laid off and was still unemployed, and likewise where there is no dispute that his mother was unemployed as well, there can be no doubt that Lucatero's strike was entirely proper.

Because appellants cannot dispute these core justifications for the strike, they build their entire argument around alleged misstatements by Nibco's counsel below.  This argument has fatal flaws, aside from ignoring that the core justifications for Lucatero's strike were undisputed and accepted strategic bases for strikes.  *See Burks*, 27 F.3d at 1429 and discussion *supra*.

The first flaw is that appellants ignore the facts in the record.  Indeed, Nibco's counsel did include in his initial list of justifications for the strike his subjective impressions that Lucatero (1) "indicated that he was not, you know, frankly, I thought comfortable sitting as the juror" and (2) "indicated that, you know, the experience of his father getting laid off was something that bothered him

and he was concerned about that." EOR 252:3-7. Appellants' theory that these statements impacted the district court's decision disintegrates, however, upon a review of the transcript, as the court implicitly *rejected* these classic subjective justifications when it did its job of evaluating the facts to ensure that the strike was not racially motivated:

> THE COURT: The problem is you didn't ask whether his father was suffering or whether he's been upset by it, whether there are any kinds of hard feelings or difficulties. Whether he thought it was fair or unfair.

EOR 258:23-259:1.

There is no need to debate whether counsel's intuitions were appropriate bases for the strike, because, in response to the court's observations, Nibco's counsel turned to Lucatero's own statements in the jury questionnaire and *narrowed the justifications for the strike*[12]:

---

[12]     Subjective justifications, of course, can be entirely proper. *Cf. Purkett*, 514 U.S. at 766 (prosecutor struck two jurors on grounds that "I don't like the way they looked, with the way the hair is cut, both of them," and "the mustaches and the beards look suspicious to me") and 768 (at third step of *Batson* inquiry, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination"). Counsel's intuitions about Lucatero can hardly be dismissed as "implausible or fantastic," given the undisputed facts that both of the 19-year-old's parents were unemployed. *Cf. also United States v. Lorenzo*, 995 F.2d 1448, 1454 (9th Cir. 1993) (no *Batson* violation in tax protestor prosecution where ethnic juror stricken and prosecutor cited his "'long, unkempt' hair and 'long' beard and 'associated his appearance with the counterculture beliefs of "hippies"'"; this identified legitimate "concern that a juror may identify with the defendant"); *Thompson*, 827 F.2d at 1260 ("reasons may not be logical, but that's

(continued . . . )

MR. HAHESY: But I have his, you know, questionnaire. I mean, he indicates what the --[13]

. . .

MR. HAHESY: **Father got laid off because of no hours. Both of his parents are unemployed at this time**. And --

. . .

THE COURT: In other words, it sounds like he was laid off because there was no work for him.

MR. HAHESY: And that's the situation here where there was a slowdown in the business. People were laid off because of the slowdown of the business. And so, you know, when you have a case that involves claims relating to lay off, if you've got one of your jurors whose parent has undergone this event recently.

THE COURT: All right. I'm going to find that the facts are sufficiently analogous, in other words, a layoff because of a reduction in work and persons being out of work where the juror lives with his father. And that exact circumstance is being experienced.

There's certainly nothing racially charged or racially motivated against that and that's what *Batson* seeks to prevent. It doesn't seek to prevent the legitimate exercise of peremptory challenge for strategic reasons by a trial lawyer. Therefore I'm going to deny the *Batson* challenge on that.

EOR 259:2-260:3 (emphasis added).

Appellants object to the court's reference in its ruling that Lucatero "lives

with his father," but they cannot seriously contend that there is no support in the

---

( . . . continued)

what peremptory challenges are all about"; "[t]hey are often founded on nothing more than a trial lawyer's instinct about a prospective juror").

[13] At this point in the discussion, appellants' counsel interjected: "I disagree that he said -- that Mr. Lucatero said he made any kind of claim." This is a *non sequitur*, as Nibco's counsel did not assert that Lucatero's father brought a claim.

record for the conclusion that Lucatero lived with his family, let alone that this is an "implausible or fantastic justification" indicating pretext. *Purkett*, 514 U.S. at 768. Lucatero indicated on his questionnaire that he was 19 years old. App. 139. He stated on his questionnaire that he did not rent his home. *Id*. Rather, he checked the box indicating that he owned his home. Yet he also testified that his sole employment was serving as a "retail associate" at a discount store. EOR 154:22-155:4. His juror questionnaire revealed that he had held this job for 11 months. App. at 139. And he indicated that he was close to his father. *Id*. at 143.

In sum, Nibco's counsel had ample justification to *assume* that Lucatero lived with his parents.[14] The Ninth Circuit's decision in *Stubbs v. Gomez* confirms that Nibco's counsel was entitled to make that assumption and that reliance on such an assumption in no way evidences "pretext." In *Stubbs*, the prosecutor struck prospective juror Chaquita Goodloe on multiple grounds, including the specific statement that she "had no working experience at all. She was . . . twenty-five at the time. She had five children. She had never been married. She wasn't working." *Stubbs*, 189 F.3d at 1103. However, the prosecutor later acknowledged that "Ms. Goodloe's jury questionnaire did not state that she had no work history,

---

[14]    He also had ample justification to disbelieve Lucatero's statement that he owned a house and to conclude that, in fact, Lucatero lived in his parents' home. *Burks*, 27 F.3d at 1429.

but that he had made that 'assumption.'" *Id.* Despite the fact that the prosecutor's "assumption" went directly to one of his reasons for striking Goodloe, the district court found no *Batson* violation and the Ninth Circuit found no clear error. *Id.* at 1107. An assumption as to whether Lucatero actually lived with his parents likewise does not point to error here, especially given the undisputed facts that both of his parents were unemployed, his father was laid off for "no hours," and Lucatero was close to his father.

In *Mitleider*, likewise, the Ninth Circuit accepted a justification based partly on an assumption with the *express recognition that the assumption may be incorrect*. The prosecutor struck "Miss B" because, among other reasons, she was young and she showed up late to court, which the prosecutor took as a sign of "immaturity." 391 F.3d at 1044, 1048. Defendant argued that "there may have been good reasons for her tardiness, which the prosecutor failed to explore." *Id.* at 1049. The court rejected this, noting that "the prosecutor's belief that Miss B.'s tardiness was a sign of immaturity is a legitimate reason for his challenge, *even if mistaken*, as long as the reason is not pretextual." *Id.* (emphasis added). This Court did not second-guess the district court's finding of no pretext.[15] These

---

[15]    Indeed, the prosecutor made *another assumption* about a second stricken juror in that case. *Id.* at 1049 n.8. Although the court agreed "that the prosecutor erred" in his recollection regarding the second stricken juror, it was not unreasonable for the prosecutor to have been troubled by the juror's answers. *Id.*

results reflect the long-accepted truth that peremptory challenges often rest on "a trial lawyer's instinct about a prospective juror." *Thompson*, 827 F.2d at 1260.[16]

Finally, appellants make little effort to argue that "comparative analysis" undermines the legitimacy of Lucatero's strike. The discussion in Section A above (regarding the utter lack of comparability between Garcia's circumstances to the conditions of Veldstra, Stanford, Stockton, and Marchbanks) applies equally well here. None of these jurors indicated that they had two close relatives who were unemployed. They were not "comparable" to Lucatero.

In sum, the district court's no-discrimination finding as to Lucatero is strongly supported by the record.

## II. That Hispanic Jurors Were Seated On The Jury Strongly Supports The Finding Of No Discrimination.

The district court's no-discrimination finding is strongly bolstered by its concurrent finding that two Hispanic jurors (Lionel Dias and David Nunez) were included on the final panel. While not conclusive evidence of counsel's state of mind, it is nevertheless powerful objective evidence of intent, especially compared

---

[16] Appellants are mistaken when they claim that a discriminatory motive is revealed by Nibco's statements to the effect that Lucatero's father "recently" experienced his layoff. Counsel would be just as entitled to assume that the justification for striking Lucatero was even stronger if Lucatero's father had been unemployed for an extended time during Lucatero's teen-aged years. In any event, the district court made no reference to any assumption about the duration of the senior Lucatero's unemployment in his no-discrimination finding.

to appellants' theories about counsel's intent. *Gillam*, 167 F.3d at 1278 (noting that "two jurors with Latino surnames were seated on the jury"); *Burks*, 27 F.3d at 1429 (noting that "[h]ere, the prosecutor did accept minorities on the jury – a valid, though not necessarily dispositive, consideration"); *Chinchilla*, 874 F.2d at 698 n.4 ("the willingness of a prosecutor to accept minority jurors weighs against the findings of a prima facie case").

Appellants mistakenly cite *Turner v. Marshall* for the proposition that "it is of no moment that the proponent of the strikes in question may have allowed some prospective jurors of the same race or ethnicity to stay on the jury." AOB 48. In *Turner*, the empaneling of other minority jurors did not "salvage" the prosecutor's credibility when the *only* justification for the strike was expressly found to be pretextual because that sole justification was not applied to a Caucasian juror. *Turner*, 121 F.3d at 1253-55. As shown above, no comparative analysis undermines the justifications for the strikes here, and the empaneling of two Hispanic jurors only supports the no-discrimination finding.

Appellants also engage in inappropriate speculation about whether juror Lionel Dias is sufficiently "authentic" to be counted as Hispanic, thereby practicing the very sort of pernicious stereotyping that *Batson* sought to avoid. Appellants cite authorities for the proposition that Dias is a common Portuguese name, and therefore Dias is not technically "Hispanic," as if that undermines the

district court's conclusion that Nibco's counsel was not engaging in discriminator strikes. AOB at 27, n.17 and 48 n.35. Perhaps appellants would have the district court interrupt the proceeding to ask Mr. Dias whether he really was Hispanic, subjecting him to the very embarrassment and isolation *Batson* sought to eradicate.[17]

Appellants' exercise in racial genotyping has no place here and is certainly not the type of review that *Batson* requires. What does matter is evidence about what the striking attorney believed. In this case, there is no evidence whatsoever that Nibco's counsel (or the court) actually thought Lionel Dias was not Hispanic. Indeed, the evidence is entirely to the contrary, which further supports the district court's conclusion that Nibco's strikes were not motivated by discrimination.

Appellants also claim that Nibco's waiver of its final peremptory challenge provides evidence of discrimination since "another Hispanic juror, April Garza, would have been the next to be seated, as she was 'Prospective Juror Number

---

[17]     The decision in *United States v. Hernandez-Herrera*, 273 F.3d 1213 (9th Cir. 2001), illustrates the fallacy of appellant's genealogical second-guessing. In that case, this Court found no *Batson* violation when the movant objected that the government struck a juror with a "Hispanic sounding surname" and the government responded that two members of the jury had "Hispanic sounding surnames." *Id.* at 1218. The other two Hispanic sounding surnames were Susa and Sarmiento. *Id.* Had the *Hernandez-Herrera* panel consulted Wikipedia, as appellants urge here, it might have concluded that the name "Susa" suggests a Persian lineage. See http://en.wikipedia.org/wiki/Susa.

49

Twenty.'"  AOB 26 n.15; *id.* at 47.  But this argument cannot be squared with their simultaneous argument that discrimination is *also* shown by Nibco's failure to challenge Prospective Juror *Twenty-One*, Patricia Stockton.  *See id.* at 23 (decrying failure to challenge allegedly comparable juror Stockton).  Had Nibco struck Stockton, the jury would have been exactly the same, so Nibco's waiver of its fifth peremptory strike did *not* mean that Garza avoided service.[18]

## III.    The District Court Applied The Correct Legal Standard And Made The Necessary Findings.

Despite their own failure to cite any of the "evidence" on which they base their appeal, all of which was resting at their fingertips when the *Batson* motion was made, appellants criticize the district court for engaging in an "insufficiently searching" inquiry.  AOB 42-46.  And yet, notwithstanding appellants' failure to meaningfully participate below, the district court did engage in careful and separate fact-finding relating to the strikes of Garcia, Gomez, and Lucatero.

In *Gillam*, the court stated that "*Batson* requires the trial judge 'to determine if the defendant has established purposeful discrimination.'  Neither *Batson* nor its progeny requires that the trial judge make specific findings, beyond ruling on the

---

[18]    This fact also undermines appellants' reliance on *United States v. Esparza Gonzalez*, 422 F.3d 897 (9th Cir. 2005), since that case dealt with the "struck jury system," where "a waiver of a peremptory strike is properly viewed as the effective removal of an identifiable juror."  *Id*. at 899.

objection."  167 F.3d at 1278 (citing *Batson*, 476 U.S. at 98, and *Hernandez*, 500

U.S. at 363).  The court made express findings that each strike was not motivated

by discrimination.  EOR at 255 (Garcia:  no "evidence whatsoever of racial animus

associated with the challenge"); 257 (Gomez:  "we're focused on race here" and

"whether that was the motivation for the challenge"); and 259 (Lucatero:

"[t]here's certainly nothing racially charged or racially motivated against that and

that's what *Batson* seeks to prevent").

Against these express findings of no discrimination, appellants' criticism of

the district court's various word choices comes off as petty.  *Cf. Burks*, 27 F.3d at

1427 n.1 (petitioners "make too much of [the trial court's] remark" that he would

have made same decisions to strike; court "read it as reflecting the judge's effort to

articulate, perhaps somewhat inartfully, his view that the strikes served legitimate

prosecutorial purposes").  There is no error to be found in the district court's

reference to "a credible basis on all the grounds stated" for the justification of

Garcia's strike, or his reference to a "rational basis" for believing that Gomez

would be biased against Nibco.  EOR at 255-57.  As appellants' own case authority

shows, at the third *Batson* step, the district court is supposed to evaluate the

genuineness of the justifications, including an analysis of whether the justifications

are "implausible [or] fantastic."  AOB at 31 (citing *Purkett*, 514 U.S. at 768).

Appellants claim that it was "unlikely that [the district court] looked beyond the face of Nibco's counsel's arguments."  AOB 43.  But this argument willfully ignores the record, including, for example, the district court's: (1) re-characterization of two of Nibco's justifications for the strike of Gomez as a "labor versus management issue"; (2) comparison of Nibco's strikes to appellants' strikes on "labor versus management" grounds; (3) independent observation that Garcia was "one of the oddest prospective jurors [he had] ever seen";[19] and (4) reference to its own notes about Lucatero and its insistence that Nibco further support its strike.  EOR 254-60.

Appellants' criticism of the district court for a "brief" ruling on the Lucatero strike is particularly audacious.  Contrast the district court's multi-page recitation of its findings here with the two-sentence explanation for the denial of the *Batson* motion in *United States v. Alanis*, 335 F.3d 965 (9th Cir. 2003), which appellants cite repeatedly.  In *Alanis*, the Ninth Circuit construed the district court's summary approach as a complete failure to even engage in a *Batson* step-three analysis.  "It

---

[19]    Appellants criticize the district court for making this independent observation while at the same time criticizing the court for *not* "look[ing] beyond the face of Nibco's counsel's arguments."  *Cf.* AOB 43 and 44 n.34.  The district court is plainly entitled to make independent observations of the jurors' demeanor in connection with *Batson* challenges.  *See United States v. Collins*, 90 F.3d 1420, 1430 (9th Cir. 1996) ("district court judge found that the prosecutor's explanations for the challenges were satisfactory and also noted that he thought [stricken juror] behaved strangely").

is not enough that the district court considered the government's gender-neutral explanations 'plausible.'  Instead, it is necessary that the district court make a *deliberate decision whether purposeful discrimination occurred*."  *Id*. at 969 (emphasis added).  Here, the district court did exactly that – it made deliberate decisions that no purposeful discrimination occurred – yet appellants spend page after page complaining that the court did not do enough.

Appellants' superficial critique of the district court's phrasings is reminiscent of the losing argument in *Mitleider*.  In that habeas case, the trial court heard the prosecutor's justifications for the strikes and stated in its ruling:  "The test is, is there any other basis in reality for the excuse.  It's a close question in my mind, here, but I'm satisfied that there exists a valid basis for the excusal." *Mitleider*, 391 F.3d at 1045.  On habeas review, petitioner seized on these words and argued that the trial court failed to engage in a proper step three analysis under *Batson*.  *Id*. at 1047.  This Court agreed with the California Court of Appeal's determination "that despite the trial judge's choice of words, 'there was no racial basis for the exclusions and that the exclusions had a 'basis in reality' other than group bias.'  Thus, the state courts properly focused on the prosecutor's actual intent."  *Id*. at 1048.  Here, the district court made three express findings of no discrimination and thus satisfied its duty under *Batson*.

**IV.    Appellants' Statistical Disparity Claim Is Misplaced.**

Appellants' last-ditch attempt to show discrimination through a statistical disparity analysis is misguided.  Decisions reviewing statistical disparity do so at the *first step* in a *Batson* inquiry to determine whether a prima facie case exists. Indeed, appellants cite to *Johnson v. California*, 545 U.S. 162 (2005), and *Williams v. Runnels*, 432 F.3d 1102 (9th Cir. 2006), but those cases involved only step one under *Batson*.[20]  The trial courts in those cases did not even reach steps two or three.  Here, by sharp contrast, the district court reached step three and found no discrimination.

Appellants cite no case where a reviewing court threw out a trial court's express findings of no discrimination where the strikes met certain statistical benchmarks.  Any such approach would undercut the entire *Batson* framework. Opponents of strikes would always go straight to the numbers, especially where, as here, they have no factual basis for undermining a no-discrimination finding.  But this court has cautioned that, even at step one, where statistics are commonly

---

[20]    Appellants cite *Hernandez*, 500 U.S. at 363, for the proposition that "[o]ne of the 'relevant circumstances' commonly examined by courts is the presence of any statistical indicia of discrimination." AOB 47.  This is misleading.  The cited discussion in *Hernandez* concerned whether the *proffered justification* for a strike "results in the disproportionate exclusion of members of a certain race," in which case the trial judge "may consider that fact as evidence that the prosecutor's stated reason" was pretextual.  *Hernandez*, 500 U.S. at 363.   It did not concern, let alone endorse, the type of statistical comparison appellants propose.

considered, "there is no magic number of challenged jurors" that controls.

*Chinchilla*, 874 F.2d at 698.[21]   Appellants' statistical arguments cannot possibly

overcome the district court's express no-discrimination findings, which were

amply supported by the record.

## **CONCLUSION**

The district court's separate findings that each of the three strikes at issue

here were not motivated by racial discrimination, but rather were based on sound

strategy and facts that appellants did not dispute below, shows that *Batson*'s goal

---

[21]   Appellants' statistical argument is misleading in any event.  They argue that, after the strikes, "the number of Caucasians had been reduced by less than 50%, [and] fully two-thirds of the Hispanics had been removed."  AOB 48.  Because the number of Caucasians in the jury pool was much larger than Hispanics at the outset, *any* reduction in the number of Hispanic jurors would "impact" their numbers "disproportionately."  A more probative comparison would look to the relative makeup of the venire at different times.  For example, whereas Hispanics composed 28.5% of the panel before peremptory strikes were lodged (6 of 21), they composed 20% of the final jury panel (2 of 10).  This is hardly sufficient to call into question the district court's findings of no purposeful discrimination (the real test under *Batson*).  If the sample is expanded to include all 36 jury pool members to enter the box during jury selection (21 finalists plus the 13 jurors dismissed by the district court and the two stricken for cause on appellants' motion), appellants' "disparate impact" theory evaporates:  Hispanics composed 19.4% of prospective jurors (7, counting Jesus Galvan, of 36) entering the box, and they composed 20% of the final panel.   (Non-peremptory dismissals at EOR 60, 68, 86, 92, 104, 125, 133, 141, 144, 147, 173, 228, 229-230, 234, 240.)

of avoiding discriminatory jury selection was vindicated here.  The district court's

rulings should be affirmed.

Dated:  June 29, 2009                    Respectfully Submitted


    /s/ Charles J. Stevens
Charles J. Stevens
Stevens, O'Connell & Jacobs LLP
Attorneys for Appellee Nibco, Inc.

## STATEMENT OF RELATED CASES

Appellee is unaware of any related case "pending in this court," as set forth in Ninth Circuit Rule 28-2.6. Appellants identify an appeal involving pre-trial discovery in this case as "related," but that appeal was decided more than five years ago and did not concern any of the issues raised in this appeal. *Rivera v. Nibco, Inc.,* No. 02-16532.

## CERTIFICATE OF COMPLIANCE

I certify that the number of words in this brief, exclusive of the table of contents, the table of authorities, and this certificate is 13,486, as calculated by the word processing system used to prepare this brief.


        /s/ Charles J. Stevens
        Charles J. Stevens

## **CERTIFICATE OF SERVICE**

### **U.S. Court of Appeals Docket Number 09-15136**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 29, 2009.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


    /s/ Donna J. Cronan
Donna J. Cronan