_____

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT
_____

No. 09-15136

MARTHA RIVERA, et al.,

    Plaintiffs-Appellants,

    v.

NIBCO, INC., an Indiana corporation,

    Defendant-Appellee.

On Appeal From a Judgment of the United States District Court
for the Eastern District of California,
Hon. Oliver W. Wanger
D.C. No. CIV F-99-6443 OWW SMS

**APPELLANTS' REPLY BRIEF**

Christopher Ho
Carole Vigne
The LEGAL AID SOCIETY –
  EMPLOYMENT LAW CENTER
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone:  (415) 864-8848
Facsimile:  (415) 864-8199

William J. Smith
Shelley G. Bryant
W.J. SMITH AND ASSOCIATES
2350 West Shaw Avenue, Suite 132
Fresno, CA 93711
Telephone:  (559) 432-0986
Facsimile:  (559) 432-4871

**Counsel for Plaintiffs-Appellants**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

I.  INTRODUCTION ................................................................................... 1

II.  ARGUMENT ......................................................................................... 2

A. Nibco Fundamentally Misunderstands The "Affirmative Duty" Of
The Courts Under *Batson* ........................................................................ 2

1.  Nibco's Erroneous Enshrinement Of "Deference" As The
Overriding Principle On Review Would Eviscerate *Batson*. ............ 3

2.  Nibco Invites This Court To Short-Circuit The Third And
Most Important Step Of The *Batson* Analysis. ................................. 7

3.  Nibco Refuses To Acknowledge The Necessity And
Significance Of Comparative Juror Analysis. ................................. 13

4.  The District Court's Articulations Of An Insufficiently
Searching Legal Standard For *Batson* Challenges Only Further
Invites De Novo Review. ................................................................. 15

B. Nibco's Efforts To Explain Away Disparities Revealed By
Comparative Juror Analysis Cannot Obscure The Overwhelming
Indicia Of Pretext. ................................................................................... 17

1.  Roxanne Garcia ............................................................................. 18

a. The Fact That Nibco's Stated Reasons For Striking Ms.
Garcia May Facially Comport With "Accepted Trial
Strategy" Only Begs The Question Of Pretext. ........................... 18

b. Nibco's Characterization Of Its Counsel's False
Representation To The Court About Ms. Garcia's Mother's
Non-Existent Discrimination Case As A Mere "Mistake" Is
Unconvincing. .............................................................................. 19

i

c. Nibco Misconstrues The Record To Exonerate Its Counsel's Suggestion That Ms. Garcia Was Not Forthcoming About Her Mother's Imaginary Lawsuit .................................................. 21

d. Nibco Trivializes Its Mischaracterization Of Ms. Garcia's Statements About Her Mother. .................................................. 23

e. Nibco's Efforts To "Slice And Dice" Away The Race-Based Disparities Revealed By Comparative Analysis Is Contrary To The Cases. ............................................................................ 23

2. Teresa Gomez ................................................................. 30

3. Adrian Lucatero ............................................................. 33

C. Nibco's Remaining Arguments Lack Substance. ............................... 35

D. This Court Is Not Barred From Considering Appellants' Arguments and Appendix. ................................................................ 37

III. CONCLUSION ...................................................................... 40

CERTIFICATE OF COMPLIANCE ............................................. 41

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977).................................................................. 3

*Batson v. Kentucky*, 476 U.S. 79 (1986)................................................. *passim*

*Boyde v. Brown*, 404 F.3d 1159 (9th Cir. 2005)........................................ 8, 9

*Burks v. Borg*, 27 F.3d 1424 (9th Cir. 1994) .......................................... 4, 21

*Concrete Pipe and Products of California, Inc. v. Construction
    Laborers Pension Trust for Southern California*, 508 U.S.
    602 (1993)................................................................................ 41

*Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008) ....................... 13, 14, 15

*Hernandez v. New York*, 500 U.S. 352 (1991) ............................................... 5

*Kesser v. Cambra*, 465 F.3d 351 (9th Cir. 2006) .......................... 2, 5, 14, 21

*Lewis v. Lewis*, 321 F.3d 824 (9th Cir. 2003)........................... 12, 13, 16, 20

*McClain v. Prunty*, 217 F.3d 1209 (9th Cir. 2000) ................................. 6, 21

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) .................................................. 6

*Miller-El v. Dretke*, 545 U.S. 231 (2005)............................................... *passim*

*Mitleider v. Hall*, 391 F.3d 1039 (9th Cir. 2004) ................................... 34, 25

*Paulino v. Harrison*, 542 F.3d 692 (9th Cir. 2008) ....................................... 9

*Purkett v. Elem*, 514 U.S. 765 (1995)........................................................... 8

*Snyder v. Louisiana*, ___ U.S. ___, 128 S. Ct. 1203 (2008) ..................... 4, 8

*Stubbs v. Gomez*, 189 F.3d 1009 (9th Cir. 1999)........................................... 34

*Turner v. Marshall*, 121 F.3d 1248 (9th Cir. 1997)...................................... 36

*United States v. Alanis*, 335 F.3d 965 (9th Cir. 2003)......................... 4, 9, 16

*United States v. Arce*, 997 F.2d 1123 (5th Cir. 1993) ........................... 38, 39

*United States v. Bauer*, 84 F.3d 1549 (9th Cir. 1996) .................................... 9

*United States v. Collins*, 551 F.3d 914 (9th Cir. 2009) .......................... 16, 17

*United States v. Contreras-Contreras*, 83 F.3d 1103
   (9th Cir. 1996) .................................................................... 38, 39

*United States v. Gillam*, 167 F.3d 1273 (9th Cir. 1999).............................. 10

*United States v. Rudas*, 905 F.2d 38 (2d Cir. 1990)..................................... 40

*United States v. Thompson*, 827 F.2d 1254 (9th Cir. 1987) ........................ 38

*United States v. United States Gypsum Co.*, 333 U.S. 364 (1948).............. 41

*United States v. You*, 382 F.3d 958 (9th Cir. 2004)....................................... 4

*Williams v. Runnels*, 432 F.3d 1102 (9th Cir. 2006) .................................... 35

*Williams v. Woodford*, 396 F.3d 1059 (9th Cir. 2005) ........................... 35, 37

*Yee v. Duncan*, 463 F.3d 893 (9th Cir. 2006)................................................. 9

## FEDERAL RULES

Fed.R.Evid. 807 ............................................................................................ 38

## I.    INTRODUCTION

More than anything else, Nibco's answering brief demonstrates its fundamental failure to acknowledge and take seriously the teachings of *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny.  As explained below, Nibco urges a level of deference to its actions and those of the district court that flouts *Batson*'s command that the courts are required to undertake an affirmative and searching inquiry into the possibility of pretext. Correspondingly, Nibco short-circuits the *Batson* analysis by giving short shrift to the duties of the trial courts at *Batson*'s third step inquiry into pretext, suggesting instead that the mere proffer of facially acceptable justifications for its strikes creates a presumption of race-neutrality.  Indeed, Nibco would also have this Court ignore the plentiful evidence that the district court, in word and action, erroneously applied an overly deferential standard of review in denying appellants' *Batson* objections.

Nibco's tortured attempts to explain away the abundant evidence of pretext in this case are, themselves, testimony to the improbability of the race-neutral reasons it offers up.  Through its repeated pleas to characterize its numerous factual misrepresentations to the district court as innocent mistakes, its selective and convenient invocation of its right to "disbelieve" prospective jurors for no apparent reason, and its internally contradictory

attempts to rationalize its trial counsel's actions, Nibco seeks a deferential acceptance of its explanations that the implausibility of its own excuses discourages.

As shown below, Nibco's legal and factual arguments cannot obscure the simplest explanation for its strikes of three Hispanic prospective jurors – that they were motivated by racial considerations. The sheer weight of the evidence pointing in that direction is such that even assuming *arguendo* that some of "[t]he evidence in the record here 'is open to judgment calls . . . when this evidence on the issues raised is viewed cumulatively its direction is too powerful to conclude anything but discrimination.'" *Kesser v. Cambra*, 465 F.3d 351, 367-68 (9th Cir. 2006), citing *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005).

## II.    ARGUMENT

### A.    Nibco Fundamentally Misunderstands The "Affirmative Duty" Of The Courts Under *Batson*.

As a threshold matter, Nibco's defense of the district court's failure to comply with *Batson* is shot through with assertions that misrepresent the affirmative role that the courts are required to play in conducting that analysis, and illustrate the scope of Nibco's failure to understand the *Batson* analysis itself.

2

1.    **Nibco's Erroneous Enshrinement Of "Deference" As The Overriding Principle On Review Would Eviscerate *Batson*.**

Simply put, Nibco's arguments are based on a fundamental presumption that this Court has no business examining either the district court's actions and statements at trial or its ruling. Strenuously complaining that appellants do not have license to "micro-manage" or "second-guess" the district court, AB 14-15, 24, Nibco repeatedly invokes the concept of "deference" – whether to imagined findings made by the district court, or to its trial counsel's mistaken "assumptions" and "trial strategy" – as a shield against the "sensitive inquiry into such circumstantial and direct evidence of intent as may be available" that the courts are required to undertake. *Batson*, 476 U.S. at 93 (quoting *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977)). Particularly conspicuous in this regard are Nibco's repeated suggestions that the district court's opportunity to make observations of demeanor endows its findings with an immunity from review that would require this Court to overlook the plain record evidence of Nibco's factual misrepresentations about the struck jurors.[1] Even deference to "demeanor" observations, however, has its limits.[2]

---

[1]    *See, e.g.*, AB 20 (suggesting that district court's opportunity to observe demeanor of Nibco's counsel in connection with Ms. Garcia's "close family member's recent experience with discrimination" is decisive

Manifestly, Nibco fails to understand or take seriously the nature of the "sensitive inquiry" that *Batson* requires. For example, it argues that the legitimacy of the reasons given for a peremptory strike turns on "whether the proffered rationale has some basis in accepted trial strategy," citing *United States v. You*, 382 F.3d 958, 968 (9th Cir. 2004), and asserts that deference to the district judge is required on such questions. AB 14. Nibco then exonerates its trial counsel's strikes as non-pretextual because he (unsurprisingly) offered up facially neutral reasons of that nature.[3] This argument, which effectively presumes *Batson* validity once the striking party

---

of pretext question); AB 35 n.8 (arguing that "[t]he district court witnessed first-hand the various parties' demeanor and decided that Ms. Gomez's own eloquence about her experiences and her views supported the strike.").

[2]    *See, e.g.*, *United States v. Alanis*, 335 F.3d 965, 969 n.5 (9th Cir. 2003) (noting that customary deference to demeanor observations did not require court to ignore strong evidence in the "cold record" of pretext); *see also Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994) ("While subjective factors may play a legitimate role in the exercise of challenges, reliance on such factors alone cannot overcome strong objective indicia of discrimination."). This is particularly so where the trial court never made specific findings based on alleged demeanor evidence. *See Snyder v. Louisiana*, ___ U.S. ___, 128 S.Ct. 1203, 1209 (2008) ("Here, however, the record does not show that the trial judge actually made a determination concerning Mr. Brooks' demeanor. . . . For these reasons, we cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous.").

[3]    *See, e.g.*, AB 20, 32, 35, 40, 42.

has stated its reasons for the strikes,[4] notably neglects to acknowledge that the ultimate question in this regard is "not whether the stated reason represents a sound strategic judgment, but 'whether counsel's race-neutral explanation for a peremptory challenge should be believed.'" *Kesser*, 465 F.3d at 361, citing *Hernandez v. New York*, 500 U.S. 352, 365 (1991).

And in the same breath, Nibco warns this Court to limit its review to no more than what was stated by the parties during the *Batson* sidebar.[5] Doing so, however, would run counter to *Batson*'s requirement that the courts consider all relevant evidence available to them.[6] It would also stretch the concept of deference beyond any recognition. Limiting the scope of inquiry in *Batson* appeals to the bare words spoken by counsel would tie the hands of a reviewing court and compel affirmance even where, as here,

---

[4] On this point see section II.A.2, *infra*.

[5] Nibco asserts that "[a]ccordingly [the reviewing court] must consider '[t]he correctness of the court's ruling . . . *in terms of the information before [it] at the time that the Batson objection was raised*.'" AB 15 (in the course of arguing *inter alia* that district court was not in error in not reviewing juror questionnaires available to it at the time of the sidebar) (emphasis added; citations omitted; all brackets in original).

[6] *See, e.g.*, *Batson*, 476 U.S. at 93 ("[A] court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent *as may be available*.") (emphasis added); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) ("*Miller-El*") ("[A] defendant may rely on '*all relevant circumstances*' to raise an inference of purposeful discrimination.") (emphasis added).

the district court ignored relevant evidence or otherwise failed to conduct even a minimally colorable *Batson* inquiry. Such a result would make a mockery of and, indeed, render impossible *Batson*'s mandate that the courts consider all available evidence of discriminatory intent. Yet Nibco would justify such a result by the talismanic invocation of "deference," dismissively characterizing as "micro-management" or "second-guessing"[7] any presumptively "audacious"[8] attempt by the Courts of Appeals to do anything more than uncritically ratify every *Batson* ruling that came before them.

Nibco's appeals to this bloated notion of deference – which informs the entirety of its answering brief – would, if credited, render *Batson* a dead letter. As the Supreme Court has pointedly noted, "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that certificate of

---

[7] This Circuit has taken a different view on a court's decision not to "second-guess." *See, e.g.*, *McClain v. Prunty*, 217 F.3d 1209, 1223 (9th Cir. 2000) ("[T]he court's refusal to 'second-guess' the prosecutor's reasons for exercising a peremptory challenge . . . was 'contrary to clearly established Federal law as determined by the Supreme Court of the United States.'") (citation omitted).

[8] AB 52.

appealability, permitting review of district court's denial of habeas relief on

*Batson* grounds, should have issued where reasonable jurists could have

disagreed as to evidence of pretext).[9]  And the Court reiterated two years

later that "[t]he standard is demanding but not insatiable."  *Miller-El v.*

*Dretke*, 545 U.S. 231, 240 (2005) ("*Miller-El*") (refusing to defer to state

court's conclusion that prosecutor's stated reasons for strikes of African-

American prospective jurors were not pretextual).

Nibco's wishful elevation of "deference" from one of many

considerations informing the *Batson* analysis to one that swallows all others

would relegate the Courts of Appeals to a rubber-stamp role in reviewing

any peremptory strike where race was alleged to be a factor.  As such,

Nibco's protestations that appellants assess its trial counsel's actions, and the

decision of the district court, with insufficient deference are not quarrels

with appellants' analysis; rather, they are quarrels with *Batson* itself.

## 2. Nibco Invites This Court To Short-Circuit The Third And Most Important Step Of The *Batson* Analysis.

Although manifest throughout its answering brief, Nibco's

mischaracterization of *Batson*'s mandates may be most evident in its

---

[9]  Because it involved habeas review of a state court conviction, *Miller-El*'s *Batson* analysis in fact employed a substantially <u>more</u> deferential standard to the lower courts' determinations than that required in non-habeas *Batson* cases, such as that at bar.

misconception of the three-step *Batson* analysis.  The Supreme Court

recently reiterated that analysis:

> First, a defendant must make a prima facie case showing that
> a peremptory challenge has been exercised on the basis of race[;
> s]econd, if that showing has been made, the prosecution must
> offer a race-neutral basis for striking the juror in question[; and
> t]hird, in light of the parties' submissions, the trial court must
> determine *whether the defendant has shown purposeful
> discrimination*.

*Snyder v. Louisiana*, ___ U.S. ___, 128 S.Ct. 1203, 1207 (2008) (quoting

*Miller-El*) (Thomas, J., dissenting) (emphasis added).  As the stage in the

analysis where the justifications advanced by the strike proponent are

examined by the court for evidence of pretext, *Batson*'s third step is pivotal.

Up until that point, the strike proponent only has the burden of articulating –

not proving – a race neutral reason for the strike.  *See, e.g.*, *Boyde v. Brown*,

404 F.3d 1159, 1171 n.10 (9th Cir. 2005) ("[W]e do not consider whether an

explanation is pretextual when we decide, in *Batson*'s second step, whether

it is race-neutral.  We consider only whether the explanation is *facially* race-

neutral."), citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (emphasis in

original).

Nibco, however, contends *sub silentio* that its step two proffer of

ostensibly race-neutral justifications in effect relieved the district court of

any meaningful obligation to evaluate the truth of those justifications – i.e.,

to carry out *Batson*'s third step.  For example, without acknowledging it is doing so, Nibco invites this Court to conclude that the mere plausibility of the reasons its counsel gave for striking prospective jurors Roxanne Garcia and Adrian Lucatero was, without more, enough of a basis for the district court to find an absence of discrimination.  *See, e.g.*, AB 22.  This, of course, is not so.  *See, e.g.*, *United States v. Alanis*, 335 F.3d 965, 969 (9th Cir. 2003) ("It is not enough that the district court considered the government's gender-neutral explanations 'plausible.'"); *Boyde*, 404 F.3d at 1171 n.10; *see also United States v. Bauer*, 84 F.3d 1549, 1565 (9th Cir. 1996) ("In accepting the explanations as race-neutral, the district court does not implicitly find a lack of discriminatory intent.") (Noonan, J., dissenting).  Accordingly, a trial court is required to conduct all three steps of the *Batson* analysis even where the strike proponent has met its burden of production at step two.  *Yee v. Duncan*, 463 F.3d 893, 901 (9th Cir. 2006); *Paulino v. Harrison*, 542 F.3d 692, 703 (9th Cir. 2008).

Nibco also contends that to satisfy its obligations under *Batson*, the district court was only required to make "express findings" for each juror – as opposed to actively undertaking the step three inquiry into the possibility

of racial motivation.[10]  But the "express findings" Nibco points to, AB 51,
are at best conclusory statements devoid of substance or reasoning – hardly
indicative of a searching step three analysis.  Certainly, the district court was
bound to do more than utter a few well-chosen buzzwords.  And in asserting
that the district court, in any case, actually <u>did</u> venture beyond the facial
race-neutrality of Nibco's assertions in probing for pretext, Nibco offers up
only the following:

> Appellants claim that it was "unlikely that [the district court]
> looked beyond the face of Nibco's counsel's arguments."  But
> this argument willfully ignores the record, including, for
> example, the district court's: (1) recharacterization of two of
> Nibco's justifications for the strike of Gomez as a "labor versus
> management issue"; (2) comparison of Nibco's strikes to
> appellants' strikes on "labor versus management" grounds; (3)
> independent observation that Garcia was "one of the oddest
> prospective jurors [he had] ever seen"; and (4) reference to its
> own notes about Lucatero and its insistence that Nibco further
> support its strike.

AB 52 (footnotes and page citations omitted; brackets in original).

---

[10]  AB 50-53.  Nibco cites *United States v. Gillam*, 167 F.3d 1273, 1278
(9th Cir. 1999), for the proposition that "[n]either *Batson* nor its progeny
requires that the trial judge make specific findings, beyond ruling on the
objection."  But this passage does not purport to address the nature of the
inquiry that must *precede* any findings.  In any event, the quoted language is
presented out of context.  *Gillam* referred to findings (sought by the
defendant but not made by the trial court) as to whether he had made out a
prima facie *Batson* case and whether the prosecution had articulated a race-
neutral reason for its strike.  *Id.*

The fact that Nibco even offers the first three of these enumerated actions as evidence that the district court actually undertook a step three inquiry, however, only underscores its misunderstanding of *Batson*. Far from constituting a meaningful step three inquiry into pretext, those three cited actions reflected an improper attempt by the district judge to <u>rationalize and validate</u> Nibco's strikes.

It is not for the district court to think up more or different race-neutral reasons for the strikes at issue. *Miller-El*, 545 U.S. at 252 ("If the stated reason does not hold up, its pretextual significance does not fade because a trial court, or an appeals court, can imagine a reason that might not have been shown up to be false."). In fact, because the district court was in effect assisting Nibco's counsel by shaping and better articulating its ostensibly race-neutral explanations – instead of examining them with a disinterested and critical eye – those actions cannot even be properly viewed as part of a *Batson* step three inquiry. If anything, the district court's statements served only to bolster Nibco's burden of production at step two.[11]

---

[11] The fourth and only remaining supposed example of the district court's efforts to carry out a step three analysis and actually evaluate Nibco's arguments for pretext – the district judge's pointing out that Nibco's counsel had not asked Mr. Lucatero whether he felt his father's job loss had been unfair – scarcely rehabilitates its otherwise total failure to do so. Indeed, Nibco's counsel could <u>not</u> explain his failure to ask – thereby casting doubt on the veracity of his first stated reason for the strike. Yet when

Moreover, that Nibco can only point to this handful of examples – damaging as they are – as its <u>sole evidence</u> that the district court went beyond the face of Nibco's stated reasons is a remarkable (if inadvertent) admission that the district court plainly failed to conduct a meaningful step three inquiry.  Instead, the district uncritically, and erroneously, accepted those representations as true.

As illustrated by Nibco itself, therefore, the district court did not comply with *Batson's* mandate to undertake a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93.  It failed to do so notwithstanding this Circuit's admonition that "[d]uring *Batson*'s third step, the court has an *affirmative duty* to determine if purposeful discrimination occurred." *Lewis v. Lewis*, 321 F.3d 824, 832 (9th Cir. 2003) (emphasis added) (reversing where the "trial court did not conduct a meaningful step-three analysis").  This Court should reject Nibco's invitation to gloss over the district court's failure to undertake that duty.  Moreover, as a consequence of that failure, that court's factual determinations are entitled to less deference. *See Green v. LaMarque*, 532

Nibco's counsel shifted ground and tried another reason, the district court accepted it without apparent hesitation.  At the same time, it adopted Nibco's counsel's inaccurate representation that Mr. Lucatero lived with his father.  Nibco's counsel did not correct the district court.  EOR 259:18-260:3.

F.3d 1028, 1031 (9th Cir. 2008) ("On appeal, the state essentially asks us to presume the trial court found the prosecutor's race-neutral reasons from striking Deborah P. to be genuine . . . Yet we must not make such a presumption where 'the court never fulfilled its *affirmative duty* to determine if the defendant has established purposeful discrimination.'") (citing *Lewis*) (emphasis added).

### 3.   Nibco Refuses To Acknowledge The Necessity And Significance Of Comparative Juror Analysis.

The most striking evidence of Nibco's refusal to take seriously the affirmative duty imposed at step three of the *Batson* analysis is its unequivocal denial that the courts are <u>required</u> to undertake comparative juror analysis in deciding *Batson* challenges.  AB 25.  Indeed, even through its use of quotation marks at nearly every mention of the term, Nibco seems intent upon dismissing comparative juror analysis as being little more than a figment of appellants' legal imagination.  Its failure to take seriously the importance and necessity of such an analysis is evident both in its cursory effort to demonstrate why prospective jurors Garcia, Gomez, and Lucatero "cried out"[12] to be struck over their fellow venirepersons, and in its weak

---

[12]   AB at 4, 12, 19, 28.

assertion that, in any case, they were simply too individual and distinguishable to be compared to anyone else.[13]  AB at 26, 40, 47.

But as appellants pointed out in their opening brief, comparative juror analysis <u>is</u> required – both on the part of the trial court, *Green*, 532 F.3d at 1030, and by reviewing courts, "even when it was not requested or attempted in the [trial] court."  *Kesser*, 465 F.3d at 361 (citing *Miller-El*).  In its answering brief, Nibco inexplicably asserts that "[c]ontrary to appellants' claim that a comparative analysis 'required,' AOB at 30-31, *Green* itself, decided years after *Miller-El*, confirms that 'comparative analysis' is *not* required."  *See Green*, 532 F.3d at 1030 (emphasis in original).

Nibco's reliance on *Green*, however, is grievously misplaced, as that case says just the opposite.  *See id.*, 532 F.3d at 1030 ("Here, the trial court failed to undertake "'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available,'" *including a comparative analysis of similarly situated jurors*, *as required by clearly established Supreme Court law* at the time of the trial.") (citing *Batson* and *Miller-El*) (emphasis added).[14]

---

[13]   These two subjects are discussed at greater length in section II.B, *infra*.

[14]   Nibco identically misrepresented *Green* in its reply brief in support of its motion to strike appellants' Appendix.  Docket Entry 6954280 at 6.

It is unclear how Nibco claims to discern the <u>absence</u> of that obligation in this unequivocal language.[15]  Yet its erroneous reading of the applicable law plainly informs the equally mistaken standard of uncritical deference that it invites this Court to adopt.[16]

### 4. The District Court's Articulations Of An Insufficiently Searching Legal Standard For *Batson* Challenges Only Further Invites *De Novo* Review.

The district court's failure to conduct any but the most deferential review of Nibco's reasons for its strikes is mirrored in Nibco's dismissive characterization as "petty"[17] appellants' concern[18] that the district court misapprehended the correct standard for the *Batson* analysis.  Against the backdrop of what the district court plainly failed to do, and in light of its findings that Nibco's reasons were simply "rational," "not irrational,"

---

[15]  Its mischaracterization of *Green* aside, Nibco evidently fails to consider that *Green* could not in any case overrule *Miller-El,* a decision of the Supreme Court.

[16]  Elsewhere, Nibco appears grudgingly to concede that comparative analysis is appropriate, but only in "extreme" cases, where the indicia of race-based strikes are explicit and virtually unavoidable.  AB 27 n.4.  But in this one of many attempts to point to immaterial factual distinctions between cases that demonstrate no difference, Nibco would persuade this Court that comparative analysis is warranted only when it is the least needed.

[17]  AB 51.

[18]  AOB 42-46.

"credible," or "facially valid," Nibco's claim that the district court nevertheless understood its obligation to conduct a "sensitive inquiry" into pretext is unconvincing. In a profession where the outcomes of cases routinely turn on the careful parsing and interpretation of seeming verbal minutiae, it is not enough for Nibco to maintain, in essence, that the district judge either was sloppy in his choice of language, or did not intend for the wording of his *Batson* rulings to have any significance.

Appellants will not reprise their prior arguments on this point, other than to note that this Circuit has, quite appropriately, found trial courts' specific word choices to be important indeed in reviewing their *Batson* rulings for error. *See, e.g.*, *Alanis*, 335 F.3d at 969 ("It is not enough that the district court considered the government's gender-neutral explanations 'plausible.'"); *Lewis*, 321 F.3d at 832 ("Concluding that one of many of the prosecutor's reasons, after noting that little or no record support for it exists, is 'probably reasonable' simply does not fulfill [*Batson*'s affirmative] duty."). But more to the point, Nibco appears not to understand that it is not the district court's statements of an incorrect standard *per se* that are at issue; rather, it is that those statements line up precisely with its erroneously deferential and insufficiently searching consideration of Nibco's strikes.

Accordingly, for all the reasons stated thus far, this Court is entitled to utilize a *de novo* standard on this appeal. *See, e.g.*, *United States v. Collins*, 551 F.3d 914, 919 (9th Cir. 2009) ("We generally review a district court's *Batson* determination for clear error . . . However, where the district court applies the wrong legal standard, we review the claim de novo.") (citations omitted).

Nibco's unwillingness to acknowledge the applicable law as stated by *Batson* and its progeny should inform this Court's assessment of its attempts to dispute the clear results of the comparative juror analysis in this case. Appellants address those arguments below.

> **B.   Nibco's Efforts To Explain Away Disparities Revealed By Comparative Juror Analysis Cannot Obscure The Overwhelming Indicia Of Pretext.**

Possibly because it takes the position that any meaningful step three inquiry into pretext is unnecessary or at most superfluous to the *Batson* analysis, Nibco spends more time reciting and embellishing the facial merits of its stated race-neutral reasons than it does squarely addressing the striking race-based pattern of juror questioning and challenges that is laid bare by comparative juror analysis. As noted below, Nibco's attempts to attack the findings of that analysis are, in the end, unpersuasive.

### 1.    Roxanne Garcia

**a.    The Fact That Nibco's Stated Reasons For Striking Ms. Garcia May Facially Comport With "Accepted Trial Strategy" Only Begs The Question Of Pretext.**

As it does with each of the struck Hispanic prospective jurors, Nibco elaborates upon its stated reasons for striking Ms. Garcia, pointing to cases that find such reasons facially acceptable.  To begin with, however, although it is ordinarily true that peremptory challenges based on "accepted trial strategy" are accorded deference by the courts, in the instant case this argument is a red herring.  Appellants do not disagree that such reasons may be valid grounds for exercising a peremptory strike – provided, however, that those reasons are indeed the true reasons for the strike.  As such, Nibco's argument for judicial "deference" toward "accepted trial strategy" only begs the question as to its genuine motivation for striking Ms. Garcia, as well as Ms. Gomez and Mr. Lucatero.

Upon scrutiny, none of the reasons Nibco gives for striking Ms. Garcia hold up.  Notably, despite Nibco's many assertions, its trial counsel's actions are not immunized from review because they purportedly flowed from his "mistakes," "assumptions," "instincts," or "intuition."  As will be pointed out, Nibco cannot easily hide behind such subterfuges.

18

**b.    Nibco's Characterization Of Its Counsel's False Representation To The Court About Ms. Garcia's Mother's Non-Existent Discrimination Case As A Mere "Mistake" Is Unconvincing.**

Appellants have shown that Nibco's exercise of a peremptory challenge to remove Ms. Garcia was, in fact, pretextual.[19]  Nibco asserts in response that "mistakes do not support a pretext finding."  But in doing so, it sidesteps the true question here: whether its counsel's misrepresentations about the nonexistent lawsuit <u>were</u> mere "mistakes" or, instead, were knowing misstatements of fact aimed at defeating the *Batson* objection.  As noted in appellants' opening brief and as Nibco admits, AB 22, Nibco's counsel had, minutes earlier, specifically asked Ms. Garcia whether her

---

[19]    Nibco takes issue with this conclusion, arguing in a footnote that it "did not strike Garcia based on her 'attitudes' about language in the workplace."  AB 39 n.11.  Of course, that Nibco did not proffer that reason at sidebar is hardly dispositive of its true reasons for her strike.  In any event, appellants are not claiming her attitudes on that subject *per se* were the reason for her strike.  Rather, as already argued, the facts point to the conclusion that she was struck because she was Hispanic.  *See, e.g.*, AOB 7-10, 21-28, 33-34, 38-42.  It is moreover indisputable that aside from Caucasian prospective juror April Davis-Brannum, who did not answer the relevant question on her questionnaire, AOB 41 n.32, the <u>only</u> persons Nibco affirmatively singled out to ask about those attitudes were Hispanic.  EOR 216:23-221:15 (prospective jurors Garcia and Nuñez).  The significance of this pattern of disparate questioning is discussed at AOB 40-41.  (It is true that Nibco did not single out prospective juror Teresa Gomez for that question, but she had doubtless already said enough during her prior colloquy with the district court to earn her strike.)  Finally and obviously, Nibco had no control over which jurors raised their hands to volunteer answers to a prior general question on the matter.  Those jurors are thus irrelevant to the intent inquiry.

mother had filed a suit based on her work experiences, and Ms. Garcia directly responded, "No, she just moved on." AOB 33.

Plainly, whether her mother had filed suit was a matter of concern to Nibco's counsel, one significant enough to prompt him to ask his pointed follow-up question in the first place. Because an affirmative response would have helped him to defend his strike of Ms. Garcia, based on the assertedly increased likelihood that she would be sympathetic toward plaintiffs, it is safe to presume that he listened carefully to Ms. Garcia's answer and that it registered with him. The simplest and most likely explanation of his subsequent misrepresentation to the district court, therefore, is that it was knowing and intentional. For Nibco to nonetheless ask this Court to believe that the references of its counsel, an experienced trial lawyer who had his notes in front of him, EOR 250:14-15, to an imaginary lawsuit were actually inadvertent "mistakes" to be excused as such, strains credulity. *See also Lewis*, 321 F.3d at 830 ("[I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination.").[20] No appeal to deference can obscure the telling nature of this "mistake."[21]

---

[20] Nibco's convoluted attempts to distinguish *Lewis* on its facts, AB 21, is unavailing since the proposition appellants cite *Lewis* for – that the presence of race-neutral reasons does not trump the fact that a strike

      **c.**      **Nibco Misconstrues The Record To Exonerate Its Counsel's Suggestion That Ms. Garcia Was Not Forthcoming About Her Mother's Imaginary Lawsuit.**

Relying on selected portions of the voir dire transcript, Nibco next protests that its counsel was justified in complaining that Ms. Garcia was not adequately forthcoming in her responses to the juror questionnaire, and in using that as a basis for his strike. AB 24. Yet a fuller reading of the transcript bears out that this assertion has no basis:

> MR. HAHESY: . . . And, you know, the impression that I developed from her is that there's still some lingering issues related to [her mother's "case"]. She also, when she filled out the questionnaire, *she didn't indicate, you know, that matter* when she completed it and then when Your Honor asked her did she have any issues about discrimination or whatever, there was no question. And then I had to do the followup *to get that issue out*.

AB at 24 (emphasis added).

---

proponent has also offered up reasons found to be pretextual – is reiterated in numerous other decisions of this Court. *See, e.g.*, *Kesser*, 465 F.3d at 359; *McClain*, 217 F.3d at 1221 ("Where the facts in the record are objectively contrary to the prosecutor's statements, serious questions about the legitimacy of a prosecutor's reasons for exercising peremptory challenges are raised."). Nibco's citation to *Burks v. Borg*, 27 F.3d 1424 (9th Cir. 1994), for the proposition that evidence of pretext will invariably be outweighed where the remaining reasons offered are "clear and reasonably specific," *id*. at 1429, is a similarly fanciful reading, as it elevates a specific factual conclusion in a single case into an overarching principle binding upon all *Batson* cases, irrespective of their particular facts.

[21] On this *see* section II.A.1, *supra*.

Nibco's counsel thus represented to the district court that Ms. Garcia had failed to mention "*that matter*" or "*that issue*" – her mother's imaginary lawsuit – in her questionnaire.  But a review of Ms. Garcia's questionnaire – which, again, the district court failed to undertake – would have shown that she in fact <u>had</u> indicated throughout her questionnaire that family members or others close to her had had negative workplace experiences of various sorts, including "[r]acial discrimination" and "wrongful termination."[22]  By selectively quoting from the transcript, Nibco creates the false impression that its counsel was actually trying to get Ms. Garcia to "describe" her mother's experience, not to <u>disclose</u> it in the first place[23] – and then faults her for not "describing" it to its satisfaction.[24]  AB 24.  But as the transcript bears out, this was not what Nibco's counsel was (incorrectly) alleging she

---

[22]  Appendix at 45 (Question 26), 49 (Question 45).  The eleven checkmarks elsewhere touted by Nibco are somehow not accounted for at this point.

[23]  Nibco contends that "[Appellants] accuse Nibco's counsel of 'disingenuously claim[ing] to the district court that [he] had to do followup to get' Garcia *to describe* her mother's experience."  AB 24 (emphasis added).

[24]  Elsewhere, Nibco remarkably asserts that when it asked Ms. Garcia whether she could be impartial, she could only have satisfied it of her objectivity by saying "yes," AB 19, instead of her more articulate response that "I would have to hear what they would have to say.  What's being presented, you know. There's true, false."  EOR 222:4-6.  In sports parlance, this might well be described as "moving the goalposts."

had failed to do.  Nibco's continued misstatements of the record

notwithstanding, this additional explanation for striking Ms. Garcia remains

suggestive of pretext.

### d.     Nibco Trivializes Its Mischaracterization Of Ms. Garcia's Statements About Her Mother.

Nibco seeks to minimize the import of its counsel's misrepresentation

to the district court that Ms. Garcia had stated that she was "very" close to

her mother.  AB 24.  But as argued above, words matter.  Nibco can scarcely

dispute that Ms. Garcia never used the "very" phrasing.  Second, though

Nibco dismissively fails to recognize it, there is a clear and meaningful

difference between saying that one is "close" to someone, as opposed to

being "very close" to that person.  And although this added example of

misstating the record of course would not be dispositive of pretext taken by

itself, it does further contribute to the cumulative indicia of Nibco's counsel

as being so intent on striking Ms. Garcia that he was willing to overstate,

stretch, or even misstate the record toward that end.

### e.     Nibco's Efforts To "Slice And Dice" Away The Race-Based Disparities Revealed By Comparative Analysis Is Contrary To The Cases.

Nibco maintains that comparative juror analysis is somehow

impossible to perform as to Ms. Garcia, claiming that "there were no jurors

who were 'otherwise-similar' to Garcia when it came to their personal and family experience with discrimination."  AB 25.  Leaving aside Nibco's curious effort to turn 11 checkmarks on her questionnaire into facial, "glaring" proof of its benign motivations,[25] AB 26, its argument that this alone renders her incapable of being compared with others is at odds with the case law.  *See, e.g.*, *Miller-El*, 545 U.S. at 247 n.6 ("A *per se* rule that a defendant cannot win a <u>*Batson*</u> claim unless there is an exactly identical white juror would leave <u>*Batson*</u> inoperable; potential jurors are not products of a set of cookie cutters.").

In this regard, Nibco complains that appellants' focus on "whether 'they or someone close to them had lost their job or suffered other adverse workplace actions'" casts the net too widely and somehow wrongly "lumps"

---

[25]  Nibco repeatedly contends Ms. Garcia "stood out as a leading candidate for a strike based on her 11 check marks to Question 45."  *See, e.g.*, AB 25.  Indeed, Nibco justifies its disparate treatment of other jurors on that basis as well.  AB 28 (prospective juror Patricia Stockton checked only two boxes).  But aside from the fact that comparative analysis is not a mere bean-counting exercise, it should be noted that Question 45 can hardly be stretched into a quantifiable index of juror suitability.  A single matter (such as that with Ms. Garcia's mother) could result in several boxes being checked.  Moreover, a checkmark was also in order for *accusations* of wrongdoing.  *See, e.g.*, Appendix at 49 ("Have you . . . ever personally experienced *or been accused of* any of the following at work?  (Check all that apply)") (emphasis added).  Thus it cannot be determined from counting up checkmarks on Question 45 whether Ms. Garcia and those close to her in fact may have had experiences giving rise to <u>pro-employer</u> sympathies.

the struck jurors together (although Nibco itself treated them identically). AB 26. Nibco fails, however, to explain exactly why this characteristic (or its absence) is not a relevant basis for identifying "similarly situated" jurors for further comparison.[26] Indeed, Nibco cannot seriously dispute that from its standpoint, it had every incentive to remove jurors who had undergone adverse employment actions inasmuch as those experiences might have led them to harbor anti-employer biases. In other words, that factor would be expected to heavily influence, if not dictate, its decisions as to which prospective jurors it would strike.

Moreover, Nibco neglects to point out that this characteristic is in fact the <u>exact</u> focus of Question 26 on the questionnaire – a questionnaire jointly devised by the parties and the district court for the purpose (among others) of identifying jurors who would be favorable or unfavorable to each side. Appellants did not invent a focus on this characteristic for purposes of conducting comparative juror analysis; to the contrary, the parties and district court agreed that Question 26 was an appropriate inquiry that would importantly inform both sides' choices of jurors. Nibco's argument that prospective jurors' adverse treatment at work could not be expected to

---

[26] Indeed, Nibco's attempt to downplay the significance of prior experience with adverse employment actions could not be more blatantly at odds with its argument that Ms. Garcia was legitimately struck due to her 11 check marks on Question 45, which inquired into the very same topic.

strongly inform its choices of jurors is thus not only unconvincing on its merits, but disingenuous.

Nibco's unexplained suggestion that a "side-by-side comparison" of the jurors is either different in any meaningful way from, or inconsistent with, the comparative juror analysis conducted by appellants is puzzling. To the extent it is intelligible, however, Nibco seems to contend that this Court may not look to the broad patterns by which strikes were exercised but, instead, may find pretext only where two individual jurors, identical in every respect except for their race, were treated differently. But as noted above, the courts have found that this "slice and dice" approach "would leave *Batson* inoperable." *Miller-El*, 545 U.S. at 247 n.6. And just as appellants' comparative analysis points to plentiful evidence of disparate juror selection based on race, an examination of each of the Caucasian jurors discussed by Nibco in its self-described "cursory review" of them, AB 26, indicates just the same.

If anything, prospective juror Gary Stanford far surpassed Ms. Garcia with respect to his potential for anti-employer bias. His overt antipathy toward his wife's employer and her (actual, not imaginary) consideration of imminent legal action, AOB 22-23, undeniably made Mr. Stanford much more likely than Ms. Garcia, whose mother had "moved on," to be

unsympathetic to Nibco based on its stated "labor versus management" concerns. Nibco's failure to ask him <u>any questions at all</u> about his wife's termination is thus nothing less than remarkable. Nor can this failure be retrospectively explained away by the fact that he was later struck by the appellants. During voir dire, Nibco obviously had no way of knowing whether appellants would strike him; indeed, it had no way at all of predicting how the parties' strikes would unfold until the strike sheet was actually passed back and forth. As such, it would clearly have behooved Nibco to inquire, while it still could, into any anti-employer biases Mr. Stanford harbored in case he remained "in the box," since Nibco could later be faced with a choice of whether to strike him itself.[27] Its failure to ask him <u>any</u> questions on this important matter is inexplicable by reference to ordinary trial considerations.

Nibco's failure to ask prospective juror Albert Veldstra about his layoff is, similarly, not easily explained away. Although that layoff occurred "40 years ago," the mere fact that Mr. Veldstra still remembered it, long afterwards, indicated it had had a strong impact upon him for reasons unknown, warranting at least <u>some</u> inquiry. And as previously pointed out,

---

[27]   This, of course, applies not only to Mr. Stanford, but to all prospective jurors who had similar adverse experiences but were not asked about them by Nibco.

Nibco made no effort to ask Mr. Veldstra about the adverse employment action noted in his answer to Question 26. Appendix 243 (indicating disciplinary action at work against him or someone close to him).

In claiming that it had no need to ask prospective juror Patricia Stockton any questions at all about her brother's termination – despite her clear comparability with Ms. Garcia, whose mother was also terminated – Nibco argues that Ms. Stockton stated in her questionnaire that he "*just moved on and got another job,*" AB 28 (emphasis in original), apparently trying to downplay the impact it had upon her. However, her statement is virtually identical to that made by Ms. Garcia, whose strike Nibco justifies on the alleged basis that her mother's termination rendered her insufficiently objective. EOR 218:20-21 ("No, she just moved on."). Nibco cannot have it both ways. The fact that Ms. Stockton was never seated is immaterial and does not explain Nibco's failure to ask her any questions at all.[28]

As to prospective juror Jennifer Tweedy, Nibco does not explain its bald assertion that it "did not need to question Tweedy to properly conclude that she should be stricken." AB 26. To the contrary, she reasonably could be expected to have pro-employer sympathies, as her superiors promptly addressed her complaints about a sexist co-worker to her satisfaction. EOR

---

[28] *See* preceding footnote and associated text.

152-54.  Nibco's decision to strike her may, if anything, been intended to help obscure the fact that all of its other strikes were of Hispanics.

Finally, as to prospective juror Nancy Marchbanks, the fact that the disciplinary letter she received was written in the 1970s did not render follow-up questions any less advisable.  As with Mr. Veldstra, Ms. Marchbanks' recollection of that incident years later indicated, if anything, that it had a marked impact upon her.  And although Nibco brushes aside her having witnessed a supervisor's undoubtedly unwelcome kiss of a co-worker, this trivializes the serious nature of sexual harassment, and its potential to create a hostile work environment – one which Nibco's counsel, an employment law attorney, would certainly be expected to be sensitive to.  The potentially upsetting nature of seeing a supervisor exploiting his position of power to force unwanted advances upon a subordinate would, by any reasonable estimation, have warranted followup, particularly as to Ms. Marchbanks' feelings about the steps (if any) her employer took to address the incident.

Although Nibco appears to believe that appellants must prove that these matters would <u>necessarily</u> have biased these Caucasian jurors before appellants may question its decision not to ask any follow-up questions, that is not the case.  Instead, the point is simply that unless the possibility of bias

29

could reasonably be <u>ruled out</u> by their statements, the concerns raised by those statements – that is, <u>if</u> those concerns were genuinely held by Nibco – strongly advised in favor of inquiring into them, under commonly accepted principles of trial strategy. Yet Nibco did not do any such follow-up. AOB 21-25. That it did not do so casts into serious doubt its claims that those were its true reasons for striking Ms. Garcia or her two fellow Hispanic jurors.[29]

### 2.    Teresa Gomez

Nibco's effort to downplay the racial disparities evident in its strike of Teresa Gomez suffers from many of the same problems discussed with respect to its strike of Ms. Garcia. It first argues its counsel was "entitled to assume" that Ms. Gomez's praised Frito-Lay <u>because</u> it was a multilingual workplace. AB 31. As previously noted, the record contains no support for

---

[29]  Nibco contends its failure to conduct needed follow-up questioning is explained away by the fact that the parties did not have unlimited time to conduct their voir dire, and suggests that only in cases such as *Miller-El*, a capital case where jury selection consumed "over five weeks,' could prudent follow up questioning fully take place. AB 28-29 n.5 (citing *Miller-El*); *see also* AB 32 n.7, 38 n.10. Suffice it to say that the district court never indicated that Nibco's counsel was running short on time, let alone <u>had</u> run out of time; that the voir dire conducted by appellants' counsel covered over 21 pages of the transcript (EOR 187:18-208:25), while Nibco's voir dire, which followed, covered only about fourteen pages (EOR 209:4-222:16); and that Nibco's counsel, an experienced trial advocate, would certainly have made some attempt to seek additional time if that had indeed posed any obstacle to a sufficiently thorough voir dire on topics of alleged concern.

that leap of reasoning.  AOB 35.  If anything, Nibco's counsel may have made that "assumption" precisely *because* Ms. Gomez was Hispanic; query whether he would have done so had she been Caucasian.

In any event, Nibco's next argument – that its counsel was likewise entitled to "assume" that Ms. Gomez might harbor an <u>anti</u>-employer bias because she filed a workers' compensation claim against Frito-Lay – asks this Court to believe that its counsel was, simultaneously, entitled to make exactly the <u>opposite</u> "assumption" about Ms. Gomez's attitude toward Frito-Lay.[30]  Again, Nibco cannot have it both ways; its acrobatic twists and turns of reasoning only point up how her strike is inexplicable by reference to trial strategy or, indeed, logic.[31]

Further, Nibco's attempt to point to the termination of Ms. Gomez's sister as a source of anti-employer bias is not only undercut by her own statement that "it was her [own] fault that she got fired," EOR 248:5-6; it also again begs the question whether its superficial rationality on trial

---

[30]  Nibco so contends even though, when responding to its own trial counsel's questions on the very subject, Ms. Gomez stated that Frito-Lay had in fact handled her claim "fairly," and that "I have no grievances with them."  EOR 249:2-7.

[31]  Left with nothing else, Nibco resorts in the end to arguing that its counsel was "entitled to disbelieve" Ms. Gomez on this point, AB 36, but offers no reasons <u>why</u> her plain words should not have been taken seriously.

strategy grounds, which it needlessly belabors, was in fact the <u>true</u> reason Nibco struck her.  Moreover, its attempt to exonerate its trial counsel's misstatement to the district court that Ms. Gomez's sister had "problems with discrimination" once again asks this Court to believe that this was simply another "mistake" that should be ignored.[32]  AB 34.  By this point, however, that excuse begins to wear thin, used as it is to explain away the fact that here, just as with his "mistaken" reference to Ms. Garcia's mother's imaginary lawsuit, this additional "mistaken" representation came just minutes after he had expressly asked Ms. Gomez a pointed question on the subject, and got exactly the opposite answer.[33]

Finally, Nibco's response to the clear upshot of comparative analysis as to Ms. Gomez, AB 36-40, mainly rests on the assertion that the jobs of Caucasian prospective jurors Albert Veldstra and Tina Lucas would "naturally" and "of course" place them in contact with speakers of other languages.  AB 37-38.  But how this somehow undercuts their comparability

---

[32]  On this *see also* section II.A.1, *supra*.

[33]  Nibco asserts that its counsel said "Or not." immediately after his misrepresentation about her sister's non-existent "problems with discrimination," contending that amounted to a retraction.  AB 34.  The district court, however, certainly did not understand it to be such since, much as with the Lucatero strike, *see* n.11 *supra*, it <u>repeated</u> Nibco's misrepresentation in upholding the strike Ms. Gomez.  EOR 256:19-20 ("her sister's involved in a discrimination claim").  Nibco's counsel did not correct the district court in this instance, either.

with Ms. Gomez, who likewise worked in a multilingual setting and who likewise expressed a level of comfort with it, is mysterious.  And Nibco's effort to deny the applicability of comparative analysis as to Ms. Gomez on the basis that Nibco offered a multiplicity of other (unspecified) reasons for striking her is likewise infirm, as it fails to take into account the Supreme Court's admonition that exact identity between challenged and non-challenged jurors is not a precondition for *Batson* review.  *See, e.g.*, *Miller-El*, 545 U.S. at 247 n.6.  What is more, if taken to its logical conclusion, this defense would permit a strike proponent to defeat a *Batson* challenge simply by asking different questions of each prospective juror so as to render them supposedly non-comparable.  As such, it proves too much.

### 3.    Adrian Lucatero[34]

After again begging the question by reciting at length its stated reasons for striking Mr. Lucatero, Nibco invites this Court to apply a "but for" test to determine whether a strike proponent's misrepresentations of fact should be relevant to the question of intent.  AB 42-44 ("Appellants' theory that these statements impacted the district court's decision disintegrates, however, [because] the court implicitly *rejected* these classic subjective justifications . . .") (emphasis in original).  Suffice it to say that the notion

---

[34]  On Mr. Lucatero's strike, *see also* n.11 *supra*.

that a pretextual proffer should somehow be ignored by *Batson* because the trier of fact found it <u>unworthy</u> of credence is not only illogical, but indeed misses the point of the entire inquiry into pretext.

In addition (perhaps because he made no checkmarks in response to Question 45), Nibco alleges that the reason Mr. Lucatero "cried out" for <u>his</u> strike was that he was the only juror with <u>two</u> relatives who were or who in the past had been unemployed. Appendix 142; AB 47. But this point of alleged distinction, scant as it is, was never proffered by Nibco's counsel as a reason for his strike; Nibco only pointed out that Mr. Lucatero's <u>father</u> had been unemployed. *See, e.g.*, EOR 258:15-16 ("Well, his father's laid off, he lives with his father."). As such, this belated argument, as with the other race-neutral reasons Nibco first offers on appeal, *see* n.40 *infra*, "reeks of afterthought." *Miller-El*, 545 U.S. at 245.

Nibco further argues that its counsel "had ample justification to *assume* that Lucatero lived with his parents."[35] AB 45 (emphasis in original). But that argument hardly justifies presenting that assumption to the district court <u>as fact</u>, as Nibco did here. Neither of the cases Nibco cites

---

[35]  Nibco's reliance on *Stubbs v. Gomez*, 189 F.3d 1009 (9th Cir. 1999), and *Mitleider v. Hall,* 391 F.3d 1039 (9th Cir. 2004), both habeas cases, is misplaced. Both cases found that a strike proponent's stated "assumptions" were <u>permissible</u> given the facts in those cases – not that "assumptions" are *per se* non-pretextual, as Nibco seems to suggest.

here permits a strike proponent to do so.  More importantly, Nibco's

argument begs the question whether its counsel's misrepresentation was an

innocent mistake, as it would have this Court believe or, instead, a knowing

misstatement of fact.  As quoted by Nibco itself, this Circuit has found

assumptions permissible, even if mistaken, only "as long as the reason is not

pretextual."  *Mitleider v. Hall,* 391 F.3d 1039, 1049 (9th Cir. 2004).  That, of

course, is the ultimate issue here, one Nibco continues to avoid.[36]

### C.    Nibco's Remaining Arguments Lack Substance.

Nibco offers an in-depth criticism of "[a]ppellants' last-ditch attempt

to show discrimination through a statistical disparity analysis".  AB 54-55.

This argument, however, is a classic "straw man," since appellants nowhere

claim that statistics alone compel finding a *Batson* violation here.  Indeed,

Nibco cannot seriously dispute the broader proposition, which appellants do

argue, that courts undertaking the pretext inquiry commonly consider

statistical indicia of discrimination.  *See, e.g*, *Williams v. Runnels*, 432 F.3d

1102, 1103, 1108 (9th Cir. 2006) (discussing "inference of bias raised by the

statistical disparity" where prosecutor used three out of four peremptory

---

[36]    As with Ms. Gomez, Nibco again seeks to dispose of a clear factual
inconsistency with the bald, unexplained assertion that it was entitled to
"disbelieve" Mr. Lucatero when he wrote on his questionnaire that he owned
his house.  AB 45 n.14.

strikes to excuse African-Americans).  As argued previously, the numbers in this case – where Nibco likewise used three out of four strikes to remove Hispanics from the jury – are equally indicative.  AOB 47-49.

In this respect, Nibco's claim that pretext is dispelled by its decision not to strike Hispanic jurors David Nuñez and Lionel Dias[37] is less than convincing, particularly in view of the strategic reasons it may have had for leaving them on the jury.  *See, e.g.*, *Miller-El*, 545 U.S. at 250 ("[I]f the prosecutors were going to accept any black juror to obscure the otherwise consistent pattern to opposition of seating one, the time to do so was getting late.").  Nibco's attempt to limit the cited proposition from *Turner v. Marshall*, 121 F.3d 1248 (9th Cir. 1997) – that the presence of minority jurors does not inoculate the striking party from *Batson* liability – to the

---

[37]  Though Nibco criticizes appellants for noting that Mr. Dias may not have been Hispanic, it does not explain why that question is unimportant.  Indeed, apart from characterizing this issue as inviting racial "genotyping," AB 13, 49, a term whose dictionary definition makes its use here unintelligible, what is notable about Nibco's response on this matter is its stunning failure to take *Batson*'s racial inquiry seriously.  Nibco's odd statement that *Batson*'s purpose is to eradicate "embarrassment and isolation," AB 49, only underscores this.

It cannot be disputed that whether a prospective juror is African-American, Hispanic, Asian, or Caucasian is a critical part of the *Batson* analysis.  For *Batson* purposes, race does matter.  Nibco's retort that appellants only quibble over Mr. Dias's 'authenticity,' AB 48, a word choice that seems to equate racial distinctions with differences between types of food, also suggests Nibco believes that one's Portuguese heritage is somehow "close enough" to being Hispanic to "pass" as such.

facts of that case, as before, points to distinctions without any differences, since the proposition at issue is well-established in *Batson*'s jurisprudence. *See, e.g.*, *Miller-El,* 545 U.S. at 250.

Lastly, Nibco cannot dispute that had it used its fifth peremptory strike, Hispanic prospective juror April Garza would have been seated on the jury. *See* AOB 47. Its effort to show that a hypothetical strike of prospective juror Patricia Stockton might yield a different outcome is curious since, as the second juror left in the box with only one seat left to fill, she would not have been seated in any case, and there would not even have been an opportunity to strike her.

### D.    This Court Is Not Barred From Considering Appellants' Arguments and Appendix.

Finally, Nibco again contends that this Court is barred from considering evidence that was allegedly not "before [it] at the time that the *Batson* objection was raised." AB 15 (citations omitted). This Circuit, however, has expressly approved of the consideration, on *Batson* appeals, of evidence that was not available below. *See, e.g.*, *Williams v. Woodford*, 396 F.3d 1059, 1065 n.3 (9th Cir. 2005).[38]

---

[38]    *Williams*, 396 F.3d at 1065 n.3 ("The fact that this pattern-or-practice evidence did not become available until after Williams' trial does not make it less probative of the prosecutor's discriminatory intent. The <u>*Batson*</u> inquiry is whether there was racial discrimination in the selection of Williams' jury.

For brevity's sake, appellants will not reprise the arguments on this matter in their opposition to Nibco's motion, other than to point out that the materials in the Appendix are proper subjects for judicial notice and, even if considered to be hearsay, are covered by Federal Rule of Evidence 807.[39]

---

This question, like so many other claims of error that federal courts consider on habeas, concerns whether error occurred, not *when* evidence of the error became available. The panel opinion cited no case and offered no rationale to support a conclusion that the timing of discovery of relevant evidence should matter in proving a *Batson* claim. A pattern or practice of discrimination in jury selection is no less pernicious – and evidence of that pattern or practice is no less probative to the issue of prosecutorial intent – whether the pattern or practice was known at the time of the trial, or discovered subsequently.") (emphasis in original).

[39]  Nibco's citations to assertedly contrary authority are unavailing. In *United States v. Thompson*, 827 F.2d 1254 (9th Cir. 1987), the district court permitted the government to justify its strikes without defense counsel present; defense counsel only learned of the stated reasons for the strikes after the defendant had been convicted. *Id*. at 1256. Certainly, *Thompson* was not a "sandbagging" case, nor it did not purport to set out any requirements as to precisely what type of evidence a strike opponent must adduce, or when.

Nibco also cites to *United States v. Contreras-Contreras*, 83 F.3d 1103 (9th Cir. 1996), to suggest that appellants have somehow forfeited their opportunity to fully argue their *Batson* claims on this appeal. In *Contreras-Contreras*, however, defense counsel never made a *Batson* objection; as such, the issue was "whether a defendant's silence can preserve an objection for appeal." *Id*. at 1104. In that case, the court proceeded through step three of the *Batson* analysis notwithstanding that "silence." *Id*. at 1104-07. By comparison, in the case at bar, appellants immediately made their *Batson* objections and strenuously argued them before the district court.

Finally, Nibco's citation to *United States v. Arce*, 997 F.2d 1123 (5th Cir. 1993), for the proposition that each and every possible ground for a *Batson* objection must be stated at the time the motion is made or be deemed waived, is unilluminating given this Circuit's far different approach in

As noted, this Circuit is clear that comparative juror analysis "is required *even when it was not requested or attempted in the* [trial] *court*." *Kesser*, 465 F.3d at 361 (citing *Miller-El*) (emphasis added). If that mandate is to have any meaning, it follows that reviewing courts are permitted and, indeed, obliged to address concerns arising from that comparative analysis that were not raised in the trial court in the first instance. None of the cases Nibco cites in this regard supports an opposite conclusion. Accordingly, Nibco's claim that this Court is prohibited from considering such matters on this appeal should be rejected.[40]

---

*Contreras-Contreras*. The sole authority cited by *Arce*, *United States v. Rudas*, 905 F.2d 38 (2d Cir. 1990), stands the far more limited proposition that "defense counsel must expressly indicate an intention to pursue the *Batson* claim." *Id.* at 41. Here, appellants vigorously disputed Nibco's stated reasons for its strikes at sidebar, and in no way suggested that they had abandoned their objections.

[40] Appellants note that Nibco does not appear constrained by its own arguments on this score, as it now offers up reasons for its strikes that it did not advance below. *See, e.g*., AB 19 ("When asked if [prospective juror Garcia] could "put aside [her] mother's experience" in this discrimination case, she did not say "*yes*.") (emphasis in original); AB 20 ("In all, [Garcia] checked *11 boxes* on Question 45's grid – far more than any other juror.") (emphasis in original); AB 42 ("[T]here is no dispute that [prospective juror Lucatero's] mother was unemployed as well"). On this *see Miller-El*, 545 U.S. at 252 ("[W]hen illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis.").

## III.  CONCLUSION

The district court clearly erred when it denied appellants' *Batson*

motion.[41]  Accordingly, this Court should vacate the judgment below and

remand this matter for a new trial.


Dated:  July 30, 2009           Respectfully submitted,

                                Christopher Ho
                                Carole Vigne
                                The LEGAL AID SOCIETY –
                                   EMPLOYMENT LAW CENTER

                                William J. Smith
                                Shelley G. Bryant
                                W.J. SMITH & ASSOCIATES


                     By:    /s/Christopher Ho_____
                                   CHRISTOPHER HO

                                Attorneys for Appellants
                                MARTHA RIVERA, et al.

---

[41] "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 622 (1993), quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395 (1948).

## CERTIFICATE OF COMPLIANCE

I certify that the number of words in this brief, exclusive of the table of contents, the table of authorities, and this certificate, is <u>9,774</u>, as calculated by the word processing system used to prepare this brief.

<u>/s/ Christopher Ho</u>
CHRISTOPHER HO